**EDUCATION LAW CENTER**
By: Ruth Deale Lowenkron, Esq.
    Jenna L. Statfeld, Esq.
60 Park Place, Suite 300
Newark, New Jersey 07040
(973) 624-1815, ex. 21
Fax: (973) 624-7339
Email: rlowenkron@edlawcenter.org
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| D.C. on behalf of T.C. and D.C., <br><br>                PLAINTIFFS, <br> v. <br><br> MOUNT OLIVE TOWNSHIP BOARD <br> OF EDUCATION, <br><br>                DEFENDANT. | **COMPLAINT** |

.

       Plaintiffs D.C. and D.C. on behalf of her child T.C. (collectively, "D.C."), residing at 76 Clinton Avenue, Budd Lake, New Jersey 07828, by their attorneys the Education Law Center, for their complaint against Defendant, the Mount Olive Township Board of Education ("Mt. Olive" or "the Board"), whose offices are located at 89 Route 46, Budd Lake, NJ, 07828, allege as follows:

**PARTIES**

1.     Plaintiff D.C. is the mother and legal guardian of T.C.

2.     T.C. is a nineteen year old who resided, and continues to reside, with his mother in Mt. Olive's public school district during the relevant period of the claim. During the 2011-

2012 school year, T.C. was a twelfth grade student in the Mt. Olive school district who was eligible for special education services under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA").

3.     Defendant Mount Olive Township Board of Education is the "local education agency" as defined by IDEA, 20 U.S.C. § 1401(15). For all times relevant herein, Defendant has been the agency with primary responsibility for providing T.C. with a free, appropriate public education.


## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter for the appeal of a Final Decision rendered by the New Jersey Office of Administrative Law, as well as for the recovery of attorneys' fees and costs pursuant to 20 U.S.C. § 1415(i)(2) in that claims are asserted under IDEA, (b) 29 U.S.C. § 794(a)(2) in that claims are asserted under Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("Section 504") (c) 28 U.S.C. § 1331 in that claims are asserted under the laws of the United States, and (d) 28 U.S.C. § 1343 in that claims are asserted under laws providing for the protection of civil rights.

2.     Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. §1391.


## STATUTORY AND REGULATORY SCHEME

3.     Under IDEA, a child with a disability is entitled to a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1415(a)(1)(A).

4.    A FAPE must emphasize "special education and related services designed to meet [the child's] unique needs and prepare [the child] for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1).

5.    Related services must be included in a child's FAPE as warranted, and include all "developmental, corrective and other supportive services" that are "required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A).

6.    In developing the Individualized Education Program (IEP) for a child with disabilities, the IEP Team must consider the child's strengths, the parents' concerns, the results of the most recent evaluations, and the academic, developmental and functional needs of the child. 20 U.S.C. § 1414(d)(3)(A).

7.    A child's IEP must include a "statement of measureable annual goals" that meet the child's needs. 20 U.S.C. § 1414(d)(a)(A)(i)(II).

8.    A school district must conduct a re-evaluation of each child with a disability at least once every three years, at the request of the child's teacher or parent, and as warranted. 20 U.S.C. § 1414(a)(2).

9.    A child must be evaluated "in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B).

10.

11.    When a child's behavior impedes his or her learning, or the learning of others, the school district must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. § 1414(d)(3)(B)(i).

12.     A school district must provide "written prior notice to the parents of the child" whenever the district proposes to initiate or change, or refuses to initiate or change, the educational placement of the child. 20 U.S.C. § 1414(b)(3).

13.     Within ten school days of a change in placement of a child with a disability because of a violation of a code of student conduct, "the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file" to determine if the conduct in question was a manifestation of the child's disability. 20 U.S.C. § 1414(k)(1)(E) (emphasis added).

14.     A school district must provide "as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications that are designed to address the behavior violation so that it does not recur" for a child whose disciplinary change in placement exceeds ten consecutive school days and whose behavior was determined to not be a manifestation of his or her disability. 34 CFR § 300.530(c)-(d).  The functional behavioral assessment ("FBA") must include at least one structured observation by the evaluator outside the testing session, at least one interview with the teacher(s) of the child, a review of the child's developmental and educational history, a review of interventions documented by the child's teacher, and at least one informal measure such as surveys, rating scales and self-reports. N.J.A.C. 6A: 14-3.4(f).

15.     Within five school days of any suspension, all children in New Jersey are entitled to receive educational services. N.J.A.C. 6A:16-7.2(a).

16.     When a school district changes a child's placement for more than ten consecutive school days for disciplinary reasons, and determines that the child's behavior was not a

manifestation of the child's disability, the district must continue to provide educational services to the child to ensure that the child can continue to participate in the general education curriculum, and can progress toward meeting the goals in his or her IEP. 34 CFR § 300.530(c)-(d). A school district may never deprive a child with a disability of educational services for more than a total of ten school days in a school year. 34 C.F.R. § 300.530(b)(2).

17.     Beginning when the child with a disability is 14 years old, or younger if appropriate, the district must include a Transition Plan and Transition Services in the child's IEP, which includes a statement of the student's strengths, interests and preferences, and a course of studies and related strategies consistent with those strengths, interests and preferences that are "intended to assist the student in developing or attaining postsecondary goals related to training, education, employment and, if appropriate, independent living." N.J.A.C. 6A:14-3.7(e)(11). The IEP should also include, as appropriate, "a description of the need for consultation from other agencies that provide services for individuals with disabilities including, but not limited to, the Division of Vocational Rehabilitation Services in the Department of Labor," and "a statement of any needed interagency linkages and responsibilities." *Id.* Beginning when the child with a disability is 16 years old, or younger if appropriate, the district must include in the child's IEP a statement of "appropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training, education, employment and, if appropriate, independent living and the transition services including a course of study needed to assist the child in reaching those goals." N.J.A.C. 6A:14-3.7(e)(12).

18.     A child's transition plan must be updated annually. N.J.A.C. 6A:14-3.7(e)(11).

19.     When a due process hearing is held pursuant to the provisions of IDEA regarding the provision of a FAPE to a child with a disability, "the school district shall have the burden of proof and the burden of production." N.J.S.A. 18A:46-1.1

## FACTS

20.     T.C. attended school in the Mt. Olive Township school district from 2007 through 2012.

21.     T.C. was determined eligible for special education and related services, based on a classification of "Autistic." In addition to being diagnosed with Autism, T.C. has anxiety, a moderate to severe language disorder and a Sensory Processing Disorder with Sensory Over-Responsivity sub-type (SOR). T.C. also has an extreme sensitivity to loud noises, babies crying and crowded spaces. When he faces situations that he perceives as threatening or overwhelming, he reacts with aggression or elopement. As Dr. Daniel DaSilva, a pediatric neuropsychologist hired by Mt. Olive to evaluate T.C., testified, T.C. has a "longstanding" history of anxiety and adverse reactions to children and loud noises.

22.     Dr. Chaye Lamm Warburg, a private occupational therapist who evaluated T.C. and who testified at T.C.'s due process hearing as an expert in Sensory Integration and Occupational Therapy, testified that she personally observed T.C.'s sound sensitivity, and response to what he perceived as noxious stimuli, during her evaluation. When a child entered the room that T.C. and Dr. Lamm Warburg sat in, T.C. "became distressed, evidenced by an increased pace of pacing, the look of his face was rapid, more pressured kind of speech." T.C. asked if they could switch rooms, which they did, but when he saw a twelve year old girl sitting in the new room, T.C. entered hesitantly and then "ducked into a closet."

23.     T.C. was deemed to require a legal guardian at his eighteenth birthday, based on a psychological evaluation that found that T.C. lacks the capacity to make decisions for himself. His mother, D.C., was appointed his full legal guardian.

