Return Date: June 17, 2013

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

D.C. o/b/o T.C. and D.C.,

               Plaintiffs,

      v.

MOUNT OLIVE TOWNSHIP
BOARD OF EDUCATION,
               Defendant.

**Oral Argument Requested**

Civil Action No.: 2:12-cv-05592-KSH-PS

---

## BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
Jenna Statfeld Harris, Esq.
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3879
jharris@paulweiss.com

EDUCATION LAW CENTER
Ruth Deale Lowenkron, Esq.
60 Park Place, Suite 300
Newark, N.J. 07102
(973) 624-1815, ext. 21.
rlowenkron@edlawcenter.org

*Attorneys for Plaintiffs D.C. o/b/o T.C. and D.C.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ......................................................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................1

ARGUMENT..................................................................................................7

A.    Standard of Review ...............................................................................7

B.    Mt. Olive Violated T.C.'s Right to a Free Appropriate Public
      Education...............................................................................................9

    1.    Mt. Olive Failed to Appropriately Evaluate T.C. in all
            Areas of his Disability and Thereby Impeded T.C.'s
            Ability to Receive Meaningful Educational Benefits.............. 11

       (a)    Mt. Olive Failed to Conduct Initial Evaluations of
                  T.C. in all Areas of Suspected Disability ....................... 12

       (b)    Mt. Olive Failed to Conduct Re-Evaluations of T.C.
                  in all Areas of Disability................................................. 13

    2.    Mt. Olive Failed to Design and Implement an IEP Based
            on T.C.'s Unique Needs That Was Reasonably Calculated
            to Enable T.C. to Receive Meaningful Educational
            Benefits ..................................................................................... 15

       (a)    Mt. Olive Failed to Provide an Educational
                  Placement and Program Based on T.C.'s Unique
                  Needs .............................................................................. 15

       (b)    Mt. Olive Failed to Provide Related Services that
                  T.C. Required to Access his Special Education ............ 17

          (i)    Mt. Olive Failed to Provide an Appropriate
                        Sensory Diet ......................................................... 18

          (ii)   Mt. Olive Failed to Provide Appropriate
                        Social and Adaptive Skill Training..................... 20

          (iii)  Mt. Olive Failed to Provide an Appropriate
                        Individual Aide.................................................... 21

       (c)    Mt. Olive Offered No Relevant Evidence to Support
                  the Educational and Related Services it Offered to
                  T.C. ................................................................................ 22

i

3.    Mt. Olive Failed to Consider or Behavioral Interventions to Address T.C.'s Extensive Behavioral Needs ....................... 23

4.    Mt. Olive Failed to Provide T.C. with an Appropriate Manifestation Determination which Led to T.C.'s Indefinite Suspension and Further Deprivation of Educational Benefit.................................................................. 26

5.    Mt. Olive Impeded T.C.'s Parent from Participating in the Decision-Making Process ......................................................... 29

    (a)    Mt. Olive's failure to provide D.C. with prior written notice when it changed T.C.'s educational placement greatly compromised D.C's role in the IEP process ..................................................................... 30

    (b)    Mt. Olive's failure to provide D.C. with notice of, and the opportunity to participate in, T.C.'s manifestation determination review denied D.C. her right to participate in T.C.'s educational process .......... 32

    (c)    Mt. Olive's failure to respond to D.C.'s requests and concerns greatly limited D.C.'s role in T.C.'s education......................................................................... 33

6.    Mt. Olive Prematurely Graduated T.C., Despite the Fact that he had a Flawed "Transition Plan," Failed to Meet any of his IEP Goals, and was Wholly Unprepared for Post-Secondary Life .......................................................................... 33

    (a)    Mt. Olive failed to provide an appropriate transition plan in T.C.'s IEP to prepare him for postsecondary life .................................................................................. 35

    (b)    T.C. failed to meet any of the goals in his transition plan................................................................................... 36

    (c)    T.C. was wholly unprepared to graduate in June 2012 ................................................................................ 37

    (d)    Mt. Olive and the ALJ erroneously relied solely on T.C.'s grades to determine that T.C. was prepared to graduate........................................................................ 38

CONCLUSION............................................................................. 39

Return Date: June 17, 2013

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anderson* v. *Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................. 8

*Bd. of Educ. of E. Windsor Reg'l Sch. Dist.* v. *Diamond*,
   808 F.2d 987 (3d Cir. 1986) ................................................................... 16

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.* v. *Rowley*,
   458 U.S. 176 (1982) ......................................................................... passim

*Brown* v. *Sch. Dist. of Phila.*,
   No. 11-6019, 2012 WL 3064022 (E.D. Pa. July 26, 2012) ................... 10, 11

*Carlisle Area Sch.* v. *Scott P.*,
   62 F.3d 520 (3d Cir. 1995) ....................................................................... 8

*Chuhran* v. *Walled Lake Consol. Sch.*,
   839 F. Supp. 465 (E.D. Mich. 1993), *aff'd* 51 F.3d 271 (6th Cir.
   1995) ...................................................................................................... 34

*D.E.R.* v. *Bd. of Educ. Of Borough of Ramsey*,
   No. Civ.A.04-2274, 2005 WL 1177944 (D.N.J. May 18, 2005) ............... 30

*D.F.* v. *Collingswood*,
   694 F.3d 488 (3d Cir. 2010) ................................................................... 23

*D.S.* v. *Bayonne Bd. of Educ.*,
   602 F.3d 553 (3d Cir. 2010) ..................................................................... 8

*Doe* v. *Todd County Sch. Dist.*,
   625 F.3d 459 (8th Cir. 2010) ................................................................. 31

*Dracut Sch. Comm.* v. *Bureau of Spec. Educ. App. of the Mass. Dep't.*
   *of Elementary and Secondary Educ.*,
   737 F.Supp.2d 35 (D. Mass. 2010) ........................................................ 35

*G.D.* v. *Wissahickon Sch. Dist.*,
   832 F.Supp.2d 455 (E.D.Pa. 2011) ........................................................ 11

iii

*J.M.* v. *Morris Sch. Dist. Bd. of Educ.*,
   No. 10-cv-06660, 2011 WL 6779546 (D.N.J Dec. 23, 2011) ..................... 15

*M.C.* v. *Central Regional Sch. Dist.*,
   81 F.3d 389 (3d Cir. 1996) .................................................................... 23

*M.G.* v. *Caldwell-West Caldwell Bd. of Educ.*,
   804 F. Supp. 2d 305 (D.N.J. 2011) ....................................................... 24

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................ 7

*Moorestown Tp. Bd. of Educ.* v. *S.D.*,
   811 F. Supp. 2d 1057 (D.N.J. 2011) ..................................................... 11

*N.B.* v. *Hellgate Elem. Sch. Dist.*,
   541 F.3d 1202 (9th Cir. 2008) .............................................................. 13

*P.K.* v. *N.Y.C. Dep't. of Educ.*,
   819 F. Supp. 2d 90 (E.D.N.Y. 2011) .................................................... 18

*P.V.* v. *Sch. Dist. of Phila.*,
   No.2:11-cv-04027, 2013 WL 618540 (E.D.Pa. Feb. 19, 2013) ........... 22, 30

*R.E.* v. *N.Y.C. Dept. of Educ.*,
   694 F.3d 167 (2d Cir. 2012) ....................................................... 9, 24, 26

*R.S.* v. *Montgomery Twp. Bd. of Educ.*,
   No. 10-5265, 2012 WL 2119148 (D.N.J. June 11, 2012) .......................... 38

*Rodrigues* v. *Ft. Lee Bd. of Educ.*,
   No. 2:08-cv-05736, 2011 WL 486151 (D.N.J. Feb. 7, 2011) ..................... 33

*S.H.* v. *State-Operated Sch. Dist. of City of Newark*,
   336 F.3d 260 (3d Cir.2003) .................................................................... 8

*S.N.* v. *Washington Twp. Bd. of Educ.*,
   No. 11-3876, 2012 WL 4753428 (D.N.J. Sept. 27, 2012) ......... 10, 15, 23, 29

*Sch. Bd. of the City of Norfolk* v. *Brown*,
   769 F. Supp. 2d 928 (E.D. Va. 2010) ............................................ 26, 27, 31, 32

