UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

D.C. o/b/o T.C. and D.C.,

            Plaintiffs,

       v.

MOUNT OLIVE TOWNSHIP
BOARD OF EDUCATION,
                      Defendant.

Civil Action No.: 2:12-cv-05592-
KS-PS

---

**STATEMENT OF MATERIAL FACTS PURSUANT TO L.CIV.R. 56.1**

---

PAUL, WEISS, RIFKIND,
WHARTON   & GARRISON LLP
Jenna Statfeld Harris, Esq.
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3879
jharris@paulweiss.com

EDUCATION LAW CENTER
Ruth Deale Lowenkron, Esq.
60 Park Place, Suite 300
Newark, N.J. 07102
(973) 624-1815, ext. 21.
rlowenkron@edlawcenter.org

*Attorneys for Plaintiffs D.C. o/b/o T.C. and D.C.*

Pursuant to Rule 56.1 of the Local Rules of this Court, plaintiff D.C. o/b/o T.C. and plaintiff D.C. respectfully submit this statement of material facts as to which plaintiffs contend there is no genuine issue to be tried:

1.      T.C. is nineteen years old and resides with his mother, D.C., in the Mt. Olive school district. Ex. 8.

2.      T.C. attended school in defendant Mt. Olive Township Board of Education ("the district" or "Mt. Olive") from 2007 through 2012, and received special education and related services under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA") based on an eligibility classification of "Autistic." Ex. 1, Ex. 2, Ex. 3, Ex. 4, Ex. 5, Ex. 6, Ex. 7.

3.      During the 2011-2012 school year, T.C. was a twelfth grade student in the district. Ex. 7.

4.      T.C. was diagnosed with autism when he was 3 years old.  Ex. 8.

5.      T.C. also has a language disorder.  Ex. 1, *Present Levels of Academic Achievement & Functional Performance: Speech-Language*.

6.      T.C.'s Full Scale IQ is 79, placing him in the 8th percentile and in the borderline range of intellectual functioning. Ex. 9.

7.     T.C.'s scores on cognitive assessments are in the low and very low range. Ex. 7 at 6. T.C. scored in the 3rd percentile in Broad Reading and Reading Fluency, the 3rd percentile for Academic Knowledge, the 2nd percentile for Broad Written Language, the 1st percentile for Broad Math and the $0.5^{th}$ percentile for Math Calculation. Ex. 10. T.C.'s mathematical computation skills are in the deficient range, and his Word Reading score was in the 6th percentile. Ex. 9 at 8.

8.     T.C. requires, and his IEP consistently provided for, the assistance of an individual aide for the entire school day. Ex. 1, Ex. 2, Ex. 3, Ex. 4, Ex. 5, Ex. 6, Ex. 7.

9.     T.C. was exempt from passing the High School Proficiency Assessment ("HSPA"), Ex. 4 at 20; Ex. 5 at 21; Ex. 6 at 21; Ex. 7 at 26, which is generally required to be passed by a student with a disability participating in the general education curriculum in order for the student to graduate from high school according to N.J.A.C. 6A:14-4.10.Mt. Olive's Director of Special Services testified that he did not know that T.C. was exempt from passing the HSPA. Ex. 12, 40:14-15.

10.    When T.C. entered the district in 2007, his Broad Math score was in the 7th percentile, and his Academic Knowledge score was in the 14th

percentile. Ex. 4 at 3. After three years in the district, T.C.'s Broad Math score dropped to the 1st percentile, and his Academic Knowledge score dropped to the 3rd percentile. Ex. 10; Ex. 16, at 2-3.

11.   T.C. was referred for psychological evaluation to determine whether he required a legal guardian. Ex. 11 at 1. According to the New Jersey Department of Human Services, a "decision that an individual needs a guardian is based on a sound clinical assessment of the individual's ability to make choices and decisions, capacity for independent living and understanding of guardianship." BGS Fact Sheet, http://www.state.nj.us/humanservices/ddd/services/guardianship/.  Mt. Olive's Assistant Director of Special Services testified that she was aware that T.C. was deemed to require a legal guardian, Ex. 12, 127:13-15.