24.     Mt. Olive hired Dr. Daniel DaSilva, a pediatric neuropsychologist, to conduct a neuropsychological evaluation of T.C. on April 29, 2011.Dr. DaSilva, who also testified as the parent's expert at trial, found, among other things, that T.C.'s impairments in social pragmatics and his cognitive deficits significantly impact his daily functioning. Dr. DaSilva recommended, among other things, that T.C. receive multi-modal teaching modalities geared towards his strengths and weaknesses, instructors who are familiar with the needs of teenagers with autism, a certified teacher to serve as T.C.''s aide, a highly structured learning environment with controls for noise, a therapeutic environment to address socialization, as well as pragmatic, continued speech/language therapy, social skills training, and life skills training to prepare for post-high school transitioning.

25.     In prior years, Mt. Olive provided T.C. with the following services and accommodations:  an individual aide, speech/language therapy and Applied Behavioral Analysis ("ABA") therapy aimed at improving T.C.'s language and communication fluency, age-appropriate socialization behaviors, independent work skills, conversational skills and interaction with peers.

26.     Although T.C.'s prior IEPs provided for related services, Mt. Olive continuously failed to update T.C.'s Goals and Objectives so that they were both individualized for his needs and updated based on his progress. Mt. Olive failed to properly track T.C.'s progress in his areas of need, and further failed to conduct re-evaluations in all suspected areas of disabilities every three years, even upon D.C.'s request for same.

27. At least annually since 2007, if not more often, D.C. expressed her concerns about T.C.'s occupational, sensory integration, behavioral, educational, social and life skills needs that were not being met in Mt. Olive.

28. Notwithstanding the severity of his disability, and notwithstanding the services the district had provided in years past, during the 2011-2012 school year, Mt. Olive placed T.C. in general education classes without any supports, except for Study Skills and English where he received minimal in-class support.

**T.C.'s Occupational Therapy and Sensory Integration Needs**

29. T.C.'s occupational therapy and sensory integration needs have been clearly documented since T.C. was enrolled in the district in 2007. T.C.'s need for frequent movement breaks and his significant sensitivities to certain stimuli, loud noises and young children are described in his IEP for each school year, in all district evaluations, and in his mother's numerous letters to Mt. Olive.

30. In February 2007, during his first year in the district, one of the goals developed for T.C. in his IEP was that he "be able to tolerate unpleasant sounds in a socially acceptable manner, and not shout, yell or otherwise engage in negative behavior when presented with uncomfortable sound to his ears, by end of June 2007."

31. In January 2008, Mt. Olive introduced a "Behavior Management Plan" to target T.C.'s behavior of being "[u]pset when observing babies/children as defined by covering of ears, squinting of eyes, moaning, and inability to continue with tasks." T.C., himself, noted in his handwritten IEP goals for that year: "[n]ot being afraid of loud noises."

32.     In addition to the documentation of T.C.'s needs, Mt. Olive also noted incidents that were caused by T.C.'s sound sensitivities and sensory integration deficits. For example, in July 2010, T.C. was placed in an Extended School Year ("ESY") program where, according to his IEP, T.C. would serve as a teacher's assistant in a class with elementary school-aged students. T.C. was actually placed as a teacher's assistant in an even younger class (preschool) that summer. Despite placing T.C. in an environment with known triggers -- children and unexpected noises – Mt. Olive provided absolutely no supports for T.C.

33.     According to Dr. Chaye Lamm Warburg, the private occupational therapist who evaluated T.C. and who testified at T.C.'s due process hearing as an expert in Sensory Integration and Occupational Therapy, T.C. found this environment very upsetting. She further testified that this placement was not appropriate for T.C. because it contained known triggers, and that the noise and unpredictability inherent in a preschool classroom would not provide an environment where T.C. would be able to thrive.

34.     Not surprisingly, after three days of the program, T.C. began to exhibit anxiety and frustration, culminating in his running away from the school and refusing to return. D.C. spent the entire 2010-2011 school year trying to work with Mt. Olive to obtain compensatory education for the time T.C. lost during the summer, but she was unsuccessful.

35.     D.C. requested a Complaint Investigation by the New Jersey Department of Education ("NJDOE") on July 8, 2011 regarding the failed ESY program. The NJDOE Complaint Investigation Report concluded that Mt. Olive not only failed to "implement the ESY program for the student as stated in the IEP," but furthermore, "upon realization that the student was experiencing difficulties, Mt. Olive should have reconvened a meeting of the IEP team to

address the issue," but did not do so. NJDOE found that Mt. Olive was "noncompliant" and ordered corrective action.

36.     The Corrective Action Plan required the district to: (1) distribute a memorandum by December 2, 2011 to all Child Study Team ("CST") members, teachers and district administrators which addresses the requirement to strictly implement an IEP as written, (2) distribute a memorandum by December 2, 2011 to all CST members and district administrators which states that if the district is unable to implement an IEP as written, a meeting of the IEP Team should be immediately convened to address the issue, (3) reconvene a meeting of T.C.'s IEP Team by November 30, 2011 to determine whether T.C.'s absence from the ESY program caused regression, and (4) provide compensatory educational services to T.C. if determined necessary, by May 1, 2012.

37.     Mt. Olive failed to comply with the corrective action plan. Mt. Olive never distributed the two memoranda. T.C.'s IEP Team failed to meet by November 30, 2011 to discuss whether T.C. had regressed after missing an entire summer of services. In fact, the IEP Team did not meet to discuss T.C.'s need for compensatory education until February 28, 2012, at which time Mt. Olive offered a mere 10 hours of ABA therapy and 10 hours of instruction in math to T.C. to make up for an entire summer of missed services, and then never even provided those minimal services.

38.     Mt. Olive was also aware of numerous incidents that transpired between T.C. and another student with whom he had difficulty as a result of his sensory integration deficits. The other student, who also is classified for special education, screams loudly and often behaves aggressively towards T.C., exacerbating his sensitivities and anxieties. T.C. often encountered the particular student near his locker, which was right next to the mailroom where the particular

student worked. D.C. and T.C. made multiple requests for T.C.'s locker to be changed so as not to be near the particular student, but the district failed to grant this simple request. On at least three occasions, T.C. reacted to the other student's screaming by running away from the school building, chasing the student, or striking the student.

39.     Despite T.C.'s significant deficits, he last received an occupational therapy ("OT") evaluation more than five years ago, in 2007, at which time Mt. Olive's occupational therapist noted that T.C.'s ability to modulate sensory information "requires further investigation." There was no such "further investigation," and while T.C. received OT in 2007 through 2011, his OT goals and objectives were vague and never updated.

40.     T.C. never received a sensory assessment, nor did he receive any supports for his sound sensitivities and general sensory needs.

41.     The only OT program provided to T.C. was the "Alert Program," a program to help a child regulate his or her behaviors using arousal level identification and modification. For example, a child learns to identify his or her "engine speed" (too high, too low, etc.) and then learns specific techniques to address and stabilize the engine speed.

42.     According to Dr. Lamm Warburg, an Alert Program should be regularly updated for a student depending on progress. T.C.'s Alert Program was only included in two of his IEPs, and was never updated or changed.   Dr. Lamm Warburg testified that T.C.'s Alert Program did not address his most serious sensitivities and anxieties regarding loud noises.  Dr. Lamm Warburg testified that the Alert Program was the only thing in T.C.'s sensory "diet" -- the collection of activities a student can access to regulate his or her sensory integration needs. Dr. Lamm Warburg testified that other parts of a sensory diet should have been used to attempt to lessen the impact of sound on T.C. She provided an example of the Therapeutic Listening

Program which addresses sound sensitivity directly through the use of therapeutic music and sounds, a very effective tool in her expert experience, which she used with T.C. during her assessment of him. T.C. had never been exposed to the Therapeutic Listening Program until his visit to Dr. Lamm Warburg, and he was very reluctant to stop using it.