Doc#: US1 8485787v24

*Shelton* v. *Maya Angelou Pub. Charter Sch.*,
578 F. Supp. 2d 83 (D.D.C. 2008) ..................................................... 25, 27

*T.C.* v. *N.Y.C. Dep't. of Educ.*,
584 F.3d 412 (2d Cir. 2009) .................................................................. 30

## Statutes

20 U.S.C. § 1400(d)(1) ............................................................................ 9

20 U.S.C. § 1401(26)(A) ......................................................................... 18

20 U.S.C. § 1412(a)(1) ............................................................................ 34

20 U.S.C. § 1414(a)(2) ............................................................................ 11

20 U.S.C. § 1414(a)(2)(ii) ....................................................................... 24

20 U.S.C. § 1414(a)(2)(A) ...................................................................... 13

20 U.S.C. § 1414(a)(2)(B) ...................................................................... 13

20 U.S.C. § 1414(b)(3) ............................................................................ 30

20 U.S.C. § 1414(b)(3)(B) ................................................................... 2, 11

20 U.S.C. § 1414(d)(1)(A)(i) ................................................................... 33

20 U.S.C. § 1414(d)(1)(A)(i)(II) .............................................................. 21

20 U.S.C. § 1414(d)(3)(A) ...................................................................... 15

20 U.S.C. § 1414(d)(3)(B)(i) ................................................................... 24

20 U.S.C. § 1415(a)(1)(A) ......................................................................... 9

20 U.S.C. § 1415(j) .................................................................................. 39

20 U.S.C. § 1415(k)(1)(C) ...................................................................... 28

20 U.S.C. § 1415(k)(1)(G) ...................................................................... 28

20 U.S.C. § 1415(k)(1)(E) ................................................................. 26, 31

Doc#: US1:8485787v24

N.J.A.C. 6A:14- 2.7(u) ............................................................................................. 39

N.J.A.C. 6A:14-1.1(d) ............................................................................................. 34

N.J.A.C. 6A:14-2.3(h)(5) ......................................................................................... 24

N.J.A.C. 6A:14-3.7(e)(11) ................................................................................... 33, 35

N.J.A.C. 6A:14-3.8(a) ............................................................................................. 11

N.J.A.C. 6A:16-7.2(a) ............................................................................................. 27

## REGULATIONS

34 C.F.R. § 104.25(a) ............................................................................................. 14

34 C.F.R. § 300.34(a) ............................................................................................. 18

34 C.F.R. § 300.34(c)(12) ....................................................................................... 18

34 C.F.R. § 300.34(c)(14) ....................................................................................... 18

34 C.F.R. § 300.303(a)(2) ....................................................................................... 11

34 C.F.R. § 300.304(c)(6) ....................................................................................... 11

34 C.F.R. § 300.530(b)(2) ....................................................................................... 27

34 C.F.R. § 300.530(c) ............................................................................................ 27

34 C.F.R. § 300.530(d) ........................................................................................ 25, 27

## OTHER AUTHORITIES

FED. R. CIV. P. 56(c) ................................................................................................. 7

Doc#: US1:8485787v24

Return Date: June 17, 2013

## **PRELIMINARY STATEMENT**

T.C. is a student with autism and other severe disabilities who has vast academic, social and behavioral needs.  T.C.'s school district, Mt. Olive, knew of T.C.'s extensive needs since his enrollment. Rather than provide the necessary services to ensure that T.C. received a free and appropriate public education, Mt. Olive placed stumbling block after stumbling block before him.  Sadly and not surprisingly, T.C. regressed significantly.  In June of 2012, although T.C. had absolutely no vocational or academic prospects, Mt. Olive forcibly graduated him, depriving him of the educational services to which he is entitled until age 21 under the Individuals with Disabilities Education Act ("IDEA").

The undisputed facts of this case demonstrate Mt. Olive's extensive violations of T.C.'s rights, and support a finding in favor of Plaintiffs for summary judgment.

## **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

T.C. is a student with autism, a language disorder, and a sensory processing disorder, who was enrolled in the Mt. Olive School District in 2007, and was forcibly graduated in 2012.  Ex. 1 - Ex. 8.  T.C.'s full scale IQ is 79 (8th percentile), which is in the borderline range of intellectual functioning.  Ex. 9 at 6.  T.C.'s cognitive scores on other assessments are

likewise very low, ranging from the $0.5^{th}$ to 3rd percentile. Ex. 7 at 6, Ex. 10. T.C. required an individual aide throughout his school day and was deemed to require a legal guardian. Ex. 1 – Ex. 7, Ex. 11, Ex. 12, 127:13-15.

T.C. has extreme sensitivities to loud noises, crowded spaces, and small children, which have been well-documented since he enrolled in Mt. Olive in 2007. Ex. 1. In 2012, Dr. Chaye Lamm Warburg, DPS, OTR/L,[1] evaluated T.C. and found that he met the criteria for a Sensory Processing Disorder ("SPD"), and that, consistent with his SPD, T.C. reacts to certain stimuli that he perceives as threatening with aggression or elopement, known as a "fight or flight" response. Ex. 13 at 9.

Although Mt. Olive was well aware of T.C.'s sensitivities and behaviors, it never properly evaluated or addressed them. Mt. Olive *never* conducted an assessment of T.C.'s sound sensitivities; failed to evaluate T.C. every three years as required by IDEA, 20 U.S.C. § 1414(b)(3)(B); failed to conduct a Functional Behavioral Assessment ("FBA") despite T.C.'s increasingly erratic behavior and the written request of his mother, D.C.; failed to conduct a Functional Vocational Evaluation or assess any of T.C.'s strengths, preferences, interests and needs as they related to his postsecondary goals; and further removed occupational therapy ("OT")

---

[1] Dr. Lamm Warburg has a doctorate in occupational therapy, and is a registered, licensed occupational therapist. She is the Director and Founder of Pediatric Occupational Therapy Services, LLC. She testified as an expert in occupational therapy and sensory processing.

services entirely from T.C.'s Individualized Education Program ("IEP") despite the fact it was considered a crucial related service for T.C., and despite the fact that Mt. Olive had not evaluated T.C.'s OT needs since 2007. Ex. 4 – Ex. 7, Ex. 14, Ex. 12, 89:1-10, 97:7-9,125:8-23.

Mt. Olive also gravely mishandled the few services it actually offered T.C. For example, Mt. Olive determined that T.C. required a "sensory diet" [2] to self-regulate. Ex. 3. The proffered sensory diet minimally addressed T.C.'s movement needs and did not at all address his severe sound sensitivities. Ex. 3. The sensory diet provided that T.C. take movement breaks and use exercise equipment – donated to Mt. Olive by T.C.'s family, Ex. 12, 221:12-20, – to stay focused in school. Ex. 2, Ex. 4, Ex. 12, 189:15-22. Although Mt. Olive's occupational therapist noted how crucial the sensory diet was for T.C., it was inexplicably removed from T.C.'s IEP in May 2009. Ex. 1, Ex. 3, Ex. 5 at 5, Ex. 7, Ex. 12, 189:19-21. In 2010, D.C. expressed her concerns that T.C. could not consistently access the exercise equipment, Ex. 5 at 3; Ex. 6 at 3, but Mt. Olive never responded. It then moved the exercise equipment to a larger and noisier room that T.C. refused to enter because it exacerbated his anxiety. Ex. 13; Ex. 12, 229:4-24. Mt.

---

[2] A sensory diet is a collection of activities that children can use to receive the sensory input that they need to stay calm and regulated. Tr. 6/4, 38:14-20, 85:4-10.

Olive never provided an alternative to address his movement needs. Ex. 15, 67:6-20; Ex. 4 at 5; Ex. 6 at 5.

Instead of properly evaluating T.C. and providing appropriate services, Mt. Olive used plans of "over-exposing" T.C. to known triggers without teaching him any coping methods. Ex. 2. Mt. Olive failed to demonstrate that such plans had any basis in therapeutic research. For example, Mt. Olive placed T.C. in a preschool classroom to be a teacher's assistant for his Extended School Year ("ESY") program, despite T.C.'s well-documented fear of young children. *See e.g.,* Ex. 4, Ex. 12, 64: 15-21, 158:3-7. Predictably, after a few days, T.C. ran away from the building and the police were called to locate him. Ex. 12, 65:14-22. Mt. Olive also repeatedly exposed T.C. to a particular student who had a tendency to scream aggressively, by forcing T.C. to share an aide with this student, placing his locker next to the student's work placement, [3] and forcing him to do collaborative activities with this student.