12.   T.C.'s most recent IEP placed T.C. in general education classes for more than 80% of the school day. Ex. 7 at 20. T.C.'s most recent IEP provided for in-class support only in his English class, Ex. 7 at 1.

13.   T.C.'s most recent IEP stated that he required accommodations in his general education classes that included permitting self-removal from class, grading only the work completed, reducing the amount of work given, and providing a study guide in advance. Ex. 7, at 18-19.

14. T.C.'s most recent IEP provided for the following Related Services: Speech/Language therapy, Applied Behavioral Analysis ("ABA") therapy and a 1:1 Aide. Ex. 7 at 1.

15. T.C.'s most recent IEP does not describe ABA therapy, or provide any goals or objectives for T.C.'s ABA therapy. Ex. 7.

16. T.C.'s most recent IEP does not provide any "Behavioral Interventions" and stated that such interventions were "[c]onsidered not needed." Ex. 7 at 11.

T.C.'s Social Skills Needs

17. Mt. Olive evaluators note T.C.'s "poor social pragmatics," Ex. 9 at 3, including "perseverative tendencies," *Id.*, and "fleeting eye contact," Ex. 1, *Occupational Therapy Evaluation*.

18. T.C.'s first IEP from Mt. Olive stated that he "will benefit from training in the area of social interaction." Ex. 1 at 2. T.C.'s goals in that IEP include: being able to tolerate sounds "in a socially acceptable manner," being able to "demonstrate more conversational and spontaneous language," and being able to "demonstrate marked improvement in body awareness, [and] understand privacy." Ex. 1, *Goals for [T.C.] IEP developed 2/28/07 through 2/28/08*.

19.   D.C. expressed her concerns about T.C.'s social skills development and training at multiple IEP meetings. Ex. 4 at 3; Ex. 5 at 3; Ex. 6 at 3.

20.   Mt. Olive hired Dr. Daniel DaSilva, a pediatric neuropsychologist, to conduct a neuropsychological assessment of T.C in December 2010. Ex. 9; Ex. 10 at 4; Ex. 17, 134:2-17.

21.   According to that neuropsychological assessment, T.C.'s scores in the areas of social skills and adjustment were "commensurate with those living in supervised settings," Ex. 9 at 9-10. Furthermore, the evaluation noted that T.C.'s "notable impairments in social pragmatics are evident" and "these deficits impact significantly on his day-to-day functioning." Ex. 9 at 11.

22.   T.C.'s neuropsychological evaluation provided the following recommendations for T.C.: a therapeutic environment to address socialization and pragmatics, social skills training in both group and individual settings, multi-modal teaching modalities geared towards his strengths and weaknesses, instructors who are familiar with the needs of teenagers with autism, a certified teacher to serve as T.C.'s aide, a highly structured learning environment with controls for noise, as well as pragmatic, continued speech/language therapy, and life

skills training to prepare for post-high school transitioning. Ex. 9 at 11-12.

23.   T.C.'s subsequent IEPs did not accept, or discuss, these recommendations. Ex. 6; Ex. 7.

24.   T.C.'s most recent IEP mentions a "social skills group." Ex. 7 at 5, but Mt. Olive did not present any evidence that it had, in fact, placed T.C. in any such group. There is no provision for social skills training in the "Related Services" section of the IEP, Ex. 7 at 1, nor do any of the IEP goals and objectives relate to social skills training. Ex. 7.

25.   T.C.'s most recent IEP does not provide for any life skills. Ex. 7, 1-2.

T.C.'s Occupational Therapy and Sensory Processing Needs

26.   Since at least 2007, when T.C. entered the district, he has suffered from anxiety, a "fear of crowded spaces and sensitivity to loud noises," Ex. 1 at 2, and "an extreme sensitivity to babies and the potential that they will cry," Ex. 1 at 4. *See also*, Ex. 1, *Occupational Therapy Evaluation*.

27.   When T.C. first entered the district in 2007, one of his goals in his IEP was "[n]ot being afraid of loud noises." Ex. 1, *My Goals*.