43.     T.C. was diagnosed with Sensory Processing Disorder with Sensory Over-Responsivity sub-type (SOR). SOR sub-type involves a child's "flight or fight" response to noxious stimuli.

44.     Dr. Lamm Warburg testified that she personally observed T.C.'s "flight" response in her office when other children came into the room, and noted that he did not have effective coping strategies to deal with what he perceived as noxious stimuli. Dr. Lamm Warburg testified that T.C. also exhibited the "flight" response when he ran away from the school and when he refused to enter the room with exercise equipment because of the presence of what he perceived to be noxious stimuli.

45.     Dr. Lamm Warburg also testified about T.C.'s "fight" response, which included his physical response to the particular student with whom he had difficulty.

46.     Dr. Lamm Warburg testified that she would not be surprised if T.C. continued to exhibit a "flight or fight" response in the future.

47.     According to his IEP, T.C. was supposed to have access to exercise equipment – donated to the school by T.C.'s mother – as a crucial part of his sensory diet.  At IEP meetings and in writing, D.C. repeatedly expressed her concern to Mt. Olive that T.C. be able to access this equipment. After a number of successful years of T.C. using the equipment in a small, quiet room, the equipment was moved to a larger, busier room that was used by other students, including the particular student with whom T.C. had difficulty. Unsurprisingly, T.C. developed

-12-

substantial anxiety when even near the room. As Dr. Lamm Warburg testified, T.C. eventually refused to go to the room at all because of the presence of the particular student. Instead of working to come up with appropriate substitutions for the movement activities, or instead of finding an alternative space for the equipment, for over one year, Mt. Olive just left T.C. without access to his exercise equipment. According to Dr. Lam Warburg's testimony, T.C. was deprived of the main part of his sensory diet and did not receive a substitution. While the district allowed T.C. to walk around the school, Dr. Lamm Warburg testified that walking around the school is not adequate to address T.C.'s needs at this time because it does not provide the same intensity of input to T.C.

48.     T.C.'s aide did not receive any specialized training in carrying out a sensory diet, even though, as Dr. Lamm Warburg testified, such training was critical to ensure the aide could appropriately work with T.C. and understand his reactions and cues.

49.     Dr. Lamm Warburg testified that T.C.'s occupational therapy goals did not address his auditory needs at all. She further testified that the OT goals were difficult to measure, as they were not defined clearly enough. Finally, she testified that there were no notations of T.C.'s progress in any of the vague OT goals.

50.     As recently as May 2010, Mt. Olive's own occupational therapist, Elizabeth Petersen, recommended that T.C. continue to receive OT for 60 minutes per week. Notwithstanding that recommendation, and notwithstanding the fact that Mt. Olive had been providing 60 minutes of OT per week to T.C. for multiple years, Mt. Olive completely stopped providing T.C. with OT in May 2011without ever having re-evaluated T.C., and without even any explanation. Furthermore, any reference to T.C.'s sensory integration needs, sound sensitivities, or history with the particular student, were fully removed from the IEP in 2011. The

IEP Team even removed statements of T.C.'s mother's concerns about T.C.'s sensory diet and therapies, which had been in every IEP until that point, and continued to be expressed in her verbal and written communications with the Team.

51. Dr. Lamm Warburg testified that she was informed by Sharon Staszak, Mt. Olive's Assistant Director of Special Services, that OT was removed from T.C.'s IEP because the parent requested it. However, when Dr. Lamm Warburg discussed the removal of OT from T.C.'s IEP with D.C., D.C. was not aware that OT had been removed from her child's IEP, definitely did not want it removed, and stated that she "didn't know that she had that kind of power."

52. According to Dr. Lamm Warburg's testimony, T.C.'s sound sensitivities and sensory integration needs were clearly driving his behaviors, and should have continued to be addressed by the most recent IEP. She further testified that T.C.'s sound sensitivities impact his day and his ability to learn in school. She testified that T.C. has not learned to cope with stimuli that he perceives to be dangerous, and that there are no supports in place to help T.C. learn to cope in school or in the real world.

53. Dr. Lamm Warburg testified that, although the district had not taught T.C. any coping strategies for the real world, he could definitely learn such strategies if he were in an environment where sensory strategies were integrated into his program. Dr. Lamm Warburg recommended that T.C. receive a comprehensive sensory integration assessment, access to supports like the treadmill and elliptical, individual and small group occupational therapy, a comprehensive sensory diet, support in developing coping mechanisms, therapeutic listening,, an analysis of T.C.'s environment to prevent noxious and unpredictable stimuli, and an updated audiometric evaluation.

**T.C.'s Behavioral Needs**

54.      Mt. Olive was aware of T.C.'s sustained sensitivity to the particular student who exacerbated his sensory needs, yet did precious little to ameliorate it. Mt. Olive was further aware of T.C.'s behaviors as a result of that student, including running away from school, chasing the other student and striking her, yet again did little to assist him. These behaviors were caused by T.C.'s sound sensitivities and inability to cope with sensory input perceived as noxious.

55.      According to Dr. Teresa Herrero-Taylor -- a behaviorist who reviewed T.C.'s records and who testified as an expert in autism, psychology, behavior, social skills, life skills, academic programming and transition planning --  T.C. exhibited a pattern of behavior that should have raised concerns for Mt. Olive. She testified that T.C.'s behaviors were all related to each other and were all triggered by auditory stimuli.

56.      Because of T.C.'s extensive behavioral problems, on January 24, 2011, D.C. made a written request to Mt. Olive for a FBA. In her letter, she stated that she was requesting an assessment of T.C.'s behaviors that "may be impeding meaningful progress for [T.C.] in the areas of both social and academic challenges." She noted that the ABA therapy that he was receiving was not provided in a timely or consistent manner, and was not adequately addressing his behavioral needs. Without even offering any explanation, Mt. Olive refused to provide the requested FBA, and refused to even determine whether such an evaluation was warranted.

57.      According to Dr. Herrero-Taylor, Mt. Olive should have conducted an FBA of T.C. She testified that, in her expert opinion, Mt. Olive should have conducted an FBA the first time that T.C. eloped from school, given the severity of his behavior and the need for police

involvement. Dr. Herrero-Taylor testified further that T.C. needed a Behavioral Intervention Plan ("BIP") with full positive behavioral supports and coping strategies.

58. At a meeting in May 2011, T.C.'s IEP was amended to include an "ABA Update" by Mt. Olive's behaviorist. The update included one goal which was "[t]o have [T.C.] walk by, without saying anything or touching anyone, when a specific student is making loud unexpected noises." The behaviorist's plan to address T.C.'s sensitivities and phobias was to continuously expose T.C. to the particular student, including forcing T.C. to engage with the specific student through activities like baking and games. As Dr. Lamm Warburg testified, this plan failed to address T.C.'s fundamental sound sensitivity. There were no behavioral assessments on which the "update" was based, nor did Mt. Olive provide any research to back up this throw-the-child-in-the-lion's-den approach. As Dr. Herrero-Taylor testified, the plan should have included calming techniques, as well as positive behavioral supports to prevent the triggering behavior. Not surprisingly, the "update," like the previous plan in 2008, failed to address T.C.'s auditory sensitivity, failed to provide any "positive behavioral supports," failed to provide any "antecedent strategies," and failed to provide any coping strategies for T.C. As Dr. Herrero-Taylor explained, antecedent strategies are those that prevent and reduce problem behavior by altering stimuli such as routines and environments and responding to appropriate and inappropriate behaviors. Positive behavioral supports are those that are proactive and that support and encourage appropriate behaviors throughout a student's day.