As a result of Mt. Olive's mishandling of T.C.'s needs, T.C. regressed academically, behaviorally and emotionally. Between 2007 and 2010 (the last time Mt. Olive administered an educational assessment to T.C.), T.C.'s math score dropped from the 7th to the 1st percentile, and his Academic

---

[3] D.C. and T.C. repeatedly requested that T.C.'s locker be moved away from the mailroom where the particular student worked, but Mt. Olive refused.

Knowledge score dropped from the 14th to the 3rd percentile.  Ex. 10; Ex. 16 at 2-3.  Experts for both sides testified that such significant regression is concerning and requires immediate attention.  *See* Ex. 12, 150:8-23; Ex. 17, 49:4-50:1.  Despite this disconcerting regression, in 2011, Mt. Olive placed T.C. in general education classes for 80% of his school day and reduced his in-class supports.  Ex. 7.  Moreover, because Mt. Olive failed to address T.C.'s root sound sensitivity, forcibly exposed him to known triggers without *any* coping mechanisms, and failed to provide required evaluations and appropriate services, T.C.'s behavioral needs increased.  Between 2011 and the fall of 2012, T.C. ran away from school, and twice struck the particular student, in response the student's screaming.  Ex. 18; Ex. 12, 61:1-14, 22-24.  Notwithstanding these behaviors, Mt. Olive again failed to conduct an FBA.  In response to a similar altercation in January 2012, Mt. Olive conducted a Manifestation Determination Review ("MDR") – a hearing required by IDEA to determine if a child's misbehavior was a result of the child's disability – but it did so without including D.C. or the district behaviorist, and without considering relevant records.  Ex. 21.  The incomplete MDR team determined that T.C.'s behavior was not a manifestation of his disability and suspended him indefinitely pending a psychiatric evaluation.  *Id.*  Even after D.C., who has extremely limited

5

means, obtained an evaluation at her own expense, Ex. 22, Ex. 23, Mt. Olive refused to allow T.C. to return to school until D.C. sought emergent relief from the State. Ex. 33. As a result of Mt. Olive's myriad failures, T.C. was suspended for two months, during which time he only received six hours of instruction. Ex. 24.

When T.C. returned to school, he had fallen behind in his classes and continued to show signs of emotional distress. Incredibly, despite his two-month absence without instruction, T.C. "earned" a near-A average for the year. Ex. 25, Ex. 12, 33:11-13, 34:1-5. Mt. Olive also deemed T.C. ready to graduate, despite his academic regression and the fact that he had not received any transition services or completed any of his transition goals. Ex. 26. In June 2012, Mt. Olive forcibly graduated T.C., and has deprived him entirely of educational services since that time.

On April 10, 2012, D.C. brought an amended petition for due process,[4] challenging Mt. Olive's proposed graduation and asserting that T.C. was denied a free appropriate public education ("FAPE"). A due process hearing was held before Administrative Law Judge ("ALJ") Mumtaz Bari-Brown. Petitioners presented substantial expert testimony regarding

---

[4] D.C. brought a petition for emergent relief and due process on March 7, 2012, seeking T.C.'s immediate return to school, evaluations, a transition plan based on T.C.'s needs and counseling. The emergent relief matter was settled and D.C. subsequently filed an amended petition for due process, adding a challenge to T.C.'s proposed graduation.

T.C.'s continuing academic and emotional needs. District personnel testimony demonstrated how little they knew about T.C.'s needs and services. The ALJ found that T.C. had substantial deficits, his IEP "transition plan" was outdated, and that, while his post-secondary goal was to attend college, he had not attained the requisite college entry skills, and he was at best ready to receive training in daily living skills. Although the ALJ recognized that Mt. Olive failed to enable T.C. to meet his goals, she inexplicably held that Mt. Olive provided T.C. with FAPE and could graduate him. This appeal followed.

## ARGUMENT

### A. Standard of Review

To prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When the moving party has "carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) (emphasis in original). The "mere existence of *some*

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)(emphasis in original).

Federal courts review cases brought pursuant to IDEA with a standard of review that is less deferential than the traditional standard for summary judgment. A reviewing court must "base its decision on the 'preponderance of the evidence'" while giving "due weight" to the ALJ. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.* v. *Rowley*, 458 U.S. 176, 205–06 (1982). The Third Circuit has interpreted this standard to mean a "modified *de novo*" review, *D.S.* v. *Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010), under which the court is required to defer to the ALJ's findings of fact and credibility determinations "unless it can point to contrary nontestimonial extrinsic evidence on the record." *S.H.* v. *State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir.2003). Though administrative findings of fact are "to be considered *prima facie* correct," *Id.* at 271, this Court may reject them if it "provide[s] some explanation for its departure." *Carlisle Area Sch.* v. *Scott P.*, 62 F.3d 520, 527 (3d Cir. 1995).

The undisputed material facts in this case demonstrate that Mt. Olive violated IDEA and deprived T.C. of FAPE. Extrinsic evidence on the record demonstrates that ALJ Bari-Brown made numerous material errors in her

findings. Moreover, even if this Court solely depends on the findings of fact made by the ALJ, Plaintiffs prevail as a matter of law. Therefore, Plaintiffs are entitled to summary judgment.

**B. Mt. Olive Violated T.C.'s Right to a Free Appropriate Public Education**

IDEA provides that a child with a disability is entitled to FAPE, which must include "special education and related services designed to meet [the child's] unique needs and prepare [the child] for further education, employment, and independent living." 20 U.S.C. §§ 1415(a)(1)(A). *See also* 20 U.S.C. § 1400(d)(1). A school district can deny a child FAPE by violating IDEA substantively or procedurally. A district violates the substantive requirements of IDEA by providing an IEP that is not "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. A substantive violation "automatically entitles" the parents to the appropriate remedy. *R.E.* v. *N.Y.C. Dept. of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012). A district can also deny a child FAPE by violating the procedural requirements of IDEA, the importance of which "cannot be gainsaid." *Rowley*, 458 U.S. at 205–07 ("[It is] no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures" as it did upon the "substantive standard.") A procedural violation of IDEA denies a student FAPE where it "(1) impedes the child's

9

right to a free appropriate public education; (2) significantly impedes the parents' opportunity to participate in the decision-making process; or (3) causes a deprivation of benefits." *S.N.* v. *Washington Twp. Bd. of Educ.*, No. 11-3876, 2012 WL 4753428 at *2 (D.N.J. Sept. 27, 2012). The cumulative impact of numerous procedural violations will also likely result in a denial of FAPE. *Brown* v. *Sch. Dist. of Phila.*, No. 11-6019, 2012 WL 3064022, at *5 (E.D. Pa. July 26, 2012).

The undisputed facts in this case show numerous substantive and procedural violations of IDEA by Mt. Olive; therefore, the ALJ's determination that T.C. was not denied FAPE is unsupported and is not entitled to deference. Mt. Olive's substantive violations include failing to design and implement an appropriate IEP based on T.C.'s unique needs, failing to consider or provide appropriate behavioral interventions, failing to include the parent in the decision-making process, failing to provide educational services during T.C.'s indefinite suspension and prematurely graduating T.C. in June 2012. Mt. Olive's procedural violations include failing to evaluate T.C. in all areas of his disability, failing to provide an appropriate manifestation determination review, failing to provide the parent with appropriate notice and failing to respond to the parent's requests. Any

10

one of these violations alone supports a finding that T.C. was denied FAPE. Taken together, there is no doubt of a profound deprivation by Mt. Olive.