28.   T.C. was privately evaluated by Dr. Chaye Lamm Warburg, DPS, OTR/L, in May 2012. Ex. 13. Dr. Lamm Warburg found that T.C.

meets the criteria for Sensory Processing Disorder ("SPD"), and more specifically, Sensory Modulation Disorder ("SMD") – Sensory Over-Responsive subtype ("SOR"). Ex. 13 at 9; Ex. 15, 76:16-78:6. According to Dr. Lamm Warburg, who testified as an expert in occupational therapy and sensory processing, Ex. 15, 16:23- 17:1, individuals with SPD "are unable to process sensory information accurately. SPD affects the way their brains interpret the information they take in and how they act on that information with emotional, attentional, motor and other responses," Ex. 13 at 9.

29. Mt. Olive repeatedly noted D.C.'s concerns about T.C.'s sound and sensory sensitivities, and her repeated requests that these needs be addressed. Ex. 27; Ex. 28; Ex. 29; Ex. 1; Ex. 2; Ex. 4; Ex. 5; Ex. 6.

30. Mt. Olive conducted an occupational therapy ("OT") evaluation of T.C. in 2007, which noted that T.C.'s "ability to modulate sensory information . . . requires further investigation." Ex. 1

31. Mt. Olive never conducted a sensory assessment of T.C. Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7.

32. Mt. Olive last conducted an OT evaluation of T.C. in 2007. Ex. 7 at 4.

33. Mt. Olive's current occupational therapist, Elizabeth Petersen, testified that she recommended OT to address T.C.'s sensory needs

when she first met T.C. in 2007. Ex. 12, 186:16 -187:4-8. However,
Elizabeth Petersen did not participate in T.C.'s IEP meetings or
provide T.C. with any OT services until three years later. Ex. 4, Ex. 5;
Ex. 3, Ex. 2; Ex. 1.

34.     In January 2008, Mt. Olive's behaviorist introduced a plan to target
T.C.'s behavior of being "[u]pset when observing babies/children as
defined by covering of ears, squinting of eyes, moaning, and inability
to continue with tasks." Ex. 2, *Behavior Management Plan*. The
behaviorist did not discuss any behavioral assessment on which she
based the plan. Ex. 2. The plan noted T.C.'s target behaviors interfere
with his ability to perform skills, remain on task, access less
restrictive environments and social opportunities, and "can cause
harm to [T.C.] himself." *Id.* The plan's strategies included presenting
"videos of babies and/or children in a controlled environment" to
T.C., and "gradually increasing the sound in the videos to that of a
typical listening level." *Id.* There is no information about whether this
plan was implemented, and whether T.C. made any progress on it. Ex.
4; Ex. 5; Ex. 6; Ex. 7. The plan does not appear in subsequent IEPs,
nor are there any notes in T.C.'s records about why it was removed.
Ex. 4; Ex. 5; Ex. 6; Ex. 7.

35.    T.C.'s 2009 IEP did not discuss or address his sound sensitivities or

       sensory needs. Ex. 4.

36.    OT was removed entirely from T.C.'s IEP in May 2011. Ex. 6; Ex. 12,

       97:7-9. The IEP did not provide any basis for the removal. Ex. 6. Mt.

       Olive did not conduct an OT reevaluation prior to removal. Ex. 12,

       218:2-7.The IEP did not include any information about T.C.'s present

       levels with respect to OT needs. Ex. 12, 98:8-19.

37.    Mt. Olive did not consider or discuss an OT re-evaluation at T.C.'

       Reevaluation IEP Meeting in May 2010. Ex. 5; Ex. 12, 95:19- 97: 3.

T.C.'s Extended School Year Program

38.    T.C.'s 2009 IEP provided that T.C. needed an Extended School Year

       ("ESY") program, and that he "will need individualized assistance in

       Math to assist with completion of summer assignment and to review

       math skills taught during the 2008-2009 school year." Ex. 4.

39.    The 2009 IEP does not provide for any additional services for T.C.

       during the ESY program. Ex. 4.

40.    Although Mt. Olive's Assistant Director of Special Services testified

       that in the summer of 2009, T.C.'s sensitivities to small children were

       well documented, Ex. 12, 157:24 –158: 2, and although his 2009 IEP

       did not discuss such a placement, Ex. 4, Mt. Olive assigned T.C. to

work as a teacher's assistant in an elementary school classroom during the 2009 ESY. *Id.*, 157:20-23; Ex. 5.