59. For no known or stated reason, but fortunately for T.C., in May 2011, T.C. started working with a new aide, who, unlike prior aides, was a certified teacher. T.C.'s teachers observed that T.C.'s disposition and level of effort in class improved since he started working with the new aide. The teachers noted that, with his new aide, T.C. was "more tolerant of loud

noises" and "demonstrated an ability to ignore a particular student when encountered in the hallway whereas he previously had difficulty in doing so." In the two short months when T.C. had this aide who quickly became familiar with his sensory needs, he did significantly better in school -- academically, socially and emotionally.

60.    Unfortunately, and despite D.C.'s repeated pleas for the aide to remain the same, the district, without explanation, refused to give T.C. the same aide in the 2011-2012 school year. In one letter to Mt. Olive, D.C. stated, with clear foresight, that a "change of aide now will cause a regression for him at this point and should be avoided at all costs." She further stated that having the appropriate aide working with T.C. "is one of the main reasons that [T.C.] can attend the high school in district." Nevertheless, in the 2011-2012 school year, T.C. was assigned another aide who was not a certified teacher. To make matters worse, and again for no apparent reason, T.C. was forced to work with multiple aides during the school year, none of whom were certified teachers, and most of whom did not even have experience with children with Autism.

61.    When T.C. returned to school in September 2011, his mother requested that his locker be changed from being near the particular student. T.C., himself, made the same request. Nevertheless, even this sensible and cost-free solution was ignored, and the locker remained where it was.

62.    On January 13, 2012, the particular student again approached T.C. aggressively, and T.C. again reacted with severe anxiety, without any coping mechanisms, and smacked the student. T.C. was suspended from school for one day. He returned to school thereafter, but nothing was changed in his IEP to address his needs.

63.    Dr. Herrero-Taylor testified that, given T.C.'s prior behaviors, this incident was not at all a surprise, and should have been expected.

64.     On January 23, 2012, a full ten days after the smacking incident, and with no other intervening inappropriate behaviors, D.C. received a letter from Mt. Olive, informing her that T.C. would be indefinitely suspended until he obtained a psychiatric evaluation, to be arranged and paid for by the parent. The basis for this decision, Mt. Olive claimed, was T.C.'s response to a "risk assessment" conducted by district personnel. Mt. Olive never provided a copy of the risk assessment to the parent until this action was filed. In fact, the risk assessment noted that T.C. stated, most sensibly, that he would try to avoid the other student if he saw her again. T.C.'s response on the "risk assessment" was otherwise consistent with Dr. DaSilva's testimony about T.C.'s notably impaired scores in expressive vocabulary, semantic memory retrieval and verbal fluency. Dr. DaSilva testified that T.C. has expressive communication deficits which would impact his ability to fully express his experiences, and his interactions with others.

65.     According to Dr. Herrero-Taylor, Mt. Olive did not conduct the risk assessment appropriately, as it was not comprehensive or sufficient. She testified that the evaluator did not account for T.C.'s autism, moderate to severe language disorder, or his emotional management weaknesses. Further, the district's questions did not ask questions that would actually determine whether T.C. posed a risk. Rather, as Dr. Herrero-Taylor testified, T.C.'s responses to the district questions indicate a very low risk, and more importantly, a need for interventions and supports by Mt. Olive to prevent future behavioral incidents.

66.     On February 6, 2012, the district apparently held a "manifestation determination" meeting related to the prior month's smacking incident.  Mt. Olive did not provide notice – written or otherwise – to D.C. of such a meeting. The meeting took place without T.C., his parents, or a behaviorist. As Dr. Herrero-Taylor testified, the lack of D.C.'s presence at the meeting was "quite bizarre." A summary of the meeting was sent to D.C. by mail on February

16, 2012. The determination made was that the conduct in question (1) was not caused by T.C.'s disability, (2) did not have a direct and substantial relationship to T.C.'s disability, and (3) was not the direct result of the school's failure to implement T.C.'s IEP. As a result, T.C. did not receive an FBA, a Behavioral Intervention Plan ("BIP") or any changes to his IEP.

67.     According to Dr. Herrero-Taylor's testimony, Mt. Olive's determination - that T.C.'s behavior was not a manifestation of his disability - was "highly bizarre." She testified that auditory sensitivities, tendency towards aggression and lack of control are extremely common for children with Autism. Dr. Herrero-Taylor testified that she strongly believes T.C.'s behaviors – toward the particular student, and in his responses to the risk assessment - were directly related to his disability.

68.     On March 7, 2012, D.C. filed a motion for emergency relief with the New Jersey Department of Education, Office of Special Education Programs ("OSEP"), seeking T.C.'s immediate return to school. D.C. also filed a petition for a due process hearing seeking appropriate evaluations and changes to T.C.'s IEP.

69.     D.C. was finally able to arrange for a psychiatric assessment of T.C. on March 15, 2012, which she paid for on her own, at a cost of $275. The psychiatrist stated that T.C.'s behavior towards the specific student was "based solely on his disability." The psychiatrist further stated that T.C. could return to school with the supports and modifications recommended by Dr. DaSilva, fully in place. Incredibly, although D.C. provided the requested evaluation to Mt. Olive, T.C. was still not allowed to return to school.

70.     After more than two months, on March 27, 2012, T.C. finally returned to school solely as a result of his mother's request for emergent relief and a settlement reached by counsel

in the Office of Administrative Law ("OAL"). The district, however, never reimbursed D.C. for the cost of the assessment, despite repeated requests for same.

71.     While T.C. was out of school, Mt. Olive's only offer of home instruction or related services was by instructors who had no training in autism services, and could only work with T.C. beginning at 4:30 PM, when T.C. had trouble concentrating. During the more than two months that T.C. was barred from school, he only received six sessions of academic instruction, and five speech/language therapy sessions. In addition to falling behind in academics and related services, T.C. also completely missed the spring play, for which he had hoped to be on stage crew, as in prior years. This extracurricular activity was T.C.'s favorite part of school, and the only aspect of his school day that addressed his expressed career interests of work in theater arts.

72.     Mt. Olive never provided compensatory education, or extra tutoring, to help T.C. catch up on the enormous amount of time missed.

73.     Upon returning to school, T.C. never received an FBA or any behavioral supports.

74.     On May 30, 2012, T.C. again acted out aggressively towards the particular student when she was making loud noises. The district's only response was to suspend T.C. for another day. Once again, Mt. Olive refused to provide any behavioral assessments, coping strategies, positive behavioral supports, or antecedent strategies to meet T.C.'s needs and ensure that his return to school would be successful.

75.     According to Dr. Herrero-Taylor, Mt. Olive should have provided T.C. with counseling, given his history of behavioral challenges, emotional management weaknesses and anxiety issues. Dr. Herrero-Taylor also testified about her surprise that T.C.'s IEP did not include a behavioral plan.

76.     Dr. Herrero-Taylor testified that in order to receive appropriate behavioral supports, T.C. should be placed in an out-of-district placement at least until age 21, where he can have all needs addressed, including transition planning, social skills planning, life skills training, remedial instruction in math and writing, and behavioral and emotional management. She further testified that T.C. should not graduate in June 2012 because he is not yet prepared for post-high school life.