>   1.   Mt. Olive Failed to Appropriately Evaluate T.C. in all Areas of his Disability and Thereby Impeded T.C.'s Ability to Receive Meaningful Educational Benefits

Mt. Olive deprived T.C. of FAPE by failing to appropriately evaluate and re-evaluate him. A district must evaluate a child "in all areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B); 34 C.F.R. § 300.304(c)(6) (evaluation must be "sufficiently comprehensive to identify" all of the child's needs). The evaluation must occur within a "reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *Brown*, 2012 WL 3064022 at *4; *G.D.* v. *Wissahickon Sch. Dist.*, 832 F.Supp.2d 455, 462 (E.D.Pa. 2011) (the "clearest evidence of a denial of FAPE" is the "length of time" it takes for a district to evaluate.) A district also must re-evaluate a child in each area of disability every three years, and more often if the teacher or parent requests it, or if it is warranted. 20 U.S.C. § 1414(a)(2); 34 C.F.R. § 300.303(a)(2); N.J.A.C. § 6A:14-3.8(a). The IEP team must then "review and revise" the IEP accordingly. *Moorestown Tp. Bd. of Educ.* v. *S.D.*, 811 F. Supp. 2d 1057, 1069 (D.N.J. 2011).

(a)   *Mt. Olive Failed to Conduct Initial Evaluations of T.C. in all Areas of Suspected Disability*

Although Mt. Olive knew of T.C.'s sensory and behavioral needs from the moment he was enrolled in the district, it *never* evaluated T.C. in these areas of disability.  T.C.'s earliest IEPs note that he has a "fear of crowded spaces and sensitivity to loud noises," and "an extreme sensitivity to babies and the potential that they will cry." Ex. 1 at 2, 4; Ex. 2.  One of T.C.'s own goals in an early IEP was "[n]ot being afraid of loud noises." Ex. 2.  D.C. regularly raised T.C.'s sensory sensitivities with Mt. Olive.  Ex. 27 – Ex. 29; Ex. 1; Ex. 2; Ex. 4 – Ex. 6.  Mt. Olive's occupational therapist even noted that T.C.'s "ability to modulate sensory information"  required "further investigation."  Ex. 1.

Mt. Olive's personnel also observed T.C.'s sensitivities.  Mt. Olive's occupational therapist testified that T.C.'s fear of crowds and loud noises caused him to avoid certain school hallways.  Ex. 12, 198:10-19.  On two occasions, T.C. ran away from the school building when exposed to loud noises: first, when he was imprudently placed in a preschool classroom, and again, in response to an outburst by the particular student.  T.C. also had multiple physical altercations with the particular student.   While these incidents prompted police intervention and T.C.'s suspension, Mt. Olive never responded with the appropriate and compulsory evaluations of T.C.

12

Had Mt. Olive evaluated T.C. as required, it would have determined that he had a substantial sensory-related disability. T.C. was privately evaluated and diagnosed with SPD, Sensory Modulation Disorder ("SMD") – Sensory Over-Responsive subtype ("SOR"). Ex. 13 at 9. T.C.'s SOR "affects [his] ability to regulate his behavior," and he exhibits a "fight or flight" response when faced with "situations that he perceives as threatening or overwhelming." Ex. 13 at 9. Without proper supports, T.C.'s disability causes him to shut down in the face of perceived danger, and makes it extremely difficult, "if not impossible", for him "to concentrate on his academics." Ex. 15, 81:18-82:8. Mt. Olive witnessed this "fight or flight" response and its impact on T.C.'s education, but it never evaluated T.C., Ex. 15, 82:17-23, making it impossible to develop an appropriate IEP based on T.C.'s unique needs. *See N.B.* v. *Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1210 (9th Cir. 2008) (finding that an IEP could not be appropriate when the district was on notice the student might have autism and failed to properly evaluate).

(b) *Mt. Olive Failed to Conduct Re-Evaluations of T.C. in all Areas of Disability*

Not only did Mt. Olive fail to evaluate T.C. in all suspected areas of disability, it further failed to re-evaluate T.C. in areas that it had previously evaluated at least every three years, as required. 20 U.S.C. §§

13

1414(a)(2)(A), (B); *See also* 34 C.F.R. § 104.25(a) (an evaluation is required before any "subsequent significant change in placement" of a student with disabilities). These re-evaluations were necessary to track progress and tailor T.C.'s IEP to current needs.

T.C.'s initial OT evaluation from Mt. Olive in 2007 indicated that he required OT, and subsequent IEPs through 2010 provided for OT services. Ex. 1 – Ex. 5. In 2010, the district occupational therapist recommended that T.C. continue to receive OT twice per week. Ex. 5, Academic Achievement and Functional Performance: OT; Ex. 30 at 26–27. Inexplicably, however, Mt. Olive removed OT from T.C.'s 2011 IEP without first reevaluating him, even though a reevaluation was clearly warranted. Ex. 6. In fact, Mt. Olive never conducted an OT re-evaluation; T.C.'s most recent district OT evaluation is over five years old. Ex. 7.

Mt. Olive similarly failed to conduct re-evaluations every three years in other critical areas in which T.C. had previously been evaluated and provided services. T.C.'s most recent evaluations for Applied Behavior Analysis ("ABA"), audiometry, and speech language were all last conducted in 2007. Ex. 5 at 3; Ex. 6 at 3. Without re-evaluations in critical areas, it is *impossible* that Mt. Olive had the data necessary to create an appropriate IEP. Moreover, the failure to re-evaluate deprived D.C. of information

14

about T.C.'s needs, impeding her participation in the decision-making process. Thus, Mt. Olive's failures to re-evaluate deprived T.C. of FAPE.

The ALJ correctly found that some re-evaluations were conducted in 2010, but she never discussed Mt. Olive's failure to conduct the required OT re-evaluations, among others, nor did she discuss the unilateral removal of OT services without re-evaluation. Ex. 30 at 14.

2. <u>Mt. Olive Failed to Design and Implement an IEP Based on T.C.'s Unique Needs That Was Reasonably Calculated to Enable T.C. to Receive Meaningful Educational Benefits</u>

(a) *Mt. Olive Failed to Provide an Educational Placement and Program Based on T.C.'s Unique Needs*

Mt. Olive failed to design and implement an appropriate educational program for T.C. by failing to consider T.C.'s specific needs. A district provides a student with FAPE when it designs and implements an IEP that is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *S.N.*, 2012 WL 4753428 at *1. An IEP Team must consider the child's academic, developmental and functional strengths and needs, parental concerns, and the most recent evaluation results. 20 U.S.C. § 1414(d)(3)(A). An IEP must be "likely to produce progress, not regression." *J.M.* v. *Morris Sch. Dist. Bd. of Educ.*, No. 10-cv-06660, 2011 WL 6779546, at *11 (D.N.J Dec. 23,

2011) (citing *Bd. of Educ. of E. Windsor Reg'l Sch. Dist.* v. *Diamond*, 808 F.2d 987, 991 (3d Cir. 1986)).

Mt. Olive completely ignored T.C.'s intellectual deficits and needs in designing his educational placements. Mt. Olive knew that T.C.'s full scale IQ was in the 8th percentile (Ex. 9 at 6), that his cognitive scores were in the low and very low range (Ex. 10) and that he was exempted from passing the High School Proficiency Assessment ("HSPA"). Ex. 4 at 20; Ex. 5 at 21; Ex. 6 at 21; Ex. 7 at 26; Ex. 10; Ex. 9 at 6. Mt. Olive also knew that between 2007 and 2010, T.C. regressed academically: T.C.'s math score dropped from the 7th to the 1st percentile and his Academic Knowledge score dropped from the 14th to the 3rd percentile. Ex. 10; Ex. 16 at 2-3.

Ignoring all of this information, Mt. Olive *reduced* T.C.'s academic support during his senior year, placing him in general education classes for more than 80% of the day with minimal support, Ex. 7, when he was previously in mainly self-contained, resource classes. Ex. 4 – Ex. 6. This placement deprived T.C. of necessary math remediation and reading and writing intervention. Ex. 9 at 8; Ex. 10; Ex. 16 at 2-3. Mt. Olive similarly ignored T.C.'s needs when it placed him as a teacher's assistant for

16

elementary school children[5] for his 2010 ESY program, despite T.C.'s documented hypersensitivity to young children, and complete lack of interest in working with children. Ex. 4 – Ex. 7. While Mt. Olive claimed that such a placement would help alleviate T.C.'s sensory needs, it never provided any rationale for its methods, nor did it offer any support or coping strategies. Not surprisingly, after three days of being forced into this "environment replete with the known trigger" and without support, Ex. 13 at 10, T.C.'s anxiety escalated and he ran away, requiring the police to be called. Ex. 12, 65:11-16, 158:14-17. T.C. was emotionally unable to return to the program, and Mt. Olive did not provide an alternative placement. Ex. 12, 158:17-22. Despite extensive testimony about this devastating incident, the ALJ did not mention it in her decision. Ex. 30 at 15.