41.    T.C.'s 2010 IEP assigned T.C. to function as a teacher's assistant in a class with elementary school age students for his 2010 ESY. Ex. 4.

42.    In fact, T.C. was placed in a preschool classroom as a teacher's assistant. Ex. 12, 158:3-7.

43.    During the first few days of T.C.'s ESY program in 2010, T.C. ran away from the school building. Ex. 12, 65:14-22. Mt. Olive's Director of Special Services testified that T.C. had been "nervous about coming into the school," and that the district had to contact the police to locate T.C.  Ex. 12, 65:14-25.

44.    T.C. did not return to the ESY program, (Ex. 12, 65:14-22) and did not receive any further services during that summer. Ex. 12, 158:17-22.

T.C.'s Individual Aide

45.    In May 2011, T.C. began working with a new individual aide.  Ex. 6. T.C.'s teachers observed that T.C.'s disposition and level of effort in class improved since he started working with the new aide, that he was "more tolerant of loud noises" and "demonstrated an ability to ignore a particular student when encountered in the hallway whereas

he previously had difficulty in doing so." Ex. 6, *Academic Achievement Functional Performance*. In a letter to the district in July 2011, D.C. requested that the aide remain the same, noting that she agreed to T.C.'s educational placement for the 2011-2012 school year "with the understanding by all that [the same aide] would be working with [T.C.]." Ex. 31. D.C. stated further that a "change of aide now will cause a regression for him at this point and should be avoided at all costs." *Id.*

46.     T.C. was assigned another aide who was not a certified teacher during the 2011-2012 school year. Ex. 12, 129:25-130:3. Mt. Olive did not provide any reason for the change.

T.C.'s Behavioral Needs

47.     In January 2011, D.C. requested that Mt. Olive conduct a Functional Behavioral Assessment ("FBA") of T.C. to "address areas of behavior that may be impeding meaningful progress for [T.C.] in the areas of both social and the academic challenges." Ex. 14. Mt. Olive did not perform an FBA upon receipt of the parent's request and did not provide any response to the parent's request. Ex. 12, 125:8-14.

48.     In March 2011, T.C. began experiencing difficulties with one particular Mt. Olive student, who is also classified and receives

special education services. Ex. 12, 61:1-14; 22-24. T.C. had three significant incidents with the particular student during the 2010-2011 and 2011-2012 school years. Ex. 18; Ex. 12, 61:1-14.

49.   D.C. requested that T.C.'s locker be moved because it was located right next to the mailroom where the particular student worked. Ex. 12, 112:25-113:11.Mt. Olive did not move the locker. Ex. 12, 110:23-112:7

50.   In May 2011, Mt. Olive's behaviorist introduced an "ABA Update" with one goal: to have T.C. "walk by without saying anything or touching anyone, when a specific student is making loud, unexpected noises." Ex. 6, *ABA Update*. The update provided for seven "steps," and noted that steps 1-3 were "completed," but provided no further information about these steps or any of the other steps. *Id.* There are no notes about the basis of this plan, or how it was developed. Ex. 12, 108:19 – 109:8. The behaviorist did not provide any positive behavioral supports for T.C. Ex.12, 111:12-19.

51.   T.C.'s October 2011 IEP did not mention T.C.'s sound and sensory sensitivities, and did not contain a behavior management plan, an ABA update or OT goals.  Ex. 7. It also did not include any mention of parental concern about these needs. Ex. 7at 5.

52.   T.C.'s October 2011 IEP stated that behavioral interventions were "considered not needed." Ex. 7at 11.

53.   In November 2011, T.C. himself requested that his locker be changed, because it remained next to the particular student's work setting. Ex. 12, 111:6-17. However, the locker was not changed. Ex. 12, 112:5-7.

54.   On January 13, 2012, the particular student approached T.C. when he was at his locker, and she was screaming. Ex. 20. T.C. responded by hitting her. Ex. 20.  T.C. was suspended for one day. Ex. 19.