**T.C.'s Transition Needs**

77.     On April 13 and June 20, 2011, the CST met to discuss T.C.'s IEP for the 2011-2012 school year.

78.     According to the IEP that D.C. received on July 19, 2011, T.C.'s "Statement of Transition Planning" included T.C.'s interest in attending college after graduation and the goal of living independently in his own apartment. The IEP indicated that the school social worker and/or guidance counselor would 1) conduct a career interest inventory of T.C., 2) assess T.C.'s personal strengths and interests, and 3) visit potential providers of related services.  Notably, none of these transition services were provided.

79.     The IEP further provided that 1) a pre-vocational evaluation "may be" conducted during T.C.'s senior year, 2) assistive technology would be explored, and 3) further information was needed from the N.J. Division of Vocational Rehabilitation Services ("DVRS"), the N.J. Division of Developmental Disabilities ("DDD") and the Center for Academic Support and Enrichment ("CASE") at Horizons, a program that provides support to college-able students with learning disabilities. None of these services were provided either.

80. On October 19, 2011, the Child Study Team met again to discuss T.C.'s IEP for the remainder of the 2011-2012 school year.

81. According to the October 2011 IEP, which does not include D.C.'s signature or a date on which it was sent to D.C., the "Statement of Transition Planning" again included T.C.'s interest in attending college and goal of living independently in his own apartment, and again indicated that the school social worker or guidance counselor would conduct a career interest inventory of T.C., assess his personal strengths and interests, visit potential providers of related services, that a pre-vocational evaluation "may be" conducted during T.C.'s senior year, that assistive technology would be explored, and that further information was needed from DVRS, DDD and CASE. Again, none of these services were provided.

82. During the October 2011 IEP meeting, D.C. expressed her concern that T.C. was not adequately prepared to graduate, and was not ready to transition from high school.

83. Mt. Olive repeatedly asserted that T.C. was placed on an academic track because that was what his mother wanted. However, such a position is wholly inconsistent with the clear requirements of IDEA and its implementing regulations, that a child with a disability is entitled to a FAPE, based on his or her individual needs, not based on the parents' preferences.

84. Critically, Mt. Olive never conducted a functional vocational evaluation of T.C. According to Dr. Herrero-Taylor, T.C. was in need of a functional vocational evaluation, and pursuant to IDEA, the evaluation process should have started at age 14 and continued as an ongoing process.

85. Although Mt. Olive conducted a career interest inventory of T.C. in May 2012, after D.C. brought this action, there is no documentation as to who conducted it, or what the inventory would be used for. Moreover, T.C.'s Transition Plan was not updated to include the

results of the inventory. In fact, Sharon Staszak, Mt. Olive's Assistant Director of Special Services, testified that T.C.'s career interest inventory would not be used by the district, and was intended only to provide information to T.C. According to Dr. Herrero-Taylor, conducting such an inventory during a student's senior year is unusual, and should have been done years earlier so as to adequately prepare T.C. for his transition out of high school.

86.     Even though T.C. repeatedly expressed an interest in attending college, Mt. Olive never assisted him in filling out any college applications, never provided him information about even obtaining applications, and, most critically, never took the necessary steps to determine whether college was even appropriate for T.C. As Dr. Herrero-Taylor testified, T.C.'s goals of attending college and living independently were not and are not now realistic or achievable for T.C., especially given the fact that he was deemed to require a guardian. She testified that Mt. Olive should have conducted functional vocational evaluations and provide opportunities to try out T.C.'s interests so as to determine whether his goals were achievable and appropriate. Based on the assessments and inventories, Dr. Herrero-Taylor testified, the district would be able to have a clear selection of opportunities for T.C. that were directly related to his personal strengths, interests and abilities.

87.     T.C.'s "Courses of Study" in his 2011-2012 IEP do not include any courses or programs relevant to T.C.'s goals. The only college-bound course that T.C. was enrolled in during his entire high school career was 12th grade English. Otherwise, he was enrolled in such courses as "Math in the Real World," "Study Skills" and other electives which clearly were not an appropriate course load for a student who wished to go to college.

88.     Mt. Olive's "Statement of Transition Services" for T.C. included only one activity related to his career interests, and even this one – merely to contact theater unions – was never

done by the district. The only activity that T.C. participated in that was remotely reflective of his individual interests was stage crew for Mt. Olive's high school play -- an extracurricular activity. Moreover, when T.C. was illegally and indefinitely suspended from school from January through March 2012, he missed the entire play, and was unable to participate or receive any awards like his peers. T.C.'s participation in stage crew had, until then, been one of the highlights of his school experience, and the only activity remotely relevant to post-secondary transition -- and even this was taken away from him.

89.     The identical, minimal transition plan was repeated in T.C.'s IEP year after year, never included measurable goals and objectives and was barely ever implemented.

**T.C.'s Life Skills Needs**

90.     On April 29, 2011, Mt. Olive conducted a Neuropsychological Evaluation of T.C. as part of his IEP assessment. The evaluation was conducted by Dr. DaSilva, who found, among other things, that T.C.'s social adaptation skills were comparable to those of individuals living in supervised community settings. Dr. DaSilva concluded that T.C.'s cognitive and social deficits impact his day-to-day functioning, and recommended that T.C. receive specific training in life skills.

91.     T.C.'s IEPs, however, never included life skills training or life skills classes, and the district provided no documentation about whether such programs were even considered.

92.     On December 9, 2011, T.C. received a private psychological evaluation by Dr. Herman Huber, a psychologist, who found that T.C. had limited ability to interact appropriately in a social context, was unable to do independent traveling, could not protect himself from danger, and had limited ability to make change, cook, shop, or take care of household chores. Dr.

Huber concluded that T.C. lacked the cognitive capacity to make decisions for himself or manage his affairs.

93.    T.C.'s life skills, in fact, are so compromised that he was deemed to require a legal guardian at his eighteenth birthday, and D.C. was appointed his full legal guardian.

94.    According to Dr. Herrero-Taylor, T.C.'s goal of living independently, as described in all of his IEPs, is wholly unrealistic at this point. She testified that, given T.C.'s difficulties, including police involvement when he eloped from school, his behaviors and aggression towards the particular student, his need for an individual aide, and his most recent psychological evaluation, T.C. was not yet ready to live on his own.

95.    Dr. DaSilva testified that he was shocked to learn that T.C. was expected to graduate in June 2012.  Dr. DaSilva stated that T.C.'s cognitive needs and social and adaptive behaviors all caused Dr. DaSilva great concern about T.C.'s ability to function independently outside of high school. Dr. DaSilva testified that he strongly questioned T.C.'s ability to live independently.  He emphatically testified that T.C. is not ready to go to college or to start working or otherwise live in the real world.


**T.C.'s Social Skills Needs**

96.    T.C.'s first IEP developed by Mt. Olive stated that he "will benefit from training in the area of social interaction." Some of the goals for T.C. in that IEP included: being able to tolerate sounds "in a socially acceptable manner," being able to "demonstrate more conversational and spontaneous language," and being able to "demonstrate marked improvement in body awareness, [and] understand privacy."

97.     Mt. Olive's evaluations, as well as private assessments, note T.C.'s "poor social pragmatics," including "perseverative tendencies," "fleeting eye contact" and "frequent gaze aversion."

98.     T.C.'s May 2009 IEP notes that "[p]arents want [T.C.] to get the necessary level of support as a learner and as a member of the school community, particularly in the area of social skills development." D.C.'s exact same concern is noted in T.C.'s IEPs for the next two years.