By failing to appropriately consider T.C.'s unique needs, Mt. Olive designed and implemented IEPs that were not, and could not have been, reasonably calculated to allow T.C. to received educational benefits, making the IEPs deficient, and depriving T.C. of FAPE.

(b)   *Mt. Olive Failed to Provide Related Services that T.C. Required to Access his Special Education*

Mt. Olive further failed to provide T.C. with IEPs that included the related services that T.C. needed to benefit from his special education. An

---

[5] As if the placement in the proposed elementary classroom would not have been egregious enough, Mt. Olive actually placed T.C. in a *preschool* classroom. Ex. 12, 64: 15-21, 158:3-7.

IEP must contain related services - all "developmental, corrective and other supportive services" that are "required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A). Related services include speech-language services, occupational therapy, rehabilitation counseling services[6] and social work services.[7] 34 C.F.R. § 300.34(a). Failure to provide, or elimination of, related services deprives the student of FAPE. *P.K.* v. *N.Y.C. Dep't. of Educ.*, 819 F. Supp. 2d 90, 109–15 (E.D.N.Y. 2011) (failing to provide parent training and eliminating speech and ABA therapies denied the student FAPE because it deprived the student of "sufficient support services" to "benefit educationally."). Mt. Olive denied T.C. FAPE by failing to provide, and haphazardly removing, the related services that T.C. needed to benefit from his special education.

### (i)   *Mt. Olive Failed to Provide an Appropriate Sensory Diet*

T.C.'s IEPs state that, T.C. needed a regimen of activities, or a "sensory diet," to manage his sensory needs and access his education. *See, e.g.,* Ex. 3. T.C.'s sensory diet only included one component that addressed his movement needs, but not his sound sensitivity needs. Ex. 2 – Ex. 4, Ex. 15, 38:12-24. The sensory diet provided for T.C.'s use of exercise equipment when he felt over-stimulated. Ex. 12, 189:15-22; Ex. 2, Alert

---

[6] "Rehabilitation counseling services" focus on career development, employment preparation, achieving independence, and integration in the workplace and community. 34 C.F.R. § 300.34(c)(12).
[7] "Social work services" includes positive behavioral intervention strategies. 34 C.F.R. § 300.34(c)(14).

Program; Ex. D.  District documents and testimony emphasized that this was a critical related service for T.C.  *See* Ex. 5 at 5; Ex. 1, OT Evaluation; Ex. 2 at 2; Ex. 3 at 2; Ex. 12, 189:19-21.

Nonetheless, the sensory diet was inexplicably removed from T.C.'s IEP in May 2009.  Ex. 2, Ex. 4 – Ex. 7.  Despite D.C.'s protestations,[8] T.C. was further prevented from accessing his exercise equipment at all when the district moved it to a larger and noisier room that exacerbated T.C.'s anxiety. Ex. 13.    Mt. Olive even ignored its own occupational therapist's recommendation, and refused to find an alternative space for the equipment. Ex. 4 at 5; Ex. 6 at 5; Ex. 12, 229:4-24, Ex. 15, 67:6-20.

While the ALJ briefly discussed T.C.'s sensory diet, she ignored the undisputed evidence that it was suddenly, inexplicably and detrimentally removed from T.C.'s IEPs.  Ex. 30 at 14.  In her decision, the ALJ narrowed in on the only area of agreement between Mt. Olive and Dr. Lamm Warburg: that a sensory diet *could* be beneficial to T.C.  Ex. 30, at 26-27.  However, Dr. Lamm Warburg testified extensively that Mt. Olive failed to provide a comprehensive sensory diet, Ex. 15, 38:13-39:8, failed to update the sensory diet, and that, ultimately, the sensory diet was "rendered moot" because T.C. was denied access to it.  Ex. 13 at 3, 10.  Dr. Lamm Warburg vigorously

---

[8] In 2011, Mt. Olive even stopped documenting D.C.'s concerns about T.C.'s lack of access to the exercise equipment, despite the fact that these concerns were documented in every IEP until that point, and continued to be expressed verbally and in writing. Ex. 1 – Ex. 7, Ex. 31.

disagreed with all aspects of the district's response – or lack thereof – to T.C.'s needs. Ex. 13. The ALJ's finding that she agreed with Mt. Olive is unsupported by the evidence and should not be given deference.

### (ii) *Mt. Olive Failed to Provide Appropriate Social and Adaptive Skill Training*

T.C. was also deprived of the social and adaptive skill training that he needed to access his special education, despite his "poor" social skills, including "perseverative tendencies," "fleeting eye contact" and "frequent gaze aversion." Ex. 1; Ex. 8 at 3; Ex. 9 at 3; Ex. 13 at 6. Mt. Olive recognized that T.C. would "benefit from training in the area of social interaction," Ex. 4 at 3, and noted D.C.'s concern that T.C. receive the "necessary" support in his "social skills development." Ex. 5 at 3; Ex. 6 at 3. According to Mt. Olive's neuropsychological evaluation, T.C.'s social skills scores on an adaptive behavior rating scale were "commensurate with those living in supervised settings." Ex. 9 at 9-10. Nevertheless, Mt. Olive did not include social skills services in his IEP, Ex. 7, and the ALJ failed to discuss this critical service denial. Ex. 30 at 27.

### (i) *Mt. Olive Failed to Provide Appropriate Occupational Therapy Services*

Starting in 2007, T.C.'s IEPs provided for OT every week. Although the district occupational therapist recommended that T.C. continue to receive

the same level of OT, Ex. 5, in 2011, Mt. Olive removed OT entirely from T.C.'s IEP without any explanation. Ex. 6. The occupational therapist was not even at the 2011 IEP meeting. Ex. 6; Ex. 12, 98: 3-21; 218:2-4.

Even prior to removal, T.C.'s OT was insufficient because it lacked measureable, comprehensive and annual goals. Ex. 13; Ex. 15, 46:22, 47:14. For example, one of T.C.'s OT goals was to interpret and respond to tactile input, but Mt. Olive did not explain what this meant or how T.C. could demonstrate achievement of such a goal. *See,* Ex. 5; Ex. 15, 47:15–25. There is nothing in any part of T.C.'s records about his progress – if any – towards his "goals and objectives." Ex. 13 at 3. Such information would be critical in determining whether to remove all of T.C.'s OT. Moreover, T.C.'s OT goals were not annually updated, as IDEA mandates. 20 U.S.C. §§ 1414(d)(1)(A)(i)(II); *see also* Ex. 6; Ex. 12, 217:9-12. (T.C.'s OT goals were copied from his 2010 IEP into his 2011 IEP).

Although the ALJ noted the illegal repetition of T.C.'s OT goals from one IEP to the next, she never discussed the unilateral removal of OT or the lack of appropriate goals and objectives for OT services. Ex. 30 at 24-29.

### (iii)   *Mt. Olive Failed to Provide an Appropriate Individual Aide*

Mt. Olive failed to provide T.C. with an effective aide who could help him access his education. First, T.C. was forced to share his "individual"

21

aide with the particular student with whom he had difficulty, in direct violation of his IEP.  Second, Mt. Olive failed to provide a consistent and qualified aide to T.C., instead providing multiple aides in spite of T.C.'s documented need for continuity and the impact of change on his ability to learn.  *See, e.g.,* Ex. 8 at 3; Ex. 9 at 3; Ex. 13 at 9. *See, e.g. P.V.* v. *Sch. Dist. of Phila.*, No.2:11-cv-04027, 2013 WL 618540, at *6 (E.D.Pa. Feb. 19, 2013).  During May-June of 2011, T.C. had great success with an aide who was a certified teacher.  Ex. 6; Ex. 12, 143:17-21.  D.C. requested that T.C. be assigned a similar aide during the 2011-2012 school year (Ex. 31), and Mt. Olive's neuropsychological evaluation specifically recommended that T.C. continue to work with an aide who is a certified teacher (Ex. 34), but Mt. Olive refused to follow even its own professionals' recommendations.