55.   After T.C. had returned to school for a number of days, D.C. received notice that T.C. was indefinitely suspended pending a psychiatric evaluation because he "continues to present a threat."  The notice referenced a "risk assessment," but the mailing to the parent did not include such assessment. Ex. 18.

56.   According to the "risk assessment," which D.C. only received months later during the due process hearing at her attorney's request, T.C. stated that he didn't care that he hurt the other student "because she is so annoying." Ex. 20. When the evaluator asked T.C. what he would do if he saw the particular student again, he stated that he would "try to avoid her." Ex. 20.

57.  A manifestation determination review ("MDR") meeting was held on February 6, 2012, Ex. 21, two weeks after T.C.'s suspension on January 19, 2012. Ex. 18. The meeting took place without D.C. or a behaviorist. Ex. 21 at 3; Ex. 12, 118: 11-24.  Mt. Olive's Assistant Director of Special Services admitted during her testimony that T.C.'s mother received no written notice of such a meeting. Ex. 12, 118: 25-119:7. The incomplete MDR team determined that T.C.'s behavior was not caused by his disability, did not have a direct or substantial relationship to his disability, and was not a result of the school's failure to implement the student's IEP.  Ex. 21, at 1-2.  The team further determined that T.C. was suspended pending psychiatric clearance. Ex. 21at 2.

58.  D.C. was finally able to obtain a psychiatrist's assessment of T.C. on March 15, 2012 by Dr. Jeffrey Wolff, Ex. 22, which she paid for on her own.  Ex. 23.

59.  Dr. Wolff found that T.C.'s behavior towards the specific student was "based solely on his disability." Ex. 22.

60.  During the more than two months that T.C. was barred from school, he only received 6 hours of home instruction. Ex. 24.

61.     Mt. Olive did not conduct an FBA or provide a Behavioral

        Intervention Plan to T.C. at any time after the January 2012 incident.

        Ex. 12, 123: 14-17. Mt. Olive did not present any evidence regarding

        its consideration of any behavioral supports for T.C. following the

        incident. Nor did Mt. Olive present any evidence regarding its

        consideration of any supports to address T.C.'s sensory needs after the

        incident.

62.     Mt. Olive's Director of Special Services testified that he would be

        surprised if Mt. Olive had not provided an FBA. Ex. 12, 40:8-10. In

        fact, Mt. Olive never conducted an FBA of T.C. Ex. 4; Ex. 5; Ex. 6;

        Ex. 7; Ex. 12, 125:11-23.

T.C.'s Transition Services and Forced Graduation

63.     T.C. repeatedly expressed an interest in going to college after high

        school graduation. Ex. 4 at 6; Ex. 5 at 6; Ex. 6 at 6; Ex. 7at 7.

64.     Mt. Olive's Assistant Director of Special Services testified that she

        was "uncertain" as to whether T.C. had applied to college and that she

        did not "believe" that anyone from the district helped T.C. obtain

        college applications. Ex. 12, 128:16- 21. The Assistant Director

        testified further that the team may have discussed a college with a

vocational program, but that she does not "believe" T.C. applied to
that program either. *Id.,* 129:2-10.

65. T.C. also expressed an interest in computer animation and theater arts.
Ex. 4 at 6; Ex. 5 at 6; Ex. 6 at 6; Ex. 7at 7.

66. The "Appropriate Measurable Postsecondary Goals" section in T.C.'s
May 2009 IEP stated that T.C. "expressed interest in attending college
after graduating from high school," and "is interested in pursuing a
full time career in computer animation. He also expressed interest in
working in the theatre arts field." Ex. 4 at 6. These goals are replicated
word-for-word in both T.C.'s May 2010 and May 2011 IEPs. Ex. 5 at
6; Ex. 6 at 6.

67. The "Community Participation" provisions of T.C.'s postsecondary
goals sections in his last three IEPs list T.C.'s affiliation with
numerous community programs.   Mt. Olive's Assistant Director of
Special Services testified that T.C.'s postsecondary goal statement
was exactly the same in each of the three IEPs, despite the fact that
the information was outdated. Ex. 12, 134:14-135:8. The Assistant
Director further admitted that T.C.'s participation in the programs was
accomplished as a result of the parent's or student's initiative, and not
the district's. Ex. 12, 133:10-20; 133: 22- 134:2.