99.     According to Mt. Olive's 2011 neuropsychological evaluation, T.C.'s scores on an adaptive behavior rating scale were particularly low in the areas of social skills and adjustment, and were "commensurate with those living in supervised settings." Dr. DaSilva, the district's neuropsychologist, reported that "notable impairments in social pragmatics are evident. In addition to his cognitive variability, these deficits impact significantly on his day-to-day functioning." Based on these and other evaluation results, Dr. DaSilva advised that T.C. "will require a therapeutic environment to address socialization and pragmatics. Components should include social skills training in both group and individual settings." Dr. DaSilva testified that T.C. has ongoing weaknesses and deficits in social pragmatics and social engagement. [DD 155, 11-18]

100.    Notwithstanding all the evidence of extremely limited social skills, T.C.'s most recent IEP only included "social (pragmatic) <u>language</u> skills" as part of speech/language therapy, and then Mt. Olive did not even provide that limited training.  T.C.'s 12th grade class schedule did not include any social skills group, and Mt. Olive provided absolutely no documentation of T.C.'s participation in any skills training. Further, there is no speech/language evaluation - which would have at least evaluated T.C.'s need for "social (pragmatic)" skills - since 2007. This is

especially problematic since T.C.'s speech/language therapy was terminated in May 2010 for over one year, as documented in his October 2011 IEP, without any re-evaluation to justify full removal of such a crucial service.

101.    Mt. Olive did not provide T.C. with social skills training on an individual or group basis, nor is there any documentation to show whether such options were even considered.

**Mt. Olive's Failure to Appropriately Address T.C.'s Needs, and T.C.'s Inappropriate Educational Placement**

102.    T.C.'s cognitive scores on academic assessments are in the low and very low range. He scored only in the 3rd percentile in Broad Reading, the 3rd percentile in Reading Fluency, the 1st percentile in Broad Math, the $0.5^{th}$ percentile for Math Calculation, the 2nd percentile for Broad Written Language, and the 3rd percentile for Academic Knowledge.  T.C.'s Full Scale IQ is 79 (in the 8th percentile) which places him in the Borderline range of intellectual functioning. His mathematical computation skills were in the Deficient range, and his Word Reading score was in the 6th percentile. T.C. was, of course, exempt from passing New Jersey's High School Proficiency Assessment ("HSPA") which is taken by virtually all, if not all, New Jersey students who are college-bound.

103.    Moreover, T.C.'s cognitive scores in Math and "Academic Knowledge" dropped significantly during his first three years in Mt. Olive. From January 2007 to November 2010, T.C.'s Broad Math score dropped from the 7th percentile to the 1st percentile, and his Academic Knowledge score dropped from the 14th percentile to the 3rd percentile. According to Dr. Herrero-Taylor, T.C.'s drop in scores was both significant and highly unusual, especially given his age. Dr. Herrero-Taylor further testified that, when a student shows such substantial drops, a

school district would ordinarily change the student's program or services to provide more appropriate support.

104.     Dr. Herrero-Taylor testified that, given T.C.'s math and writing scores, he would have difficulty even composing a sentence, and this would present significant challenges for him if he went to college. She testified that, given T.C.'s aspirations to go to college, she would have expected that remedial support in math and writing would have been an integral part of his program.

105.     In January 2007, T.C. was evaluated by Mt. Olive's psychologist who stated that, given T.C.'s deficits, he would require specific individualized instruction. T.C.'s IEPs from 2007 through June 2011 note that T.C.'s parents requested specific individualized instruction by trained instructors.

106.     Mt. Olive provided no individualized or other remedial instruction to T.C. in any of his classes.

107.     In May and June 2011, Mt. Olive placed T.C. in all general education classes except for Study Skills.  While he was initially provided with minimal in-class support for English and Math, in October 2011, Mt. Olive completely removed any in-class support in Math, without any explanation.

108.     Despite T.C.'s cognitive scores, lack of adequate supports, inappropriate educational program and placement, and absence from school for two months, T.C. received all A's and B's in his general education classes. Dr. Herrero-Taylor testified that the modifications in T.C.'s IEP substantially impacted his grades. For example, she testified that T.C. was given a reduced amount of work and was only graded on the amount of work he completed. She testified that these substantial modifications are the only way to explain how he could have received such

high grades with the lack of support he was receiving in the classroom. Dr. DaSilva similarly testified that based on T.C.'s neuropsychological limitations, he would predict that T.C. would struggle substantially in a general education class without support. Dr. DaSilva further testified that, given T.C.'s math computational scores in the first percentile, he would expect that T.C. would struggle in high school level math, and he would not expect him to receive high grades in a general education math class.

109.    Mt. Olive's own neuropsychological evaluator recommended that T.C.'s instructors and aides be familiar with the particular educational and social needs of students with Autism. T.C.'s mother continuously voiced her concerns that teachers and others working with T.C. lacked appropriate training, and repeatedly requested that T.C.'s teachers receive "specialized training for delivery of instruction to children with Autism."

110.    In fact, Mt. Olive never provided T.C.'s teachers with any training whatsoever regarding children with Autism.


**Due Process Hearing**

111.    On March 7, 2012, D.C. filed a petition for due process and emergent relief, seeking T.C.'s immediate return to school, evaluations of T.C. (FBA, career interest inventory assessment, functional vocational evaluation, assistive technology evaluation, sensory integration evaluation and educational evaluation), an IEP meeting to review these evaluations and update T.C.'s IEP accordingly, a Behavior Intervention Plan (BIP) based on the FBA, a transition meeting with a DVRS representative, a new transition plan, counseling services and transportation with an aide.

112.    Subsequent to an emergent relief hearing on March 22, 2012, Mt. Olive agreed to immediately return T.C. to school.

113.    D.C. filed an amended petition for due process to challenge the notice of T.C.'s graduation on April 10, 2012. OSEP forwarded the amended petition to OAL on April 11, 2012. OAL later requested that D.C. re-submit the petition, which she did on May 9, 2012.

114.    A due process hearing was held before the Honorable Mumtaz Bari-Brown of OAL on May 29, June 4, and June 11, 2012.

115.    In a Final Order dated June 19, 2012, Judge Bari-Brown denied Plaintiffs' amended petition for due process and ordered that T.C. move forward with graduation at the end of the 2011-2012 school year.

116.    Judge Bari-Brown's Final Order includes numerous errors related to the burden of proof. For example, Judge Bari-Brown mis-allocates the burden, stating that D.C., rather than Mt. Olive, failed to prove that she did not receive notice of the apparent manifestation determination review. In another example, Judge Bari-Brown states that T.C. has been very successful in his course of study in general education, relying solely on his grades and honor roll status as presented by Mt. Olive. Judge Bari-Brown's Final Order states that she is more persuaded by the district's evidence than by the parent's evidence. The only apparently persuasive evidence of the district's to which she points are T.C.'s "pupil records," stating that "T.C.'s grades in his classes are objective indications that he was making progress." Judge Bari-Brown's analysis of T.C.'s transition plan also fails in its assessment of burden of proof. Instead of requiring Mt. Olive to meet its burden of proving it provided an appropriate transition plan for T.C., and proving what options it offered to D.C.  Judge Bari-Brown reverses the burden by stating that the parent did not provide testimony about what services she rejected. (28)

117.     Judge Bari-Brown also misconstrued D.C.'s expert witness testimony in a number of ways, including:

A.     Judge Bari-Brown stated that Dr. DaSilva "could give no specific information" about the programs he recommended for T.C., even though Dr. DaSilva's testimony includes numerous details about an appropriate program for T.C., such as "behavior modification infused throughout the day" to include a point program, therapists available throughout the day and dedicated staff for the program, and social skills training in a group and on an individual basis, with structured interventions run by a trained or certified therapist.

B.     Contrary to Judge Bari-Brown's finding, Dr. DaSilva did not concede that his recommendations were inconsistent. Rather, Dr. DaSilva clearly testified that he had made an initial recommendation, and then, upon finding out that Mt. Olive had not implemented his initial recommendations, he updated his recommendations accordingly.