Although the ALJ found that T.C. made substantial progress when he started working with a new aide, and that his 2011-2012 aide was not a certified teacher, she did not make any further findings regarding Mt. Olive's failure to provide appropriate aide support to T.C.  Ex. 30.

      (c)   *Mt. Olive Offered No Relevant Evidence to Support the Educational and Related Services it Offered to T.C.*

Mt. Olive does not dispute the facts relating to T.C.'s educational program or related services, but merely points to D.C.'s "consent" to his IEPs as evidence that the district provided appropriate services.  *See, e.g.,*

Ex. 12, 69:16–19; 87:12–16; 34:1–5.  Similarly, the ALJ repeatedly states

that D.C. did not request mediation or due process until T.C.'s senior year.

Ex. 30.  However, the Third Circuit has made clear that parental consent

cannot serve as the indicia for whether a district provided a student with

FAPE.  *See D.F.* v. *Collingswood,* 694 F.3d 488, 500 (3d Cir. 2010); *M.C.* v.

*Central Regional Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996).  This evidence

is particular unpersuasive given how persistent D.C. was about expressing

her concerns directly to the district and through emergent relief/due process.

*See, e.g.,* Ex. 4 – Ex. 7, Ex. 14, Ex. 27 – Ex. 29, Ex. 31, Ex. 32.  Even if

D.C. had consented, such consent does not relieve Mt. Olive of its obligation

to create an IEP reasonably calculated to enable T.C. to receive "meaningful

educational benefits." *S.N.*, 2012 WL 4753428 at *1.  The ALJ's findings

based on parental consent are erroneous. Ex. 4. at 14-16.

    3.    <u>Mt. Olive Failed to Consider or Behavioral Interventions to</u>
           <u>Address T.C.'s Extensive Behavioral Needs</u>

Mt. Olive deprived T.C. of FAPE by failing to even consider the use

of appropriate behavioral interventions to address T.C.'s needs, even after

the parent's request, significant changes in T.C.'s behavior, and a lengthy

disciplinary change in placement.

A district is required to consider the use of appropriate behavioral

interventions and supports, including an FBA and a behavioral intervention

plan ("BIP"): (1) when a parent requests an evaluation of the child, N.J.A.C. 6A:14-2.3(h)(5); 20 U.S.C. § 1414(a)(2)(ii); (2) when a child's behavior impedes his or her learning, or the learning of others, 20 U.S.C. § 1414(d)(3)(B)(i); *M.G.* v. *Caldwell-West Caldwell Bd. of Educ.*, 804 F. Supp. 2d 305, 314–15 (D.N.J. 2011); and (3) when a child's disciplinary change in placement exceeds ten consecutive school days and the behavior was determined not to be a manifestation of the child's disability, *See*, *R.E.*, 694 F.3d at 190.

First, Mt. Olive failed to respond to D.C.'s request for an FBA. In January 2011, D.C. made a written request to Mt. Olive to evaluate T.C.'s behaviors. Ex. 14. Mt. Olive did not conduct FBA, or even determine whether such an evaluation was warranted. Ex. 12, 125:5-14.

Second, Mt. Olive failed to conduct an FBA and create a BIP even in the face of T.C.'s worsening behaviors and serious disciplinary violations. Beginning in the summer of 2010, T.C.'s disability, which was not being adequately addressed, began to cause T.C. to behave in ways that disrupted his and others' learning. For example, T.C. ran away from the school building multiple times and had repeated altercations with the particular student when his hypersensitivities were triggered. Ex. 12, 60:22-61:14,

24

65:11-20. Instead of conducting an FBA,[9] Mt. Olive developed a "plan" to address T.C.'s sensitivities by overexposing him to his known triggers, such as young children and the particular student with whom he had difficulty. Ex.2, Ex. 6. Mt. Olive did not provide any research to support this throw-the-child-in-the-lion's-den approach, ignored T.C.'s more general sound sensitivity, and persisted with the approach despite the fact that T.C. did not respond well. Ex. 16 at 8.

Third, Mt. Olive again failed to conduct, or even consider, an FBA when T.C.'s change in educational placement exceeded ten consecutive school days and his behavior was determined not to be a manifestation of his disability. In such a situation, the student "must receive . . . as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications that are designed to address the behavior violation so that it does not recur." 34 C.F.R. § 300.530(c)-(d). A suspension of over ten days is a *de facto* change in placement for a special education student. *See, e.g., Shelton* v. *Maya Angelou Pub. Charter Sch.*, 578 F. Supp. 2d 83, 100 (D.D.C. 2008). Mt. Olive should have provided an FBA and BIP in the face of T.C.'s pattern of serious behaviors that culminated in his suspension. In

---

[9] Not only did Mt. Olive not perform an FBA, it also failed to take other easy, logical steps to prevent the triggering of T.C.'s disorder, like moving T.C.'s locker away from the particular student's work area.

25

fact, when T.C. returned from suspension, his unaddressed behavioral problems continued to interfere with his education. Ex. 15, 4:21-7:8.

Mt. Olive's failure to consider appropriate behavioral interventions to address T.C.'s behavioral needs in the face of T.C.'s increasingly problematic behaviors constituted a "serious procedural violation" of IDEA that deprived T.C. of FAPE. *See, e.g., R.E.*, 694 F.3d at 190 (failure to address a student's behaviors prevents a district from obtaining the necessary information to design an appropriate IEP). Surprisingly, the ALJ did not make any findings about T.C.'s substantial behavioral needs. Ex. 30.

4. Mt. Olive Failed to Provide T.C. with an Appropriate Manifestation Determination which Led to T.C.'s Indefinite Suspension and Further Deprivation of Educational Benefit

Mt. Olive failed to provide T.C. with FAPE by conducting an MDR without the required participants and relevant student records. This resulted in an erroneous determination that T.C.'s conduct was not a manifestation of his disability, and indefinite suspension of T.C., during which he was deprived of educational services.

Within ten school days of a disciplinary change in placement of a child with a disability, "the local educational agency, *the parent*, and relevant members of the IEP Team . . . shall review all relevant information in the student's file" to determine if the behavior was a manifestation of the

26

child's disability. 20 U.S.C. § 1415(k)(1)(E)(emphasis added). In *Sch. Bd. of the City of Norfolk* v. *Brown*, 769 F. Supp. 2d 928, 946–51 (E.D. Va. 2010), the district's failure to comply with the requirements for an MDR constituted a denial of FAPE where the MDR took place without relevant members, including the parent, and without consideration of relevant student records.

Mt. Olive also violated the IDEA mandate that a district continue to provide educational services to a child whose change in placement exceeds ten days. 34 C.F.R. § 300.530(b)(2),(c) and (d); *Shelton*, 578 F.Supp.2d at 99–100. *See also* N.J.A.C. 6A:16-7.2(a) (in New Jersey services must be provided for changes in placement exceeding *five* school days).

When T.C. returned from his one-day suspension, Mt. Olive conducted something that it called a "risk assessment" of T.C. Ex. 20. The "assessment" used limited clinical judgment, did not ask appropriate questions to determine if T.C. intended to do harm, did not consider the district's responsibility in exposing T.C. to a known trigger, and most importantly, did not consider T.C.'s disability and needs. Ex. 16 at 11, Ex. 17, 83:19-85:18. For example, the assessment emphasized T.C.'s apparent indifference to the impact of his behavior, when a lack of empathy is a common characteristic of autism. *See* Ex. 17, 92: 1-18. Notably, the assessment did not show any threatening statements by T.C. Ex. 20.

Because T.C. was deemed a "risk" by this faulty assessment, Mt. Olive suspended him and conducted an MDR. Unfortunately, Mt. Olive failed to comply with almost every procedural requirement for an MDR, including: failing to notify D.C. of, or include D.C. in, the MDR; failing to consider relevant documents and history; failing to consider the impact of T.C.'s disability on his behaviors; failing to include critical members of T.C.'s IEP team such as the behaviorist and T.C.'s aide; and failing to consider teacher observations. Ex. 21 at 3. Mt. Olive's Assistant Director of Special Services admitted during her testimony that D.C. received no written notice of the MDR. Ex. 12, 118:11-24.