68.    The "Statement of Transition Services" in T.C.'s IEP included only
       one activity related to his career interests – to contact theater unions.
       Ex. 7at 9. There are no notes in T.C.'s records indicating that the
       district contacted theater unions for T.C. Ex. 7.

69.    Mt. Olive did not provide T.C. with any job sampling opportunities
       other than when he was assigned to work as a teacher's assistant
       during one summer. Ex. 12, 135:14-20. Mt. Olive's Assistant Director
       of Special Services admitted that T.C. had never expressed interest in
       being a teacher's aide. Ex. 12, 135:22-136:6.

70.    T.C.'s IEPs stated that information or advice for T.C. is needed from
       the New Jersey Division of Vocational Rehabilitation Services
       ("DVRS"), the Center for Academic Support and Enrichment
       Horizons ("CASE") at the County College of Morris,  and the New
       Jersey Division of Developmental Disabilities ("DDD"). Ex. 5 at 7;
       Ex. 6 at 7; Ex. 7at 8.

71.    DVRS, DDD and CASE were not represented at any of T.C.'s IEP
       meetings. Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 12, 137: 5-7.

72.    T.C.'s IEP provided that T.C. would take a career interest inventory to
       assess personal strengths and interests, and a pre-vocational
       evaluation, during the 2010-2011 school year. Ex. 5 at 9. His May

2011 and October 2011 IEPs state that these assessments would be conducted in the 2011-2012 school year. Ex. 6; Ex. 7

73. Mt. Olive never conducted a "pre-vocational evaluation" of T.C. Ex. 4; Ex. 5; Ex. 6; Ex. 7.

74. Mt. Olive did not conduct the career interest inventory until the second semester of T.C.'s senior year. Ex. 33. Mt. Olive did not share the results of the evaluation with T.C.'s mother. Ex. 12, 130: 25-131:7. Mt. Olive did not use the results of the evaluation in T.C.'s transition planning, and Mt. Olive's Assistant Director of Special Services admitted that the inventory was not used to help T.C. develop postsecondary goals. Ex. 12, 130:4-6).

75. Mt. Olive's Director of Special Services testified that he would be surprised to find that Mt. Olive did not conduct a Functional Vocational Evaluation ("FVE"), but could not provide any detail about whether or when an FVE was conducted. Ex. 12, 36:9-25. Mt. Olive never conducted an FVE of T.C. Ex. 12, 89:1-10.

76. T.C.'s "Courses of Study" in his most recent IEP do not include any courses or programs relevant to T.C.'s goals. Ex. 7 at 7.

77. T.C.'s most recent IEP, from October 2011, provided: "Parent is concerned that [T.C.] is not adequately prepared to transition from high school into postsecondary opportunities." Ex. 7 at 5.

78. On March 12, 2012, D.C. filed a due process petition on behalf of herself and T.C., asserting that Mt. Olive failed to provide T.C. with a free appropriate public education ("FAPE") as required by the Individuals with Disabilities Education Act (IDEA). Ex. 30 at 1.

79. Mt. Olive provided notice, dated March 27, 2012, to D.C. that T.C. was eligible to graduate from high school in June 2012. Ex. 26. D.C. immediately amended her request for due process through the Office of Administrative Law on April 10, 2012, challenging the proposed graduation, asserting that T.C. was wholly unprepared to graduate from high school, and affirming that T.C. was denied FAPE by Mt. Olive. Ex. 30 at 1.

Dated:  New York, New York

May 3, 2013

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:_____
Jenna S. Harris
(jharris@paulweiss.com)
1285 Avenue of the Americas
New York, New York 10019-6064
Tel.    (212) 373-3879
Fax.    (212) 492-0879


EDUCATION LAW CENTER

Ruth Deale Lowenkron
(rlowenkron@edlawcenter.org)
60 Park Place
Suite 300
Newark, N.J. 07102
Tel.    (973) 624-1815
Fax.    (973) 624-7339


*Attorneys for Plaintiffs*
*D.C. o/b/o T.C. and D.C.*