C.     Judge Bari-Brown incorrectly characterizes Dr. Lamm Warburg's position relative to that of the district's occupational therapist, Ms. Petersen. Dr. Lamm Warburg did not just disagree with Ms. Petersen about the types of methods used, but rather made many more recommendations and provided crucial critiques. First and foremost, while Ms. Petersen testified that T.C. did not require any OT, Dr. Lamm Warburg testified that T.C. needs OT twice per week, in addition to a number of other important supports and services. Second, Dr. Lamm Warburg emphatically criticized and disagreed with Mt. Olive's position regarding T.C.'s sensory diet, stating that "[n]otably there was no sensory diet in his records, except for the undated and unsigned document titled "'[T.C.] Alert Program.'" Third, Dr. Lamm Warburg also noted that the treadmill and elliptical

machines donated by D.C. were "cornerstones of his sensory diet," but "this year, [T.C.] cannot access them because they have been placed on the lower level of the school which he tacitly avoids because that is where the student who frightens him is in class. Thus, in, effect, [T.C.] is not receiving the supports he [is] entitled to in the IEP." Fourth, Dr. Lamm Warburg stated that T.C.'s OT Goals and Report Card for 2010-2011 "did not include decreasing auditory defensiveness as a goal, despite the impact of sound sensitivity on [T.C.]'s performance. There was no mention of specific occupational therapy techniques in that document. Additionally, it did not contain an assessment of [T.C.]'s progress over the course of the year." Dr. Lamm Warburg further criticized Mt. Olive's failure to provide an OT evaluation, failure to assess T.C.'s current sensory processing capacities, inappropriate administration of its sensory profile for T.C., failure to include "clinical observations, consultation with classroom teachers, and direct observation in classrooms, hallways and co-curricular settings" in its sensory profile of T.C., and failure to provide the services and supports to which T.C. was entitled under his IEP for coping and reducing anxiety. Finally, Dr. Lamm Warburg's clear condemnation of Mt. Olive's work, and disagreement with Ms. Petersen's position, can be found in the following words from her report, also reflected in her testimony:

> Based on [T.C.]'s history, sensory hypersensitivity and low registration are long-standing problems which should have been addressed by a comprehensive sensory evaluation followed by a sensory diet developed in occupational therapy and monitored by the occupational therapist for effectiveness, upgrading it as new challenges arose or sensory status changed. The Alert Program which may have been an effective tool should not have been rendered moot by the unavailability of effective tools that [T.C.] learned to rely on. Accommodations should have been made to immediately move [T.C.]'s locker away from known triggers, such as screaming and the sight of the source of the unpredictable noise, and an ESY placement in an environment replete with the known trigger, noise and screaming, should not have been considered.

118.     Judge Bari-Brown's "Discussion" section ignores, or dismisses altogether, all three expert witnesses brought by D.C. without adequate explanation, and despite their lengthy testimony and expert reports and their stellar credentials.

A.     Notwithstanding Dr. Lamm Warburg's acceptance as an expert in Sensory Integration and Occupational Therapy, and notwithstanding her thorough expert report and testimony, Judge Bari-Brown's only discussion of Dr. Lamm Warburg's expert opinions was to incorrectly paint Dr. Lamm Warburg as in agreement, overall, with the district's occupational therapist.

B.     Dr. Herrero-Taylor was accepted as an expert in autism, psychology, behavior, social skills, life skills, academic programming and transition planning. She testified at length about her review of T.C.'s educational records, and about her decision not to observe him because she was able to form conclusions solely based on the intensity of the troubling information she had reviewed. She testified about T.C.'s needs and the district's procedural and substantive violations of T.C.'s educational rights. Nevertheless, Judge Bari-Brown inexplicably tosses out all of Dr. Herrero-Taylor's expertise and experience, by simply stating that, because she had not reviewed T.C.'s "work product," none of her conclusions have any basis.     Dr. DaSilva was the district-hired neuropsychologist whose evaluation was incorporated into T.C.'s IEP, and who testified on behalf of D.C. Despite the fact that Dr. DaSilva conducted a thorough neuropsychological evaluation for Mt. Olive, and the fact that it was admitted into evidence, and the fact that Dr. DaSilva testified at length about his findings and recommendations regarding T.C.'s educational needs, Judge Bari-Brown did not even discuss the neuropsychological evaluation. Judge Bari-Brown only considered Dr. DaSilva's letter from one year later. Even though Dr.

DaSilva was the only neuropsychologist used by Mt. Olive, and even though he was a crucial witness who had evaluated T.C., Judge Bari-Brown inexplicably only used one sentence to dismiss his report, letter and testimony.

119.    Judge Bari-Brown inconsistently summarized Mt. Olive's position about T.C.'s needs. Judge Bari-Brown described Ms. Staszak's testimony about T.C.'s "moderate to severe language disorder and weaknesses in receptive and expressive language," T.C.'s functioning within the borderline range of development in relation to children his age, concerns about T.C.'s "ongoing needs in social/daily living skills," T.C.'s "phobias and anxiety dealing with children, crying babies, and being in large crowds and public places," T.C.'s assault on one student on three occasions, and the fact that T.C. exhibited "difficulty in attending school." (5) Inexplicably, however, the Judge also accepted Mt. Olive's assertion that T.C. has demonstrated self-sufficiency skills and can self-monitor his behaviors.

120.    Judge Bari-Brown incompletely describes T.C.'s discontinued participation in the Extended School Year program in 2011. Rather than explain why T.C. had to stop going – because Mt. Olive failed to provide the setting described in his IEP, placing him instead in an environment with known triggers and no supports – Judge Bari-Brown merely states that D.C. "decided to discontinue the summer program."

121.    Judge Bari-Brown incompletely describes the removal of OT from T.C.'s IEP, only providing Mt. Olive's testimony and excluding Dr. Lamm Warburg's testimony that D.C. did not know OT was removed from the IEP, and that there were no notes at all about why OT was removed from T.C.'s IEP.

122.    Judge Bari-Brown makes a number of conclusions in her Final Order without providing any bases for same. For example, Judge Bari-Brown states: "I am also persuaded by

the credible evidence that T.C.'s transition plan was properly developed by the CST and the parent." However, she does not explain any of the "credible evidence" to which she refers. As another example, in discussing the appropriateness of Mt. Olive's transition planning for T.C., Judge Bari-Brown merely lists the general requirements for a transition plan, but does not include the fact that T.C.'s transition plan did not conform with those requirements –it was not updated annually, it did not include a functional vocational evaluation or technical consultation from DVRS and other agencies, it did not provide interagency linkages, and did not ensure the acquisition of daily living skills. The only justification that Judge Bari-Brown provides for the appropriateness of T.C.'s transition plan is that D.C. actively participated in all IEP meetings.

123.    Judge Bari-Brown stated that Mt. Olive "offered other programs containing life-skills courses" to D.C., but they were rejected.  However, Mt. Olive did not produce any evidence to support such a statement.

124.    Judge Bari-Brown's Final Order continuously refers to the fact that T.C. was placed on an academic track with the goal of going to college. However, at the end of her Final Order, Judge Bari-Brown clearly questions the appropriateness of such educational programming for T.C. by stating that T.C. "might not have attained college entry at this time," and that he is "ready to enter vocational training to improve daily living skills." Judge Bari-Brown clearly concluded that after all of his years in Mt. Olive, and after all of Mt. Olive's push for him to be on a college track, T.C. is, at best, ready to start working on daily living skills. While it appears clear that Judge Bari-Brown recognizes Mt. Olive's failure to help T.C. meet his goal of attending college, failure to properly assess whether such a goal was appropriate in the first place, and failure to provide T.C. with the daily living skills he needed to graduate from high school, she then inexplicably finds that Mt. Olive provided T.C. with a FAPE.