The incomplete MDR team, with inadequate evidence, determined that T.C.'s behavior was not related to his disability. The MDR team further determined that T.C. was suspended pending "psychiatric clearance," which is tantamount to an indefinite – and therefore illegal – suspension in violation of 20 U.S.C. §§ 1415(k)(1)(C), (G). D.C., who has very limited resources, obtained a psychiatric assessment of T.C., Ex. 22, which she paid for on her own. Ex. 23. According to the psychiatrist, T.C.'s behavior was "based solely on his disability." Ex. 22. Mt. Olive, for no stated reason, continued to bar T.C. from school even upon receiving the psychiatrist's clearance. It was not until D.C. requested emergent relief and a settlement

28

was reached by counsel, that Mt. Olive allowed T.C. to return.   Ex. 33. During the two months that Mt. Olive barred T.C. from school, he received a mere six hours of home instruction.   Ex. 24.

The ALJ did not discuss the extensive evidence regarding Mt. Olive's serious violations of the MDR requirements or its denial of educational services, in her brief discussion of the MDR.   *See*, Ex. 30, 24-29.

### 5.   Mt. Olive Impeded T.C.'s Parent from Participating in the Decision-Making Process

Mt. Olive repeatedly excluded T.C.'s parent from the decision-making process regarding T.C.'s education, automatically depriving T.C. of FAPE. Crucial to IDEA is that parents of students with disabilities can participate at every stage of the process.   *See, Rowley*, 458 U.S. at 208 ("Congress sought to protect individual children by providing for parental involvement.") Where a procedural violation of IDEA "significantly impedes the parents' opportunity to participate in the decision-making process," the student is denied FAPE.   *S.N.*, 2012 WL 4753428 at *2. Mt. Olive failed to notify D.C. when it changed T.C.'s educational placement and conducted an MDR, and it regularly ignored D.C.'s requests and concerns regarding T.C.'s education.

(a)   *Mt. Olive's failure to provide D.C. with prior written notice when it changed T.C.'s educational placement greatly compromised D.C's role in the IEP process*

Mt. Olive excluded D.C. from the decision-making process by failing to provide written prior notice of a change in T.C.'s educational placement. A district must provide "written prior notice" to the parent when it proposes to initiate or change, or refuses to initiate or change, a child's educational placement.  20 U.S.C. § 1414(b)(3); *D.E.R.* v. *Bd. of Educ. Of Borough of Ramsey*, No.Civ.A.04-2274, 2005 WL 1177944, at *13 (D.N.J. May 18, 2005) (district's failure to provide proper written notice to the parent when it changed the student's grading system violated IDEA.) The "educational placement" of a child is more than the "bricks and mortar" of a particular school; rather, it includes the educational program, such as "the classes, individualized attention and additional services a child will receive." *T.C.* v. *N.Y.C. Dep't. of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).  The "touchstone" of whether a modification is a "change in educational placement" is whether it "is likely to affect in some significant way the child's learning experience." *P.V.*, 2013 WL 618540 at *6 (internal citation omitted). In *P.V.*, the court found that a change in placement had occurred because "an unplanned transition for children with autism is likely to affect their learning

30

rate and learning sequences" because "difficulty with transition is one of the *defining* characteristics of children with autism." *Id.* at *7.

Mt. Olive never notified D.C. that it removed OT services – that he had been receiving twice per week for years – from T.C.'s IEP, Ex. 1 – Ex. 5. In fact, D.C. was not informed of this change in T.C.'s educational placement until the present matter was brought to the Office of Administrative Law. Ex. 15, 55:9-20. The total and swift removal of a crucial service is likely to impact any student's learning experience, but T.C. suffered even more because of his difficulties with transition and change. Ex. 8 at 3 (T.C. "display[ed] extreme frustration transitioning from one environment to another,"); Ex. 9 at 3 (T.C. has general "difficulties with adaptability and transitions"). Thus, removal of OT was, unquestionably, a change in T.C.'s educational placement that significantly impacted his learning, and Mt. Olive's failure to provide prior notice of this change denied T.C. FAPE.

While the ALJ found that D.C. "maintains" that she did not receive notice of the MDR, the ALJ never discussed the clear evidence that Mt. Olive had, in fact, failed to provide such notice. Ex. 30 at 26, Ex. 12, 118:25-119:5.

31

(b)    *Mt. Olive's failure to provide D.C. with notice of, and the opportunity to participate in, T.C.'s manifestation determination review denied D.C. her right to participate in T.C.'s educational process*

Mt. Olive prevented D.C. from participating in the decision-making process when it held T.C.'s MDR without her, and when it even failed to notify her of the MDR. A parent's presence at an MDR is required, 20 U.S.C. § 1415(k)(1)(E); *Doe* v. *Todd County Sch. Dist.*, 625 F.3d 459, 461 (8th Cir. 2010), and the "denial of parental participation" in an MDR is a "*substantial* and *serious* violation of the IDEA." *Brown* 759 F. Supp.2d at 947 (emphasis added). Even though D.C.'s involvement in the MDR was an absolute prerequisite, Mt. Olive moved forward without her after noting that she was not present. Ex. 21 at 3; Ex. 17, 89:18-90:7. This failure to include the parent in an MDR constitutes a deprivation of FAPE standing on its own. *Brown* 759 F.Supp.2d at 947. Moreover, the faulty MDR resulted in a complete deprivation of education to T.C. for over two months, another significant substantive violation of IDEA. Despite the testimonial and nontestimonial evidence that D.C. had not received notice of the MDR, the ALJ did not make any findings about her absence. Ex. 30 at 16.

32

(c)   *Mt. Olive's failure to respond to D.C.'s requests and concerns
      greatly limited D.C.'s role in T.C.'s education*

Mt. Olive prevented D.C. from participating in the decision-making process in countless ways: Mt. Olive ignored D.C.'s request for an FBA for T.C., Ex. 14, Ex. 12, 125:5-14; ignored her simple request for T.C.'s locker to be moved away from a known trigger, Ex. 12, 110:23-112:7; and ignored her repeated requests, in writing and at meetings, to change T.C.'s IEPs to address his sensory, behavioral, social, and academic needs. Ex. 1 – Ex. 7, Ex. 14, Ex. 28, Ex. 29, Ex. 32. Taken together, these denials of parental participation violated the very core of IDEA's mandate that the parent be a critical member of the team that develops the student's education.

The ALJ found that D.C. was "actively involved" in T.C.'s education, Ex. 30, at 27, but ignored the undisputed fact that D.C.'s requests and concerns were continually ignored by Mt. Olive in violation of IDEA.

6.   Mt. Olive Prematurely Graduated T.C., Despite the Fact that he
     had a Flawed "Transition Plan," Failed to Meet any of his IEP
     Goals, and was Wholly Unprepared for Post-Secondary Life

Despite undisputed evidence that T.C. had a grossly insufficient transition plan, had not met his IEP goals and objectives, and was wholly unprepared to graduate from high school, Mt. Olive determined that T.C. should graduate in June 2012. Ex. 26. Mt. Olive's decision to forcibly

graduate T.C. completely disregarded his unique needs, educational records, and unmet goals, as well as his parent's repeatedly documented objections.

A school district must create and annually update a "transition plan" in a student's IEP, including courses of study and strategies related to the student's strengths, interests and preferences, that are "intended to assist the student in developing or attaining postsecondary goals related to training, education, employment and, if appropriate, independent living." N.J.A.C. 6A:14-3.7(e)(11). *See also* 20 U.S.C. § 1414(d)(1)(A)(i); *Rodrigues* v. *Ft. Lee Bd. of Educ.*, No. 2:08-cv-05736, 2011 WL 486151, at *9 (D.N.J. Feb. 7, 2011).

Children with disabilities have the right to stay in school through the age of 21, or until they graduate. 20 U.S.C. § 1412(a)(1); N.J.A.C. 6A:14-1.1(d), 1.3. A student with disabilities can only be graduated upon meeting general graduation requirements and making progress on, or completing his or her IEP goals and objectives. *Chuhran* v. *Walled Lake Consol. Sch.*, 839 F. Supp. 465, 474 (E.D. Mich. 1993), *aff'd* 51 F.3d 271 (6th Cir. 1995). Promotion from grade to grade does not necessarily show that the student received FAPE or made progress towards his or her IEP goals and objectives. *See, e.g., Rowley*, 458 U.S. at 203 n.25.