125.     Judge Bari-Brown's Final Order also contains numerous incorrect findings of fact, including:

A.     The meeting on May 12, 2010 to discuss T.C.'s re-evaluations did not include Mt. Olive's occupational therapist.

B.     Mt. Olive did not address T.C.'s behaviors through a "manifestation meeting" which includes parents, as T.C.'s parent was not present and T.C.'s behaviors were not addressed. The only result of the "manifestation meeting" was T.C.'s indefinite suspension from school.

C.     Mt. Olive did not address T.C.'s behaviors through counseling, as  T.C.'s most recent IEPs do not even include counseling.

D.     Elizabeth Petersen, Mt. Olive's occupational therapist, did not meet T.C. when he entered the district in 2007.

E.     T.C. was referred to Dr. Chaye Lamm Warburg in May 2012, not May 2010.

F.     Dr. Herrero-Taylor's position was described erroneously by Judge Bari-Brown as having "provided consulting services to the Monroe School District," when she, in fact, is currently the Monroe School District's Social Skills Specialist, Behavioral Consultant and School Psychologist.

G.     Dr. Herrero Taylor testified that the Child Study Team should have conducted a Functional *Vocational* Evaluation – not a Behavioral Evaluation. Dr. DaSilva's neuropsychological evaluation of T.C. in December 2010-January 2011 was not a re-evaluation. In fact, it was the first, and only, such evaluation conducted for Mt. Olive.

H.     Dr. DaSilva did, in fact, review T.C.'s student records – specifically, T.C.'s IEP.

I.    D.C. filed an amended petition for due process to challenge the notice of T.C.'s graduation on April 10, 2012, not May 9, 2012.    D.C., in fact, voiced objections to T.C.'s graduating" in 2012 (Final Order 22) as is made clear in T.C.'s most recent IEP which states: "Parent is concerned that [T.C.] is not adequately prepared to transition from high school into postsecondary opportunities."

J.    Ms. Petersen did not provide consultative services to T.C. during his senior year of high school.

## CAUSES OF ACTION

126.    Petitioners repeat and re-allege the allegations contained in each of the forgoing paragraphs above as though fully set forth herein.

127.    Defendant, Mt. Olive, has violated T.C.'s rights under IDEA and its implementing regulations by:

A.    denying T.C. a FAPE, in violation of 20 U.S.C. § 1415(a)(1)(A);

B.    failing to provide T.C. with special education and related services to meet his unique needs and prepare him for further education, employment, and independent living, in violation of 20 U.S.C. § 1400(d)(1);

C.    depriving T.C. of the related services that he needed to benefit from special education, in violation of 20 U.S.C. § 1401(26)(A);

D.    failing to consider, in developing T.C.'s IEP, T.C.'s strengths, D.C.'s concerns, the results of T.C.'s evaluations, and T.C.'s academic, developmental and functional needs, in violation of 20 U.S.C. § 1414(d)(3)(A);

E.      failing to provide T.C. with an IEP that included a statement of measureable annual goals that would meet his needs, in violation of 20 U.S.C. § 1414(d)(a)(A)(i)(II);

F.      failing to conduct re-evaluations of T.C. at least once every three years, at the request of his parent, or as warranted, in violation of 20 U.S.C. § 1414(a)(2);

G.      failing to evaluate T.C. in all areas of suspected disability, in violation of 20 U.S.C. § 1414(b)(3)(B);

H.      failing to consider the use of positive behavioral interventions and supports to address T.C.'s behaviors, even though his behaviors impeded his learning and the learning of others, in violation of  20 U.S.C. § 1414(d)(3)(B)(i);

I.      failing to provide D.C. with prior written notice before it initiated a change in T.C.'s educational placement, in violation of 20 U.S.C. § 1414(b)(3).;

J.      failing to meet with the parent and other relevant members of the IEP Team within ten days of T.C.'s change in placement to review all relevant information in his file to determine if his conduct was a manifestation of his disability, in violation of 20 U.S.C. § 1414(k)(1)(E);

K.      failing to provide a complete functional behavioral assessment and behavioral intervention services and modifications to address T.C.'s behavior violation so that it did not recur, in violation of 34 CFR § 300.530(c)-(d) and N.J.A.C. 6A: 14-3.4(f).

L.      failing to provide T.C. with educational services within five school days of his suspension from school, in violation of N.J.A.C. 6A:16-7.2(a);

M.      depriving T.C. of educational services for more than a total of ten school days in a school year, in violation of 34 CFR § 300.530(b)-(d).

N.      failing to include in T.C.'s IEP a statement of "appropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training,

education, employment and, if appropriate, independent living and the transition services

including a course of study needed to assist the child in reaching those goals," in violation of

N.J.A.C. 6A:14-3.7(e)(12);

O.      failing to annually update T.C.'s transition plan, in violation of N.J.A.C. 6A:14-

3.7(e)(11); and by

P.      failing to meet its burden of proof and burden of production in the due process

hearing, as required by N.J.S.A. 18A:46-1.1. *See also R.S. v. Montgomery Township Bd.*

*of Educ.*, 2012 WL 2119148, 6-7 (D.N.J. June 11, 2012), citing *Ojai Unified Sch. Dist.,* 4

F.3d 1467, 1476 (9th Cir.1993) ("To the extent the ALJ credited the District witnesses

because of their involvement in the proposed IEP, the Court notes that if such reasoning

was the main basis for according greater weight to the testimony of district personnel,

then few students would ever be able to prevail against a school district. Furthermore, as

one Court has noted, if the views of school personnel regarding an appropriate

educational placement for a disabled child were conclusive, then administrative hearings

conducted by an impartial decisionmaker would be unnecessary.")

## **RELIEF**

WHEREFORE Plaintiffs request that this Court:

A.      assume jurisdiction over this matter;

B.      reverse the order from the Office of Administrative Law, and order that T.C.

remain eligible for special education and related services in Mount Olive Township;

C.      order that Defendant remain responsible for providing T.C. a free appropriate

public education at least through age 21;

D.      order that T.C. be placed by Defendant in a therapeutic, out-of-district school that

has experience with children with Autism;

E.      order that Defendant provide T.C. with an independent, comprehensive sensory

integration assessment, audiometric evaluation, functional behavioral assessment,

educational evaluation and functional vocational evaluation;

F.      order that Defendant hold a transition planning meeting with representatives from

DVRS and DDD to update T.C.'s transition plan and activities;

G.      order that Defendant provide reimbursement to Plaintiffs for the cost of the

district-mandated psychiatric evaluation;

H.      order that T.C. receive compensatory educational services for the months he was

illegally removed from school and for the years he was deprived of appropriate services;

I.      order that Defendant pay Plaintiffs' attorney's fees and costs; and

J.      grant such other relief as this Court deems appropriate.


Dated: September 6, 2012

                                        Respectfully submitted,

                                        Education Law Center
                                        60 Park Place, Suite 300
                                        Newark, NJ 07102
                                        973-624-1815, ex. 25

                                        By:     s/ Ruth Deale Lowenkron
                                                Ruth Deale Lowenkron
                                                Jenna L. Statfeld

                                        Attorney for Plaintiffs

## <u>CERTIFICATION AS TO LOCAL CIVIL RULE 11.2</u>

Plaintiff, by her attorney, hereby certifies that this matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.


Dated: September 6, 2012


                                          Education Law Center
                                          By: <u>   s/ Ruth Deale Lowenkron</u>
                                                  Ruth Deale Lowenkron

                                          <u>Attorney for Plaintiffs</u>