(a)   *Mt. Olive failed to provide an appropriate transition plan in T.C.'s IEP to prepare him for postsecondary life*

T.C.'s transition plan and services were almost non-existent.   Mt. Olive never conducted annual assessments of T.C.'s strengths, preferences, interests and needs to guide T.C.'s transition plan and services.   Ex. 4, Ex. 5, Ex. 6, Ex. 7.   Mt. Olive did not conduct a career interest inventory of T.C. until the very end of his senior year and even then, never utilized the results. Ex. 12, 130:4-131:7.   Mt. Olive therefore lacked the basic information to guide its transition planning, to create appropriate and measurable postsecondary goals, or to design a course of study and related strategies consistent with such goals for T.C.   Ex. 4 – Ex. 7, Ex. 16 at 5-7.

The ALJ erroneously found that T.C.'s transition plan had been updated annually, Ex. 30 at 28, which ignores all evidence and testimony to the contrary.   Ex. 4, Ex. 5, Ex. 6, Ex. 7.   In fact, T.C.'s transition plan in his most recent IEP included information that was four years outdated, and repeated word-for-word the language from previous year's plans.   *Id.*

Moreover, Mt. Olive failed to provide even the minimal, boiler-plate transition services included in each of T.C.'s IEPs.   Ex. 4, Ex. 5, Ex. 6, Ex. 7.   For example, T.C.'s IEPs provided that he required linkages to the New Jersey Division of Vocational Rehabilitation Services, the Center for Academic Support and Enrichment Horizons, and the New Jersey Division

of Developmental Disabilities, as outlined by N.J.A.C. § 6A:14-3.7(e)(11).

Mt. Olive never arranged for T.C. to meet with these agencies.

These failures to provide transition planning to T.C. violated IDEA substantively and procedurally. *See Dracut Sch. Comm.* v. *Bureau of Spec. Educ. App. of the Mass. Dep't. of Elementary and Secondary Educ.*, 737 F.Supp.2d 35, 50 (D. Mass. 2010)(district's failure to provide appropriate transition-related assessments and goals denied student FAPE because IEP was not reasonably calculated to confer meaningful benefit in the critical areas of vocational, pragmatic language or independent living skills.)

    (b)    *T.C. failed to meet any of the goals in his transition plan*

T.C.'s postsecondary goals were repeated in each IEP – to go to college, to work in computer animation or theater arts, and to live independently.  Ex. 4, Ex. 5, Ex. 6, Ex. 7.  However, T.C.'s IEP had no measureable goals and objectives related to employment, or postsecondary goals in the areas of training and education. Ex. 16 at 7.  At the end of his senior year, T.C. had not applied to any colleges or vocational programs, had never received any information about the application process, and had never received job sampling in his stated areas of interest – animation or theater. Ex. L, 135:14-20.   Mt. Olive's Assistant Director of Special Services admitted that Mt. Olive had not helped T.C. achieve any of these goals.  Ex.

12, 128:16- 21, 129:2-10. Mt. Olive also did not provide *any* services to help T.C. achieve his goal of living independently, Ex. 17, 68:6–9, and T.C. was ultimately deemed to require a legal guardian based on his lack of cognitive capacity to make decisions for himself. Ex 11 at 4. As a result of Mt. Olive's failure to provide appropriate transition planning, T.C. had not met any of his postsecondary goals when Mt. Olive forcibly graduated him.

      (c)    *T.C. was wholly unprepared to graduate in June 2012*

Although Dr. Daniel DaSilva, the neuropsychologist hired by Mt. Olive to evaluate T.C., specifically recommended life skills training, Ex. 9 at 11-12, Mt. Olive never provided any such training, Ex. 5, Ex. 6, Ex. 7. Experts described T.C.'s life skills deficits, and his need to receive special education and related services until age 21. *See* Ex. 34; Ex. 13 at 10-11; Ex. 16 at 13-14; Ex.17, 189:14-15; 69:14-22. One year after Mt. Olive ignored his recommendations, Dr. DaSilva observed that T.C. "continues to lack the adaptive skills that are necessary for independent functioning" and emphasized that he "cannot overstate the extent to which [T.C.] remains unprepared to transition into the workforce" or "meet the demands of [a] more independent post high school environment." Ex. 34.

D.C.'s concerns about T.C. graduating were documented in his most recent IEP, Ex. 7, and testified to by district personnel. Ex. 12, 137:8-20.

37

Nonetheless, the ALJ erroneously stated that D.C. did not object to T.C.'s graduating. Ex. 30 at 22. The ALJ also erroneously found that D.C. rejected Mt. Olive's offer of life-skills courses, Ex. 30 at 22, despite the lack of any supporting evidence.

    (d)   *Mt. Olive and the ALJ erroneously relied solely on T.C.'s grades to determine that T.C. was prepared to graduate*

Mt. Olive insisted that T.C. made progress, Ex. 12, 33:11-13, relying solely on his grades. *Id.*, 34:1-5. Indeed, T.C. maintained a mostly A average in Spring 2012, despite his inappropriate educational program and placement, lack of adequate supports, lengthy absence from school, and the fact that he never caught up with his class work. It is *impossible* that T.C.'s high grades were warranted, let alone that he met all graduation requirements. In the face of extrinsic nontestimonial evidence of regression, grades are insufficient indicia of a student's progress.

Nevertheless, the ALJ relied heavily on T.C.'s grades as "objective indications that he was making progress," in reaching her final decision. Ex. 30 at 27. The ALJ was "more persuaded by the evidence" by Mt. Olive, pointing *solely* to "the pupil records" and "T.C.'s grades" the district offered to show that T.C. should be graduated. Ex. 30 at 27. However, giving greater weight to district personnel – as opposed to objective indicia and independent experts – solely because they were involved in T.C.'s daily

school experience is inappropriate under the law. *R.S.* v. *Montgomery Twp. Bd. of Educ.*, No. 10-5265, 2012 WL 2119148 at *7 (D.N.J. June 11, 2012)(if such reasoning prevailed, "few students would ever be able to prevail against a school district," and "administrative hearings conducted by an impartial decisionmaker would be unnecessary").

Mt. Olive's appraisals of T.C. are deeply unreliable in the face of his inadequate transition plan, unmet postsecondary goals, and evidence of academic, social and behavioral regression. T.C.'s grades are insufficient to refute this evidence. *See Rowley*, 458 U.S. at 203 n.25 (student's advancement from grade to grade does not automatically establish provision of FAPE). Thus, the ALJ's erroneous findings of T.C.'s preparedness to graduate should not be given due weight by this Court. When Mt. Olive graduated T.C. and ceased to provide T.C. with *any* educational services in the face of strong evidence that T.C. was neither academically or socially-emotionally prepared, it clearly denied T.C. FAPE.[10]

## CONCLUSION

Any one of Mt. Olive's myriad substantive or procedural violations of IDEA, alone, unquestionably deprived T.C. of FAPE. Taken together, there is no doubt that T.C. is entitled to summary judgment, reversal of his

---

[10] Such action further deprived T.C. of his automatic right to stay-put in his most recent educational program until this matter is resolved, pursuant to 20 U.S.C. § 1415(j) and N.J.A.C. 6A:14- 2.7(u).

graduated status, and compensatory services for his educational deprivation

resulting from Mt. Olive's egregious actions and omissions.

Dated:      New York, New York
            May 3, 2013

                    Respectfully submitted,

                    PAUL, WEISS, RIFKIND, WHARTON &
                    GARRISON LLP

              By:_____
                    Jenna S. Harris (jharris@paulweiss.com)
                    1285 Avenue of the Americas
                    New York, New York 10019-6064
                    Tel.   (212) 373-3879
                    Fax.   (212) 492-0879

                    EDUCATION LAW CENTER

                    Ruth Deale Lowenkron
                    (rlowenkron@edlawcenter.org)
                    60 Park Place,
                    Suite 300
                    Newark, N.J. 07102
                    Tel.   (973) 624-1815
                    Fax.   (973) 624-7339


                    *Attorneys for Plaintiffs*
                    *D.C. o/b/o T.C., and D.C.*

40