NOT FOR PUBLICATION

**United States District Court
for the District Of New Jersey**

D.C.
*on behalf of T.C. and D.C.*

                    Plaintiffs,

      v.

MOUNT OLIVE TOWNSHIP BOARD OF
EDUCATION

                    Defendant.

Civil No.: 12-5592 (KSH)

**Opinion**

**Katharine S. Hayden, U.S.D.J.**

D.C., on behalf of herself and her son, T.C., seeks review of a decision by the Honorable

Mumtaz Bari-Brown, an Administrative Law Judge in the Office of Administrative Law (the

"ALJ"), that found in favor of the defendant, the Mount Olive Township Board of Education

("the Township").  The plaintiffs argue that the Township committed numerous procedural and

substantive violations of the Individuals with Disabilities Education Act ("IDEA," 20 U.S.C.

§ 1400 *et seq.*) over a period spanning several years, thereby denying T.C. the free, appropriate

public education ("FAPE") he is entitled to under the law.  The plaintiffs also separately move

for injunctive relief.  For the following reasons, the Court will grant judgment in favor of the

Township and deny the request for an injunction.

## I. Introduction

The IDEA is a "comprehensive scheme of federal legislation designed to meet the special

educational needs of children with disabilities."  *M.A. ex rel. E.S. v. State-Operated Sch. Dist.*,

344 F.3d 335, 338 (3d Cir. 2003).  Originally enacted in 1970 as part of the Education of the

Handicapped Act, it provides federal funds to assist states "in providing educational services to

children with disabilities," subject to the condition "that states meet a number of substantive and

procedural criteria."  *Id.* at 338 & n.4.

A) Free, Appropriate Public Education

IDEA cases are often "replete with acronyms," *M.H. ex rel. P.H. v. N.Y.C. Dep't of*

*Educ.*, 685 F.3d 217, 223 n.1 (2d Cir. 2012), and this one is no exception.  The first is FAPE.

The IDEA requires those states that "provide special education funds [and that] are eligible for

federal funds to implement state-wide special education programs that guarantee a FAPE to

eligible disabled children."  *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 232 (3d Cir. 2013) (citing

20 U.S.C. § 1412(a)(1)(A)).  The United States Supreme Court has summarized the statutory

definition of FAPE, 20 U.S.C. § 1401(9), as consisting of "educational instruction specially

designed to meet the unique needs of the handicapped child, supported by such services as are

necessary to permit the child 'to benefit' from the instruction."  *Bd. of Educ. of Hendrick Hudson*

*Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 188–89 (1982).  The programs

provided under the IDEA reflect a preference for "mainstreaming," meaning that a child should

be placed in the least restrictive environment that will provide him with a meaningful educational

benefit.  *L. E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006).

B) Individualized Education Program

The second essential IDEA concept is the "individualized education program" ("IEP"),

the "centerpiece" of the IDEA.  *See D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir.

2010).  The statute identifies numerous procedural and substantive criteria that must be met for

an IEP to be deemed satisfactory.  *See* 20 U.S.C. § 1414(d).  "The IDEA does not set forth

definitive guidelines for the formulation of an IEP, but at a minimum, [t]he IEP must be

'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light

of the student's 'intellectual potential.'"  *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717 (3d

Cir. 2010) (citations and some internal quotation marks omitted).  "The right to a FAPE ensures

that students with special education needs receive the type of education that will 'prepare them

for further education, employment, and independent living.'"  *Id.* (quoting 20 U.S.C.

§ 1400(d)(1)(A)).  However, school districts are not required to "maximize the potential" of each

student.  *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 426 (3d Cir. 2013) (citations

omitted).

### C) The IDEA is a Collaboration Between Schools & Parents; States and the Federal Government

Under the IDEA, providing a FAPE is a "collaborative process . . . between parents and

schools," with the IEP as the "central vehicle" for the collaboration.  *Ridley Sch. Dist. v. M.R.*,

680 F.3d 260, 269 (3d Cir. 2012).  School districts work with parents to design the IEP, which

"must include an assessment of the child's current educational performance, must articulate

measurable educational goals, and must specify the nature of the special services that the school

will provide."  *Id.* (internal quotation marks omitted).

"In addition to the general requirements set out in the IDEA, state and federal regulations

detail the implementation of the statute."  *S.H.*, 336 F.3d at 264 (3d Cir. 2003).  The relevant

federal regulations can be found at 34 C.F.R. § 300 *et seq.*; New Jersey's codification of the

IDEA requirements is contained in Title 6A, Chapter 14 of the New Jersey Administrative Code.

*See, e.g.*, 34 C.F.R. § 300.320–23 (defining IEP substance and procedures); N.J.A.C. § 6A:14-

3.7 (same).  New Jersey's IEP requirements follow the federal requirements.  *See D.S.*, 602 F.3d at 557 n.1.  And under the state's regulations, "a child study team, which includes a school psychologist, a learning disabilities teacher-consultant, and a school social worker, along with specialists in the area of disabilities, school personnel, and parents[, is] 'responsible for identification, evaluation, determination of eligibility, development and review of the individualized education program, and placement.'"  *J.T. ex rel. A.T. v. Dumont Pub. Sch.*, 533 F. App'x 44, 46 n.2 (3d Cir. 2013) (nonprecedential).

### D) Process for Relief under the IDEA

"When a party objects to the adequacy of the education provided, the construction of the IEP, or some related matter, IDEA provides procedural recourse: [i]t requires that a State provide '[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of [a FAPE] to such child.'"  *Winkelman ex rel Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525 (2007) (quoting 20 U.S.C. § 1415(b)(6)).  This takes the form of an administrative proceeding centered around an "impartial due process" hearing, 20 U.S.C. § 1415(f)(1); *see also R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012) (clarifying that a due process hearing is "a type of administrative challenge unrelated to the concept of constitutional due process"). After state proceedings are finished, "the IDEA permits an aggrieved party to bring a civil action in any court."  *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 257 (3d Cir. 2013) (citing 20 U.S.C. § 1415(i)(2)(A)).

## II. Factual History

The following is drawn from the exhibits submitted by the plaintiffs as attachments to their motion for summary judgment and the reply brief in support of that motion, as well as the parties' statements of material fact.  The exhibits in question, which are set out in the two relevant declarations by attorney Jenna Statfeld Harris [D.E. 22, 27], include: T.C.'s IEPs from 2007 through 2011, evaluations and other assessments, parent/school correspondence, and documents created during the impartial due process administrative action.  As discussed further below, the exhibits track, but do not match exactly, the record compiled before the agency.

Since the exhibits are, with one exception, all attached to the first Harris declaration, the Court will refer to them by the exhibit numbers assigned by the plaintiffs.  Because they are inconsistently paginated and often contain inserts and enclosures, the Court will cite to specific page ranges when possible but will otherwise describe the documents in detail sufficient to identify their place in the record.

A) Background – Childhood through Middle School

T.C., now 20 years old, is a young man with high-functioning autism,[1] a disability covered by the IDEA.  *See* 20 U.S.C. § 1401(3)(A).  He was diagnosed at an early age.  At three

---

[1] Per the New Jersey Administrative Code, autism is:

> a pervasive developmental disability which significantly [affects] verbal and nonverbal communication and social interaction that adversely affects a student's educational performance.  Onset is generally evident before age three.  Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routine, unusual responses to sensory experiences and lack of responsiveness to others.

N.J.A.C. § 6A:14-3.5(c)(2).

5

and a half, he attended a half-day preschool program for disabled children in Morris County, transitioning to the private Park Lake School in Morris Plains around age five.  T.C. returned to public school for third grade, enrolling in the Nixon Elementary School in Roxbury Township, then moved to the Lincoln Roosevelt Elementary School (also in Roxbury) for fourth grade.  In April 2003, T.C. withdrew from Lincoln Elementary.  His mother, D.C., home schooled him for the remainder of fourth grade through the third marking period of seventh grade.  (*See* Mount Olive Social Assessment 1–2, Ex. 8.)

In 2004, at the age of eleven and while he was being home schooled, T.C. was given a comprehensive neuropsychological evaluation by pediatric neuropsychologist Daniel DaSilva. The evaluation was requested by the Lincoln Elementary Child Study Team to assess T.C.'s neurocognitive status "and to assist in educational planning."  Dr. DaSilva's report summarized T.C. as exhibiting "wide variability throughout the neurocognitive profile with normal and impaired functioning within virtually all domains."  (*See* 2004 Neuropsychological Evaluation 1, 12, Ex. 42.)

B) February 2007 IEP

The period of home schooling came to a close in 2007, when T.C. was 13.  Reflecting his parents' desire for a "more inclusive educational program" (2007 IEP 2), T.C. was enrolled in Mount Olive Middle School, with the aim of gradually transitioning him into a general-education curriculum.  To assist with this transition, the Mount Olive Middle School created an IEP reflecting its initial evaluation of his abilities.  Both T.C. and D.C. attended the IEP implementation meeting.

The IEP describes him as a "pleasant, hard[-]working student who has made a good adjustment to a shortened program at the middle school," and lists T.C.'s "moderate to severe

6

language disorder," "weaknesses in receptive and expressive language," and "borderline range"

functioning.  (2007 IEP 2, Ex. 1)  The IEP further indicates that T.C. has a "fear of crowded

places and sensitivity to loud noises and baby cries."  (2007 IEP 2.)

One of the IEP attachments is an Occupational Therapy ("OT")[2] Evaluation prepared by

occupational therapist Debra Karros.  The evaluation summarizes T.C.'s abilities and disabilities

in areas ranging from sensory processing to motor skills; his need for "frequent prompts to keep

on task"; and the aforementioned sound sensitivity.  Karros recommended one 30-minute OT

session per week, consisting in part of a "sensory diet," which is a program that anticipates,

controls, and channels sensory stimuli in a productive way.

The IEP lists T.C.'s post-high school interest in going to art school or becoming a

claymation artist.  (2007 IEP 5.)  The IEP indicates that any vocational analysis be conducted

during T.C.'s years at high school.  (2007 IEP 6.)

At various places, the 2007 IEP mentions T.C.'s sound sensitivity.  For example, under a

"Behavioral Interventions" heading, the IEP sets out an Applied Behavioral Analysis program

dedicated to "address[ing] severe reactions to sound situations that are upsetting to T.C."  (2007

IEP 7.)  A list of IEP goals for the year includes "tolerat[ing] unpleasant sounds in a socially

acceptable manner."  (2007 IEP 8b.)

With the goal of integrating T.C. into a general education setting, the IEP lists

modifications, among them "reduc[ing] the amount of content for which [T.C.] will be

responsible," encouraging oral responses in all classes, and grading on work that was completed.

_____

[2] Occupational therapy is the "therapeutic use of self-care, work, and recreational activities to
increase independent function, enhance development, and prevent disability," which "may
include adaptation of tasks or environment to achieve maximum independence and optimum
quality of life."  Stedman's Medical Dictionary 1975 (28th ed. 2006).

(2007 IEP 8a.)  The IEP recommends T.C.'s placement into an "extended school year" ("ESY") program from early in July to mid-August, based on its conclusion  that T.C. would "regress over the summer to the point that he could not recover or recoup information within a reasonable amount of time."  (2007 IEP 12.)

C) 2008 IEPs

The record contains two IEPs prepared in rapid succession in January 2008 (Ex. 2) and February 2008 (Ex. 3), when T.C. was in eighth grade.  The January IEP contains an "Academic Achievement Functional Performance" analysis that reflects T.C. was receiving "in-class support services for Social Studies, Science and Language Arts," and worked with a "one-on-one paraprofessional [aide] that is with him throughout his school day."  The IEP indicates that keeping "the lines of communication open" had been beneficial, and repeats an earlier curriculum modification that T.C. was to be "graded on work he completes," with tests and quizzes "modified to reflect the work that he has completed."  Also included in the January IEP is an Occupational Therapy Summary, which describes the "Alert Program" used by T.C. to "manage his sensory needs."  This program uses  "the analogy of an automobile engine to introduce its concepts of self-regulation to students."  Behaviors like tics and acting out are associated with a "high engine," whereas a "low engine" could be associated with "zoning out" in class.  Strategies for dealing with a "high engine" state include yoga postures, shoulder stands, and use of a body sock.

Once again, and for the same reason as before, the January 2008 IEP contains an ESY recommendation for the summer.  The primary difference between the January and February IEPs appears to be this recommendation, as the February IEP reflects "no current plans" to enroll T.C. in an ESY, subject to further discussion with his parents.  (*See* February 2008 IEP 12.)

D) 2009 IEP

The first high school IEP in the record (Ex. 4) is based on a May 2009 IEP meeting, taking place late in T.C.'s freshman year when T.C. was 16.  It contains much the same information as the earlier ones.  T.C. is described as "transition[ing] well to the high school setting."  (2009 IEP 3.)  An ESY is again recommended. (2009 IEP 14.)  T.C.'s schedule of special educational and related services includes the use of an aide, speech language therapy, and OT.  (2009 IEP 15–16.)

E) 2010 IEP

The 2010 IEP (Ex. 5) reflects D.C.'s desire to remove speech therapy from the IEP, to give T.C. more time to work on OT goals like movement and sensory integration.  (2010 IEP 3.) Via an Academic Achievement Functional Performance evaluation prepared by occupational therapist Elizabeth Peterson, the IEP also indicates that T.C. receives OT "twice a week" to "improve sensory processing as needed in the school environment."

The recommended ESY reflects that the one from 2009 involved T.C.'s assisting in a kindergarten class in "an effort to reduce his sensitivity to noises from babies and young children," reporting that he did "exceptionally well" and wanted to return to a similar program. (2010 IEP 16.)  The IEP also indicates that T.C. had been registered with the Division of Departmental Disabilities, but not with the Division of Vocational Rehabilitation Services. (2010 IEP 7.)

F) Confidential Educational Assessment

In accord with the three-year evaluation process contemplated by N.J.A.C. § 6A:14-3.8(a), T.C. was evaluated by Learning Disabilities Teacher Consultant Christine Pokrywa in late

2010, during his junior year.  Pokrywa met with him in her office and also observed him in a classroom setting, and set forth her findings in a "Confidential Educational Assessment."  (Ex. 10.)

Pokrywa writes that T.C. "had difficulty maintaining attention" and "had trouble staying focused and following through with direction," but "benefitted from movement breaks," "prompting," and "[r]edirection."  His performance in algebra class, for example, indicated a need for direction.

Pokrywa also administered the Woodcock John III-R test, on which T.C. generally scored in the low-average to very low ranges compared to his age-level peers.  For instance, he scored in the 13th percentile for letter-word identification and in the third percentile in the "applied problems" section of the mathematical assessment.

These results, according to Pokrywa, might be misleading.  "It is important to note," Pokrywa writes, "that T.C.'s difficulty with attention may have had a negative influence on all of the areas assessed in this educational evaluation," thereby obscuring his  "true academic potential."  Pokywra noted that T.C.'s in-school performance reflected grades of A's and B's, putting him on the honor roll, and that he expressed an interest in attending college.

G) Dr. DaSilva's Second Report

At D.C.'s request, T.C. was seen in December 2010 for a "follow-up neuropsychological evaluation" by Dr. Daniel DaSilva.  (Ex. 9.)  Issued in April 2011, the report notes that T.C. is being separately treated for anxiety "and for extreme reactions to certain stimuli such as screaming and small children."  (2011 Neuropsychological Evaluation 2.)  Dr. DaSilva also observes T.C.'s need for frequent redirection to stay on task.  T.C.'s speech was "fluent,"

representing his ability to "articulate his thoughts effectively."  (2011 Neuropsychological

Evaluation 3.)

Dr. DaSilva utilized several tests to assess T.C.'s level of ability in areas such as

problem-solving and visuospatial functioning.  One exam revealed an IQ score of 79,

corresponding to a "[b]orderline range of intellectual functioning."  (2011 Neuropsychological

Evaluation 6.)  An emotional/psychological screening revealed him to generally be functioning

in the normal range for many of its tested modalities—such as total problems, internalizing,

externalizing, oppositional defiant problems, and conduct problems—with the exception of his

score on the "affective problems" scale, which was in the "borderline clinical range."  (2011

Neuropsychological Evaluation 8.)  D.C. was asked by Dr. DaSilva to evaluate her son's skills,

producing somewhat different results—for example, she ranked T.C.'s "total problems" in the

borderline clinical range rather than the normal range.  (2011 Neuropsychological Evaluation 8.)

In the summary of his impressions, Dr. DaSilva observed particular weaknesses in T.C.'s

"language functioning, output modulation[,] and processing speed."  (2011 Neuropsychological

Evaluation 10.)  "General intellectual functioning emerged in the Borderline range overall."

(Neuropsychological Evaluation 10.)  Compared with the 2004 evaluation, the updated

assessment showed that in some areas T.C. had stayed the same and in other areas there was

growth.  (2011 Neuropsychological Evaluation 11.)

Dr. DaSilva's recommendations included a "highly structured learning environment with

adequate controls for noise and distraction," a "therapeutic environment to address socialization

and pragmatics," and "specific training life skills in preparation for his transition post high

school" including "[r]eferral to the Department of Developmental Disabilities."

(Neuropsychological Evaluation 11–12.)  Dr. DaSilva wrote that his recommended teaching

modalities were achievable "in the general education environment"; furthermore, "the current arrangement of a certified teacher functioning as [T.C.'s] aide has proven to be appropriate and necessary given [T.C's] needs."  (Neuropsychological Evaluation 11.)

### H) May/June 2011 IEP

The May/June 2011 IEP (Ex. 6) reports, under the heading "Parent concerns for enhancing the education of the student," that D.C. wants T.C.'s teachers to get "more specialized training" in dealing with autistic students, and pushes for "sensory integration strategies"—such as access to a treadmill that she had provided to the school—as part of T.C.'s sensory diet. (May/June 2011 IEP 2.)  An "Academic Achievement Functional Performance" report, dated May 2011, shows T.C. taking a mixture of general education and "resource center" classes, with grades consistently "within the A and B range."  In his senior year, the report indicates he would be taking all general education classes except for study skills.  Although T.C. is described as generally "respectful" and "responsive" in class, he also occasionally displays "visible signs of frustration," redressible by "engag[ing] in movement activities that are part of his sensory integration diet."  According to the report,  the assignment of a new teacher aide in May 2011 led to "considerable improvement in [T.C.'s] disposition and level of effort."

The May/June 2011 IEP mentions T.C.'s difficulty in dealing with a certain female fellow student, noting, for example that, he seems to be "more tolerant of loud noises and has demonstrated the ability to ignore a particular student when encountered in the hallway."  An Applied Behavioral Analysis update lists as a goal "[t]o have T.C. walk by, without saying

anything or touching anyone, when a specific student is making loud unexpected noises," using techniques such as practicing "alternate responses in a controlled environment."[3]

A section on transition planning takes note of T.C.'s interest in attending college with the goal of pursuing a full-time career in computer animation.  (May/June 2011 IEP 6.)  It reflects that, as of early 2011, he had not yet met with a Division of Vocational Rehabilitation Services representative.  (May/June 2011 IEP 7.)  As before, the IEP recommends a summer ESY placement to "provide curriculum reinforcement to prevent regression and [provide] opportunities to continue development of social skills."  (May/June 2011 IEP 16.)  Finally, under the listing of Special Education and Related Services, whereas prior IEPs contained entries for time spent with T.C.'s aide, speech therapy, and OT, the May/June 2011 IEP lists study skills, an aide, and speech therapy, but not OT.  (May/June 2011 IEP 17.)

I) October 2011 IEP

The final IEP in the record dates from October 2011 at the beginning of T.C.'s senior year at Mount Olive.  It lists five special education and related services being provided: study skills classes, in-class English support, small-group speech and language sessions, Applied Behavioral Analysis individual therapy, and an aide.  (October 2011 IEP 1, Ex. 7.)  The IEP team considered reports prepared by Dr. DaSilva and Pokrywa, as well as a social assessment by school social worker Julian Johnson (Ex. 8).  (October 2011 IEP 4.)

The IEP begins with reports from "Math in the Real World" teacher Patricia Sullivan and "Speech and Language 1" teacher Carolyn Ziekiewicz.  The former describes T.C. as "polite and

---

[3] While the record is oblique, the Court gleans that this other student had special needs and was prone to making loud, sudden noises.

respectful" and a hard worker, but "easily distracted."  The latter notes T.C.'s willingness to attend therapy.  (October 2011 IEP 4.)

The IEP discusses T.C.'s impending graduation.  It reflects D.C.'s concern that he is "not adequately prepared to transition from high school," let alone to achieve his primary goal of "liv[ing] independently in his own apartment as an adult."  (October 2011 IEP 5, 7.)  The IEP also contains two pages of lists and "linkages" with post-high school agencies that might offer T.C. support and opportunities, including the Division of Developmental Disabilities and the Division of Vocational Rehabilitation Services.  (October 2011 IEP 8–9.)

J) Parental Letters Reflect Disagreement with Program Development and Implementation

On January 3, 2011, before Dr. DaSilva's report and the three 2011 IEPs discussed above, D.C. wrote to Sharon Staszak, instructional supervisor of special services, and social worker Julian Johnson.  (Ex. 32.)  She characterized "the way that T.C.'s IEP and education [are] being handled right now" as "completely unacceptable," claiming that  "untrained teachers" were "holding him back."  D.C. said that she was creating her own transition plan for T.C.  In a follow-up letter to Staszak and Johnson on January 24 (Ex. 14), D.C. discussed an upcoming aide change, IEP and class-placement problems, and an incident where T.C. was "allowed to leave the building due to lack of supervision and overexposure to very loud, sustained noises from another student."  She further referred to T.C.'s "nonexistent" transition plan and requested a functional behavioral assessment ("FBA") of T.C.

In July 2011, D.C. wrote again to Staszak, complaining of problems with T.C.'s aides and again raising the incident where T.C. left school without supervision.  (Ex. 31.)  D.C. expressed appreciation for T.C.'s current aide, whose experience "helped T.C. to bring his grades back up as well as reducing his anxiety about returning to school."  D.C. hoped for continued stability in

14

T.C.'s aide assignment and deemed "transition after high school" as "not currently being provided by the district in any structured manner."  Finally, in September, D.C. wrote to Johnson and Director of Special Services Michael Iannucci, requesting in part another IEP meeting "to address the additional areas of concern that remain undecided for T.C.'s 2011–2012 school year."  (Ex. 36.)

K) Disciplinary Issues

Beginning in 2011, and as discussed in the IEPs above, T.C. developed an antagonistic relationship with a female student and during his junior year, he had two minor fights with her that were documented.  (*See, e.g.*, Risk Assessment, Ex. 20.)  Because T.C.'s locker was located near this student's, D.C. unsuccessfully requested that T.C. be reassigned lockers.  (*See, e.g.*, Def.'s Opp'n to Pls.' Statement of Material and Undisputed Facts ¶ 49 [D.E. 24-2].)

During T.C.'s senior year, in January 2012, he hit the student after she screamed in his presence.  Initially, this earned him a one-day suspension.  (Ex. 19.)

At a January 18 in-school risk assessment, T.C. said he disliked the student, that she was "annoying" and had "ruined [his] life since she came to this school."  He said that he did not "care that [he] hurt her because she is so annoying."  When asked what he would do if he saw her again, T.C. stated, "I [would] try to avoid her but if she is annoying I am not sure what I would do."  (Risk Assessment.)  A "Psychiatric Evaluation Form" (Ex. 18) dated January 19 but not signed, found that T.C. presented a continuing threat to the other student.  D.C. was ordered to immediately obtain a psychiatric evaluation for him, and he was suspended indefinitely. (Records Release Form, Ex. 18.)

Under the IDEA, the school was required to determine within ten days of T.C.'s suspension whether his misconduct was caused by, or had a direct and substantial relationship to,

his disability; or, in the alternative, whether the conduct in question was the direct result of a failure to properly implement his IEP. *See* 20 U.S.C.S. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e). This is known as a "manifestation determination." In a February 6, 2012 manifestation determination proceeding, school officials affirmed T.C.'s suspension pending psychiatric clearance, finding that the conduct was unrelated to his disability or a failure to implement the IEP. (*See* Manifestation Determination Ex. 21.) It is undisputed that neither D.C. nor a behaviorist was present at the meeting, and according to D.C., she was not given prior written notice of the hearing.[4]

In March 2012, T.C. was evaluated by Dr. Jeffrey Wolff, a psychiatrist chosen by D.C. In his evaluation letter, Dr. Wolff wrote that he "was concerned that [T.C.'s] hitting his peer was based *solely* on his disability." (Ex. 22 (emphasis in original).) In late March, after proceedings in the Office of Administrative Law, a settlement order provided for T.C.'s return to school. About the same time, the Township sent him a "notice of graduation," setting forth that, "barring any unforeseen circumstances," he would be graduating at the end of the 2011–2012 school year. (Ex. 26.)

### III. Procedural History

#### A) Due Process Petition

In March 2012, D.C. filed a due process petition on behalf of herself and T.C, which is not part of the record before the Court. Apparently, the plaintiffs disputed the appropriateness of

---

[4] The Court notes that record support for the lack of written notice is in a statement made on cross examination by Sharon Staszak. (*See* 5/29 Tr. 118:22–119:5.) Whether D.C. received proper notice was not definitely resolved during the agency proceedings, and statements by counsel are not evidence. *See United States ex rel. Bradshaw v. Alldredge*, 432 F.2d 1248, 1248 n.1 (3d Cir. 1970). Because this case does not turn on whether D.C. received proper written notice—for reasons discussed further below—the Court will accept her contention that written notice was not provided.

T.C.'s education program and sought his immediate return to school.  On March 23, a settlement order provided for that.  (*See* Ex. 33.)

Later, in April 2012, the plaintiffs filed a second petition, challenging T.C.'s graduation date.  This matter was resubmitted as a consolidated and amended petition for due process.  (*See* Am. Pet., Ex. A-1 [D.E. 27-1 to 27-9].)

In the amended petition, the plaintiffs contended that the school district had "failed to comply with disciplinary procedures," and was therefore violating T.C.'s right to a FAPE.  "Despite T.C.'s extensively documented sensitivity to small children and loud noises," the plaintiffs argued, the district had placed T.C. in an ESY program two years earlier (during summer 2010) that involved his interaction with preschool children; this made T.C. so anxious that he was "unable to return to the school" to complete the ESY program for that year.  (Am. Pet. 4.)

Turning to the incident with the other student, the plaintiffs contended that because T.C.'s OT-related exercise equipment had been moved, he was frequently exposed to that student both near his equipment and at his locker.  Moreover, T.C.'s aide was, for a period, working with both T.C. and the other student—a situation that plaintiffs characterized as a FAPE violation in and of itself, due to the IEP's requirement of a personal aide.  They complained that D.C.'s requests for a relocation of T.C.'s locker had gone unheeded.  The plaintiffs challenged the May/June IEP program that aimed to desensitize T.C. to that student through exposure, a plan whose failure should have been clear after the January 2012 incident.  (Am. Pet. 5–6.)

The plaintiffs further contended that T.C.'s rights were violated when, without D.C.'s consent, T.C. was questioned about the ongoing risk he posed to the other student.  At the time, D.C. had not received the risk assessment report.  (Am. Pet. 6.)

With regard to the manifestation determination hearing, the plaintiffs emphasized that they were not told about it, and hence were not in attendance.  They claimed that "[a]ll parts of this finding are clearly false," pointing to copious documentation, in IEPs and otherwise, that T.C. was triggered by this other student and had ongoing problems handling her outbursts.  (Am. Pet. 6–7.)

As a consequence, according to plaintiffs, T.C.'s suspension "took place without cause and without any procedural safeguards."  He was not allowed to return to school until late March and received minimal services during his suspension.  "As a result, T.C. was inappropriately denied FAPE from January 23, 2012[,] until March 27, 2012."  (Am. Pet. 7.)  Plaintiffs characterized his transition plan and services as "wholly inadequate," claiming that the Township had failed to prepare him for post-graduation life and violated "requirements under state and federal law."  Among the Township's alleged failures were: failure to ensure T.C.'s enrollment in vocational or skills-based classes; failure to "obtain information regarding postsecondary education"; and failure to "provide a career interest inventory or a Functional Vocational Evaluation."  Despite being about two months away from his proposed high school graduation, he had been "left completely unprepared for this transition" despite D.C.'s "numerous requests."  Any graduation date would be premature, according to the plaintiffs, and his eventual graduation should be based on his individual needs, which had not yet been met.  (Am. Pet. 7–8.)

The plaintiffs requested several different forms of relief, including evaluations like an FBA and vocational assessment, and they argued that a new IEP meeting "must be held" and a behavioral intervention plan created.  Further, the plaintiffs demanded that new transition

materials be developed, with T.C.'s graduation postponed until he had received FAPE,

"including transition services."  (Am. Pet. 8–9.)[5]

B) Administrative Hearing

Over three days of testimony, the plaintiffs and the Township presented their cases to

Judge Bari-Brown.  Neither D.C. nor T.C. testified or submitted certified statements.

At the beginning of the first day of testimony, the ALJ framed the issues before her as

follows:

> This matter concerns the due process by the parents on behalf of their child for
> completions of evaluations, transition meeting, DVRS.  They're challenging
> inappropriate transition plan, related counseling services, FBA, and an SI
> assessment with creation of [a behavioral intervention plan].  The emergency
> relief issue has been resolved. The . . . overall basic issue is whether the . . . Board
> of Education has provided FAPE [a]nd has prepared this child, T.C., to graduate
> on June 21st, 2012.  The parents have challenged that, in saying that FAPE was
> not provided.  And they want . . . continuing education here.  The district shall
> have the burden of proof of providing their testimony and evidentiary documents
> that they have provided FAPE.  . . . The issues that I will be hearing, will be the
> vocational transition provided by the district, which . . . behavior issues, social
> skills, occupational therapy, BIP, and [] there is a transportation aide issue.

(5/29 Tr. 4:8–23, 5:7–11, Ex. 12.)

The Township called three witnesses.  Director of Special Services Michael Iannucci

testified that he had assisted with T.C.'s IEP development and the programs and services

provided throughout his education at Mount Olive.  (5/29 Tr. 32:17–19.)  In Iannucci's opinion,

T.C., who had done "quite well in school," was ready to graduate.  (5/29 Tr. 33:5–13.)  Iannucci

also offered his professional expert opinion that T.C. had derived "meaningful educational

benefit from his program through his IEPs since he's been in-district."  (5/29 Tr. 35:12–19.)

---

[5] An additional claim about transportation services was raised, but apparently not pursued
further.

When asked if he would be surprised to learn that neither a functional vocational evaluation nor an FBA had been conducted, Iannucci said he would.  (5/29 Tr. 37:12–23, 40:8–10.)

The Township's next witness was Sharon Staszak, the instructional supervisor for special services at the Board of Education.  She testified about a number of the incidents addressed in the IEPs and the evaluations of T.C.  From her perspective, an FBA was not required because T.C.'s behaviors were isolated, not consistent.  (*See* 5/29 Tr. 59:7–12.)  His three major incidents with the other student were not a "pattern."  (5/29 Tr. 61:11–17.)  Overall, she testified that  his behavior in class and in school was "great."  (5/29 Tr. 60:19–21.)

Staszak also discussed T.C.'s difficulty with the 2010 ESY, which had been designed to assist him "with his apprehension toward younger children," a plan to which D.C. did not object at the time.  (5/29 Tr. 64:4–9.)  Staszak testified that he "ran away" one day before entering school, an incident Staszak attributed to both his apprehension and "other things" going on at home.  (5/29 Tr. 65:15–16, 22–25, 66:8–9.)  Staszak indicated that T.C.'s parents' separation at that time was one of those things.  T.C. did not return to the summer's ESY except briefly to apologize.  (5/29 Tr. 66:10–24.)  Staszak further said that his attendance at the 2011 ESY was similarly abbreviated, which she attributed to his getting involved in other activities outside of the program.  (5/29 Tr. 67:8–68:5.)

The testimony turned next to T.C.'s impending graduation.  According to Staszak, it had always been "presumed" that he would graduate in four years; at the IEP meetings, D.C. had not voiced concerns over this plan for her son, nor had she previously objected to the grades or placement he was awarded.  (5/29 Tr. 69:5–19, 86:19–87:16, 88:14–22.)  Staszak further testified that the senior-year meeting with the Division of Vocational Rehabilitation Services had indeed taken place.  (5/29 Tr. 78:16–79:19.)  T.C. had completed an "interest inventory" for the

20

Division, which assessed his "possible career interests and vocational interests. (*See* 5/29 Tr. 79:23–80:5.) However, D.C. had rebuffed earlier efforts to provide T.C. with vocational services, because he was "on an academic track"; and, in any event, "both [D.C.] and the [IEP] Team felt that he was college bound." (5/29 Tr. 87:17–88:13, 89:1–10.) In Staszak's opinion, T.C. was "prepared for the academic track in terms of either a community college or vocational type of program, or a four year college," having "gotten the academic skills needed to succeed as well as . . . speech services [and] behavioral services through [Applied Behavioral Analysis]." (5/29 Tr. 89:15–17.) Staszak said that throughout the IEP process, D.C. had been consulted as the "guiding force." (5/29 Tr. 90:18–20.)

Staszak also testified about T.C.'s disciplinary history and the event leading to his suspension. His behavior during his risk assessment was "atypical"; unlike prior incidents, where he had shown remorse, he was "agitated" during the aftermath of this encounter. (5/29 Tr. 81:13–82-7.) Staszak claimed that the requested psychiatric evaluation of T.C. was delayed because D.C. "refused" to have him evaluated, which she told Staszak personally. (5/29 Tr. 82:23–83:12.) Had the psychiatric clearance been obtained immediately, Staszak asserted, he would have been admitted back into school immediately. (5/29 Tr. 83:13–24.) Further, according to Staszak, D.C. had in fact limited T.C.'s time with a school-provided home instructor and speech therapist, believing he could "only handle a certain amount of home instruction at the time." (5/29 Tr. 84:11–85:15.) However, since T.C.'s return to school, Staszak testified that the diligent efforts of his teachers resulted in his being completely caught up with his work. (5/29 Tr. 85:19–86:2.)

On cross, Staszak testified that the absence of OT from the latest IEPs was due to "parental request." (*See* 5/29 Tr. 98:3–12.) She admitted that D.C. and T.C. had requested that

his locker be changed.  (5/29 Tr. 110:23–111:23, 113:4–11.)  With regard to the decision by the

Township to have D.C. bear the cost of evaluating him after his suspension, Staszak explained

this was standard operating procedure.  (5/29 Tr. 117:11–21.)

Staszak was also questioned  at length about the manifestation determination hearing.

She admitted that neither D.C. nor a behaviorist was present at the proceeding.  (5/29 Tr.

118:19–21.)  She confirmed that D.C. was not provided written notice prior to the hearing.  (5/29

Tr. 119:4–7.)

With regard to T.C.'s transition and impending graduation, Staszak was uncertain about

whether he had applied to any colleges.  (5/29 Tr. 128:16–17.)  Nor did she recall discussing at

the IEP meeting D.C.'s concerns over T.C.'s readiness to transition, even though they were

included in relevant IEPs.  (5/29 Tr. 137:8–20.)  Staszak testified she was not aware that T.C.'s

test scores had dropped between his 2007 educational assessment and his 2010 reevaluation.

(5/29 Tr. 151:5–21.)

On redirect, Staszak discussed how Dr. DaSilva's recommendations were evaluated, but

not necessarily adopted wholesale, during the formulation of T.C.'s IEPs.  (5/29 Tr. 171:14–25.)

Staszak emphasized that D.C. never objected to having to pay for T.C.'s post-suspension

evaluation.  (5/29 Tr. 174:3–12.)  Staszak also clarified that D.C. was told about the

manifestation hearing, albeit not in writing.  Staszak said that she tried to call D.C., but was

unsuccessful; a school secretary later spoke to D.C. to inform her of the meeting, but D.C. never

objected to the time or otherwise complained about the scheduling (this testimony, which was

described as "hearsay," was admitted by the ALJ, who signaled that she would not give it great

weight).  (5/29 Tr. 175:3–21.)  Staszak also disputed the narrative of academic decline,

suggesting that the battery of tests administered to T.C. did not accurately reflect his in-class functioning or his overall aptitude. (5/29 Tr. 178:6–25.)

The Township's final witness was Elizabeth Petersen, an occupational therapist at Mount Olive. Petersen discussed T.C.'s individual needs, as well as his sensory diet, "brain gym," and the implementation of the "Alert Program." (*See, e.g.*, 5/29 Tr. 187:4–23, 191:21–192:22, 195:15–196:15.) Petersen had never observed his hypersensitivity to sounds. (5/29 Tr. 197:20–24.) Petersen believed T.C. to be "adaptive," able to avoid stimuli he found to be noxious. (*See, e.g.*, 5/29 Tr. 198:10–23.)

Petersen also testified about the cessation of OT therapy:

Q. Why did you stop seeing him then?

A. T. and a substitute aide . . . stopped in my room and said that when Mrs. C. dropped him off that morning, she said she didn't want him to go to OT anymore.

Q. What did you do after you heard that?

A. We went immediately to the case manager's office. I told the aide that I could not just take her word for that. That this was part of his IEP and I needed to provide the service.

Q. Did you ever hear anything further about that?

A. When . . . me and the aide told the case manager, he said that he would call mom and follow up on it. And, a few days later, probably within a week, I got a new copy of the IEP and OT was not in it.

(5/29 Tr. 199:22–200:14.)

On the topic of T.C.'s in-school behavior, Petersen testified that it varied. (*See, e.g.*, 5/29 Tr. 206:15–207:25.) Ultimately, it was her "professional and expert opinion" that the supports presently in place were appropriate for him. (5/29 Tr. 209:15–25.)

On cross, Petersen said that she did not approve of the removal of OT from T.C.'s IEP. (*See* 5/29 Tr. 218:5–8.)  She testified that his exercise equipment, donated by D.C. and used in his sensory diet, had been relocated and, as a result, he was no longer using it.  (5/29 Tr. 229:9–230:8.)

At the close of the Township's case, the plaintiffs unsuccessfully moved for summary judgment before the ALJ.

On the second day of testimony, the plaintiffs presented the first of their three witnesses. Dr. Chaye Lamm Warburg, an occupational therapist, had earlier conducted an evaluation of T.C., based on in-office and in-school observation, in which she concluded, in effect, that his sensory sensitivities had been inadequately handled by the Township.  For example, the Township should have acted to "immediately" move his locker, and an ESY "placement in an environment replete with the known trigger, noise and screaming, should not have been considered."  (OT Evaluation 10, Ex. 13.)

Dr. Warburg's testimony repeated her earlier critiques.  For instance, although an Alert Program would ordinarily be "updated" for a particular student, here there was no evidence of any revisions to the program.  (*See, e.g.*, 6/4 Tr. 44:8–22, Ex. 15.)  T.C.'s sound sensitivities were not addressed in his stated goals and objectives.  (6/4 Tr. 48:10–16.)  Dr. Warburg testified that D.C. implied, albeit indirectly, that she had not told the IEP team to remove OT from T.C.'s IEP.  (6/4 Tr. 55:11–24.)  Dr. Warburg also said that the "desensitization" strategy used by the Township was an approach to sound sensitivity with which she was not familiar.  (6/4 Tr. 64:23–25.)

On cross, Dr. Warburg agreed that medically-based OT and school-based OT might have different goals.  (6/4 Tr. 90:9–21.)  Dr. Warburg also said that T.C. did not appear to have

reacted negatively to certain loud sounds during her period of in-school observation.  (6/4 Tr. 94:5–12, 118:24–25.)

The plaintiffs' second witness was Dr. Teresa Herrero-Taylor, a doctoral-level board certified behavior analyst and certified school psychologist.  Dr. Herrero-Taylor had conducted an evaluation of T.C, highlighting several areas of concern, such as his "very poor performance in the math and writing areas," that were not adequately addressed by his IEPs.  (*See, e.g.*, Independent Case Review 4, Ex. 16.)  Dr. Herrero-Taylor had also stressed the lack of transition planning evident in his records.  (*See, e.g.*, Independent Case Review 6–7.)

In her testimony, she pointed to the drops she measured in several skill areas, which she said were atypical.  (*See* 6/11 Tr. 49:9–50:5.)  She opined that the educational program provided by Mount Olive in the October 2011 IEP was inappropriate, based on T.C.'s needs and goals.  (*See* 6/11 Tr. 53:21–55:10.)  Further, she contended, the multiple modifications made to his educational program—such as allowing him to be evaluated based on work completed— rendered his grades and other "objective" indicia of progress without real meaning.  (6/11 Tr. 57:12–58:5.)

Dr. Herrero-Taylor also objected to the risk assessment and manifestation determination processes, pointing to the apparent brevity of the assessment and its failure to acknowledge the breadth of T.C.'s disabilities.  (6/11 Tr. 84:1–16.)  She said the result of the manifestation determination was "highly bizarre"; that "every communication" would "reflect [T.C.'s] disability" in some way, and that his apparent "[l]ack of empathy" was "part and parcel to autism."  (6/11 Tr. 88:20–25, 92:6–18.)

Dr. Herrero-Taylor testified that T.C. was not ready to graduate.  She said that T. C. should "remain in school until he's 21" and be provided with opportunities to experiment in

areas of interest to him; to graduate now would leave him adrift, "never holding a job, never going to college and never doing anything productive."  (6/11 Tr. 96:7–97:21.)

The plaintiffs' final witness was Dr. DaSilva, who had performed a 2011 evaluation of T.C. and had recently written a letter expressing his "deep concerns regarding [T.C.'s] ability to independently care for himself at this time."  (Letter 1, Ex. 34.)  On direct, Dr. DaSilva stated that he was surprised that T.C. had been scheduled to graduate and he objected to T.C.'s placement in general education.  On cross, Dr. DaSilva confirmed that the  "primary source of information for" his evaluation of T.C. was D.C., and not T.C.'s "case manager" or "any school staff."  (6/11 Tr. 201:9–25; see also 6/11 Tr. 221:13–21.)  He also acknowledged an apparent inconsistency between his 2011 evaluation and the 2012 letter.  (*See* 6/11 Tr. 218:1–13.)  In the former, he had recommended a "therapeutic environment" (*see* 2011 Neuropsychological Evaluation 12), which in his 2012 letter he had clarified to mean "a program for children and teenagers on the autism spectrum . . . comprising a large portion of the[ school] day."  He stated in the letter that there were several out-of-district programs fitting that description.  (2012 Letter 1–2.)  Notwithstanding, his 2011 evaluation stated that the appropriate teaching modalities could "be achieved in the *general education* environment."  (2011 Neuropsychological Evaluation 11 (emphasis added).)

The record as compiled before the ALJ included the various IEPs and evaluations, some additional educational materials (such as T.C.'s report cards), parent letters, and CVs of the testifying witnesses.  Certain of the plaintiffs' exhibits were challenged, and were either retracted or admitted for identification only.  (*See, e.g.*, 6/11 Tr. 5–25.)

C) ALJ's Decision

26

In a written decision, the ALJ found in favor of the Township, finding that D.C. "was in agreement with" T.C.'s 2011 IEP program. (ALJ Op. 15 [D.E. 22-53].) Further, D.C. "did not want T.C. pulled from academic classes for related services" and "did not request mediation or due process to challenge the appropriateness of the May/June 2011 IEP." (ALJ Op. 15.)

Having "carefully weighed the evidence and observed the demeanor of each witness for inconsistencies in their testimony" (ALJ Op. 26), the ALJ found the plaintiffs' witnesses to be unpersuasive. With regard to Dr. Warburg's testimony, the ALJ observed that while Dr. Warburg "disagreed with the District's transition plan and claimed that it failed to address [T.C.'s] sensory needs," her disagreement focused more on "the method used to apply the modifications and related services" rather than the services themselves. (ALJ Op. 26–27.) The ALJ pointed in this regard to similarities between the testimony of Dr. Warburg and Petersen on the level of OT recommended. (ALJ Op. 27.) With regard to Dr. Herrero-Taylor, the ALJ determined that her testimony and conclusions would "have little basis for merit," because she offered "[n]o evidence that she reviewed T.C.['s] work product." (ALJ Op. 27.) And Dr. DaSilva's recommendations for out-of-district placement were "inconsistent and were unduly influenced by the parent's desperation." (ALJ Op. 27.)

D.C.'s concerns, the ALJ ruled, were "legitimate," and the record reflected the great deal of attention paid to T.C.'s education and development. (ALJ Op. 27.) However, "[n]otwithstanding T.C.'s deficits, there is no indication that she or any member of the District would conclude, as did Dr. Herrero-Taylor, that T.C.'s post-secondary goals to attend college or work in the field of theatre arts were 'unrealistic, not in touch with reality and not achievable for T.C.'" (ALJ Op. 27.)

27

The ALJ found the evidence offered by Mount Olive to be more persuasive, citing T.C.'s grades as "objective indications that he was making progress."  (ALJ Op. 27.)  Further, "the credible evidence amply demonstrated that T.C.'s parent was actively involved in developing his education program, and participated in all IEP and transition planning."  (ALJ Op. 28.)  Thus, while "T.C. might not have attained college entry at this time as hoped for by the parent, I am persuaded that [he] is ready to enter vocational training to improve daily living skills begun in the Mt. Olive public school"—services that could be provided by state agencies.  (ALJ Op. 28.)

In sum, the ALJ concluded that the challenged IEP "complied with the foregoing regulations and requirements to provide T.C. with a FAPE in the least restrictive environment" and that he had met his graduation requirements.  (ALJ Op. 29.)

D) The IDEA Lawsuit

In early September 2012, the plaintiffs filed suit in this Court against the Township.  In their complaint [D.E. 1], they claimed that the Township violated T.C.'s rights under the IDEA and its associated regulations, such as by "depriving T.C. of the related services that he needed to benefit from special education, in violation of 20 U.S.C. § 1401(26)(A)" and "failing to consider, in developing T.C.'s IEP, T.C.'s strengths, D.C.'s concerns, the results of [his] evaluations, and [his] academic, developmental and functional needs, in violation of 20 U.S.C. § 1414(d)(3)(A)." (*See* Compl. ¶ 127C–D.)  The relief demanded included reversal of the ALJ and an order placing T.C. "in a therapeutic, out-of-district school that has experience with children with Autism." (Compl. 39–40.)[6]  The Township asserted numerous affirmative defenses in its answer, including failure to exhaust administrative remedies.  (*See* Ans. 13 [D.E. 5].)

---

[6] The Court notes that the complaint invoked Section 504 of the Rehabilitation Act, as well as the IDEA itself.  (*See* Compl. ¶ 1.)  Since then, there has been nothing presented to the Court

Attached to the plaintiffs' summary judgment motion are re-numbered exhibits reflecting some, but not all, of the total administrative record, along with certain exhibits that were not accepted into evidence before the ALJ.  The parties have stipulated that "(1) no further discovery is sought in this matter; (2) the administrative record is sufficient to determine the Motion for Summary Judgment, and that neither party seeks to reopen or expand upon that record; and, (3) no trial is sought in the District Court since the Court is acting as an appellate tribunal in the review of a Final Decision rendered by the New Jersey Office of Administrative Law pursuant to 20 U.S.C. § 1415(i)(2)."  [D.E. 31–32.]

    E) Motion for Preliminary Injunction

In late December 2013, the plaintiffs filed a motion for a preliminary injunction.  [D.E. 34.]  They requested enforcement of the so-called "stay-put" provision of the IDEA, 20 U.S.C. § 1415, demanding that the Township "reverse Plaintiff T.C.'s status from 'graduate' and reinstate Plaintiff T.C. to his prior classification as a student eligible for special education and related services during the pendency of his IDEA proceedings."  (Pls.' Notice of Mot. ¶ 2.)  The plaintiffs argued that, despite T.C.'s "unequivocal" right to his present placement, the Township "ha[d] violated [his] stay-put right and has refused to provide T.C. with any educational or related services since June 2012."  (Pls.' PI Moving Br. 1 [D.E. 35].)  Recounting several demands for education made by the plaintiffs to the Township (not previously disclosed to this Court), the plaintiffs contend that the stay-put provision was automatically triggered at the beginning of this proceeding and has been protecting T.C. ever since.  (*See* Pls.' PI Moving Br. 11.)  In effect, the plaintiffs ask the Court to apply the "automatic" stay-put provision, but

---

regarding claims arising under the Rehabilitation Act, and the Court will assume those claims are abandoned.

request a "traditional" injunction in the alternative.  (*See* Pls.' PI Moving Br. 12 n.4.)

Accompanying the plaintiffs' motion were several exhibits.  [*See generally* D.E. 36 *et seq.*]  The

matter has been fully briefed.  [*See generally* D.E. 37–39.]

### IV. Jurisdiction, Procedure, Evidence, and Standard of Review

The Court has jurisdiction over this matter pursuant to 20 U.S.C. § 1415(i)(2) and 28

U.S.C. § 1331.  *D. K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012).

In their briefs, the plaintiffs discuss the familiar Fed. R. Civ. P. 56 "no genuine dispute as

to any material fact" standard, which in the ordinary course of litigation is the standard by which

summary judgment motions are resolved.  (*See, e.g.*, Pls.' Moving Br. 7 [D.E. 21].)  But as

indicated by the Township, "other Circuits have used summary judgment motions [] to

efficiently review administrative decisions, and have not restricted the focus to discerning

whether disputed issues of fact exist."  (Def.'s Opp'n Br. 7 [D.E. 24] (citing *R.E. v. NYC Dept. of

Educ.*, 694 F.3d 167 (2d Cir. 2012).)  "[T]he term 'summary judgment' in the context of an

IDEA case has a different meaning than it has in a typical Rule 56 motion.  The motions filed by

each party might more accurately have been titled 'motion for judgment under the IDEA.'"  *Alex

R. v. Forrestville Valley Cmty. Unit Sch. Dist. # 221*, 375 F.3d 603, 611 (7th Cir. 2004)

Such an approach is used in this District.  "[W]hen there is no new evidence presented to

the district court, as in this case, the motion for summary judgment is simply the procedural

vehicle for asking the judge to decide the case on the basis of the administrative record."  *M.A. v.

Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (Simandle, J.) (internal

quotation marks & citations omitted), *aff'd*, 65 F. App'x 404 (3d Cir. 2003).  Although the

Township has not separately moved for summary judgment, the Court can, in this appellate role,

grant judgment in favor of the Township *sua sponte* if it is warranted.  *See* Fed. R. Civ. P. 56(f); *Dong*, 197 F.3d at 799; *Rodrigues v. Fort Lee Bd. of Educ.*, No. 2:08-CV-05736, 2011 WL 486151, at *3 (D.N.J. Feb. 7, 2011) (Wigenton, J.), *aff'd per curiam*, 458 F. App'x 124 (3d Cir. 2011); *see also Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) (discussing *sua sponte* summary judgment).

Originally, the plaintiffs submitted evidence for the Court's consideration that extended beyond what was presented below.  In its opposition, the Township pointed out that certain of the plaintiffs' exhibits had not been admitted into evidence by the ALJ.  (*See* Def.'s Opp'n to Pls.' Statement of Material Facts 2 [D.E. 24-1].)  Because the parties have now stipulated that the administrative record should provide the basis for the Court's decision, the Court will confine its review to the record.[7]

In an IDEA case, a district court does not use the "substantial evidence" standard typically employed in the agency-review context.  *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995).  Rather, "[w]hen considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified *de novo*' review."  *D.S.*, 602 F.3d at 564.  "Under this standard, a district court must give 'due weight' and deference to the findings in the administrative proceedings."  *Id.*  "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the

---

[7] The Court notes the Township's objections to the plaintiffs' renumbering of the administrative record.  Throughout, the Township cites to the designations used before the ALJ.  Problematically, a copy of the administrative record was never reproduced and provided to the Court; and since the plaintiffs were in charge of compiling the record on appeal, certain pieces of evidence provided by the Township that *were* furnished to the ALJ, such as T.C.'s interest inventory, were not reproduced in this appeal.  Nevertheless, the Court is satisfied that the record as compiled by the plaintiffs is complete enough, and the exclusions minor enough in scope, to allow for a fair decision on the merits of the case.

reviewing court does not adhere to those findings, it is obliged to explain why." *Id.* (internal quotation marks & citations omitted).  An ALJ's evaluation of a witness's credibility, in the context of live testimony, must be accepted "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion." *Id.* (internal quotation marks & citations omitted). Significantly, "[t]he issue of whether an IEP is appropriate is a question of fact." *S.H.*, 336 F.3d at 271.  "When parents challenge a school's provision of a FAPE to a child, a reviewing court must (1) consider whether the school district complied with IDEA's procedural requirements and (2) determine whether the educational program was reasonably calculated to enable the child to receive educational benefits." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 249 (3d Cir. 2009) (internal quotation marks & citations omitted).

Because the plaintiffs did not prevail below, they "bear[] the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 270.  Factual findings are otherwise based on a preponderance standard. *Id.* at 268; *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

Broadly speaking, a violation of the IDEA can be either substantive or procedural. "Accordingly, the Supreme Court has directed that a school district's liability for violations of the IDEA is a two-fold inquiry: (1) Has the school district complied with the procedures set forth in IDEA?; and (2) Has the school district fulfilled its obligation to provide the student with a FAPE?" *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010) (citing *Rowley*, 458 U.S. at 206–07).  "In some cases, a procedural violation may rise to the level of a denial of a FAPE," but only if "such violation causes substantive harm to the child or his parents." *Id.* (internal quotation marks & citation omitted).  Per the statutory language, substantive harm occurs only if the preponderance of the evidence indicates that:

the procedural inadequacies—

> (I) impeded the child's right to a free appropriate public education;
>
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
>
> (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii); *accord* 34 C.F.R. § 300.513(a)(2); N.J.A.C. § 6A:14-2.7(k); *C.H.*, 606 F.3d at 67.

## V. Discussion

<u>A) The Township's Procedural Defenses</u>

    1) *Unexhausted Claims*

        a) **Claims Identified in the Township's Summary Judgment Brief**

The Township argues that several of the plaintiffs' claims were not raised before the agency.  Hence, the Township contends, they are unexhausted and cannot provide the basis for relief.  Specifically, the Township singles out 1) claims based on T.C.'s evaluation by the Township, corresponding to claim 1 in the plaintiffs' summary judgment brief; and 2) claims based on interference with D.C.'s ability to participate in the decision-making process for his education, corresponding to claim 5 in the plaintiffs' summary judgment brief.  (*See* Def.'s Opp'n Br. 26–28.)

"Before seeking judicial review in the federal courts, persons claiming to be aggrieved by procedural violations of the IDEA must first exhaust their administrative remedies."  *Garro v. State of Conn. Dep't of Educ.*, 23 F.3d 734, 737 (2d Cir. 1994) (per curiam); *see also* 20 U.S.C. § 1415(f), (g), (i)(2), & (l).  "When parents of a disabled child challenge multiple IEPs in court,

they must have exhausted their administrative remedies for *each academic year* in which an IEP

is challenged."  *MM v. Sch. Dist.*, 303 F.3d 523, 536 (4th Cir. 2002); *see also Devine v. Indian

River Cnty. Sch. Bd.*, 249 F.3d 1289, 1292 n.2 (11th Cir. 2001).  This Court recently explained

the purpose behind the IDEA's exhaustion requirement:

> Congress intended that before resorting to federal court, plaintiffs must complete
> the administrative process because allowing a "claim without requiring
> exhaustion . . . would not only 'render superfluous most of the detailed procedural
> protections outlined in the statute, but, more important, it would also run counter
> to Congress' view that the needs of handicapped children are best accommodated
> by having the parents and the local education agency work together to formulate
> an individualized plan for each handicapped child's education.'"  *Komninos* [*v.
> Upper Saddle River Bd. of Educ.*, 13 F.3d 775,] 778 [(3d Cir. 1994)] (quoting
> *Smith v. Robinson*, 468 U.S. 992, 1011–12 (1984)).   In addition, exhaustion
> "allows the education agencies to apply their expertise and correct their own
> mistakes."  *Woodruff v. Hamilton Twp. Pub. Sch.*, 305 F. App'x 833, 837 (3d Cir.
> 2009) (citing *McKart v. United States*, 395 U.S. 185, 194–95 (1969)).

*MG v. Caldwell-West Caldwell Bd. of Educ.*, 804 F. Supp. 2d 305, 313 (D.N.J. 2011) (Hayden,

J.); *see also Leonard v. McKenzie*, 869 F.2d 1558, 1563 (D.C. Cir. 1989) ("Two concerns,

among others, informing the exhaustion doctrine are fairness to the agency and the orderliness of

administrative practice and procedure; it would be both unfair and unwieldy to overturn the

hearing officer's decision on grounds that she had no opportunity to consider or evaluate.").

In response, the plaintiffs contend that both D.C.'s participation in the IEP decision-

making process and the failure to properly evaluate T.C. were raised in the due process petition

and throughout the administrative proceeding.  (*See* Pls.' Reply Br. 3–4, 11 [D.E. 26].)  Thus,

according to the plaintiffs, this Court may review both claims.  With regard to the evaluation

claim, the plaintiffs refer the Court to page 8 of the amended due process petition, where the

plaintiffs demand relief in the form of immediate evaluations under a series of different rubrics.

34

They also refer the Court to scattered pages of the hearing transcript where evaluations are discussed.

But none of these discussions of evaluations resembles the plaintiffs' *present* claim, which is that the Township failed to conduct specific, formal evaluations of T.C. at specific times as contemplated by the statute. For example, the plaintiffs contend that if the Township had "evaluated T.C. as required, it would have determined that he had a substantial sensory-related disorder." (Pls.' Moving Br. 13.) They also argue that the Township failed to abide by the three-year evaluation process contemplated by the statute. (Pls.' Moving Br. 13–14.) These specific procedural failures did not form the basis of either the amended due process petition or the proceedings before the ALJ, except to the extent that the plaintiffs challenged specific shortcomings of the October 2011 IEP. Because they were not presented to the ALJ, they did not inform her decision. The Court concludes that the allegations raised in claim 1 of the plaintiffs' summary judgment brief were not exhausted and therefore cannot form a basis for relief. *See S.C. ex rel. E.T. v. Dep't of Educ., Haw.*, No. 12-00524, 2013 WL 2156475, at *8 (D. Haw. May 16, 2013) ("Plaintiffs may not recast their due process request as one raising the DOE's failure to properly assess S.C.").

With regard to the impediment claim, the plaintiffs again refer the Court to parts of the amended due process petition and scattered portions of the hearing transcripts. The plaintiffs do not explain the relevance of any of these citations; and having investigated each, the Court does not agree that they amount to exhaustion of all of the sub-parts of the impediment claim.

For instance, the plaintiffs now contend that the Township excluded D.C. from the decision-making process when it failed to provide prior written notice, in accordance with 20 U.S.C. § 1415(b)(3), when it removed OT from T.C.'s IEP. The removal of OT was certainly

discussed before the agency, but not generally in the context of a deficit of formal written notice. The ALJ was not alerted to this dimension of the plaintiffs' claim and, thus, did not rule on it.[8]

In sum, and because the plaintiffs do not argue that any exception to exhaustion operates to rescue their nonexhausted claims—*see, e.g.*, *Komninos*, 13 F.3d at 778—the Court finds that the entirety of claim 1 and subclaim "a" of claim 5 were not exhausted before the agency. Hence, the plaintiffs are not entitled to relief on those claims.

However, the plaintiffs also contest D.C.'s noninvolvement in the manifestation determination proceeding and argue that the Township failed to take seriously certain parental requests, such as those pertaining to the relocation of T.C.'s locker. Here, the Court agrees that these were properly raised before the ALJ, and will therefore reach these claims on the merits.

### b) **Additional Unexhausted Claims Not Specifically Identified by the Township as Unexhausted**

The arguments now raised by the plaintiffs often differ markedly from those squarely presented to the administrative agency. Identifying numerous procedural and substantive infirmities in the provision of services to T.C., the plaintiffs weave these new bases for relief in and around the claims raised specifically in their amended due process petition, as well as those

---

[8] In any event, the Court notes that Petersen testified that it was D.C. herself who asked that OT be removed from the IEP. This was also reflected in Petersen's "Occupational Therapy Sensory Status" update, which says that the removal of OT was "formalized" at the May 2011 IEP meeting. (Ex. 46.) Dr. Warburg testified that she heard about the discontinuation of OT from Staszak. When Dr. Warburg asked D.C. if she had requested this, D.C. responded that she "didn't know that she had that kind of power" and that Dr. Warburg "was the first one to tell her that." Dr. Warburg interpreted that this "was the first [D.C.] heard about [her role in the removal of OT]." (6/4 Tr. 55:9–24.) The ALJ did not definitively resolve the tension between these two versions of events, although the Court will note that D.C. did not exactly deny her role in the removal of OT. To the extent that D.C. played some part in the removal of OT, the failure to provide her with notice of a change she requested would not amount to a denial of a FAPE.

discussed in substantial form during the three days of testimony before the ALJ.  These new bases for relief appear to be unexhausted and thus not properly before the Court.

Complicating matters somewhat is the dearth of case law on what, exactly, constitutes "proper" IDEA exhaustion.  As the Ninth Circuit has recognized, exhaustion is not always a "check-the-box kind of exercise."  *Payne ex rel. D.P. v. Peninsula Sch. Dist.*, 653 F.3d 863, 870 (9th Cir. 2011) (en banc); *see also Lin v. Att'y Gen.*, 543 F.3d 114, 120 n.6 (3d Cir. 2008) (discussing complexity of issue exhaustion in the context of immigration proceedings).  Some courts, for example, would follow the Township's suggestion that the scope of this Court's review is limited to matters raised in the actual due process petition, and that "subsequent" constructive exhaustion cannot take place—at least when the ALJ or other hearing officer does not "*sua sponte*" reach a question raised outside of the petition itself.  *See, e.g.*, *James M. v. State of Haw., Dep't of Educ.*, 803 F. Supp. 2d 1150, 1165 (D. Haw. 2011).

The differences between the agency proceedings and what is currently before the Court simplify the matter somewhat.  Under almost any exhaustion rubric—and under the principle that "arguments asserted for the first time on appeal are deemed to be waived," *Tri-M Group, LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011)—several of the plaintiffs' present arguments were not presented to the agency either in form or in spirit, and thus cannot fairly be deemed exhausted under the framework established by Congress.  Accordingly, the Court will identify those claims as unexhausted in the discussion of the merits below, on the basis that the Township raised exhaustion as a blanket affirmative defense in its answer to the complaint, which suffices to

invoke the issue before this Court.  *See United States v. Muhammud*, 701 F.3d 109, 111 (3d Cir.

2012) (collecting cases); *Brown v. City of Syracuse*, 673 F.3d 141, 147 n.2 (2d Cir. 2012).[9]

> 2) *Statute of Limitations*

The Township also characterizes certain claims raised by the plaintiffs as time barred.

The Township specifically identifies as barred 1) the claim about the removal of OT from T.C.'s

sensory diet, 2) claims arising out of older evaluations, and 3) claims arising out of the 2007 IEP

or 2007-era events in general.  (*See* Def.'s Opp'n Br. 20 n.1, 29, 31, 35.)  The plaintiffs do not

meaningfully respond to this limitations defense.  (*See* Pls.' Reply Br. 12.)

Subject to certain exceptions that are not relevant here, "[t]he IDEA statute of limitations

requires a parent to request a due process hearing within two years of 'the date the parent . . .

knew or should have known about the alleged action that forms the basis of the complaint.'"

*D.K.*, 696 F.3d at 244 (quoting 20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.511(e)).[10]  Claims not

---

[9] Were IDEA exhaustion jurisdictional, this Court would be entitled—required, in fact—to raise the matter *sua sponte*.  Although the both the Third Circuit and courts in this District have referred to IDEA exhaustion as "jurisdictional"—*see, e.g.*, *W.B. v. Matula*, 67 F.3d 484, 493 (3d Cir. 1995), *overruled on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 795 (3d Cir. 2007) (en banc); *R.C.S. ex rel. R.S. v. Shrewsbury Borough Sch. Dist. Bd. of Educ.*, No. 12-7769, 2013 WL 4780498, at *2 (D.N.J. Sept. 5, 2013) (Shipp, J.)—other courts have reexamined the question and found to the contrary, in light of the Supreme Court's recent emphasis on careful use of the "jurisdictional" label.  *See Muskrat v. Deer Creek Pub. Sch.*, 715 F.3d 775, 784 (10th Cir. 2013) ("Other circuits have split on whether IDEA exhaustion is jurisdictional.  Most of these decisions appear to be the sort of drive-by rulings that the Supreme Court has cautioned against."); *Payne*, 653 F.3d at 870; *see also Piazza v. Fla. Union Free Sch. Dist.*, 777 F. Supp. 2d 669, 680 n.7 (S.D.N.Y. 2011) (discussing Second Circuit approach).  In any event, the Court concludes it is on firm footing, as discussed above, in reaching exhaustion pursuant to the blanket invocation by the Township in its answer, and in the context of solely those issues that were clearly not raised below.

[10] Although 20 U.S.C. § 1415(f)(3)(C) allows states to establish their own time limits for pursuing a hearing, New Jersey follows the federal timeline.  *See* N.J.A.C. § 6A:14-2.7(a)(1).  The 90-day civil suit limitations period, 20 U.S.C. § 1415(i)(2)(B), is not at issue in this case.

raised within the limitations period will not be considered.  *B.M. ex rel. H.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 447 (D.N.J. 2011) (Hillman, J.).

As discussed above, the first due process petition was filed by the plaintiffs on March 12, 2012.  It was substantially amended one month later.  Assuming for the moment that the March 12 date controls for the purposes of the timeliness calculation, the petition was timely filed for conduct taking place and claims accruing after March 12, 2010.

Several of the plaintiffs' allegations rest, at least in part, on conduct taking place before that date.  For example, as part of claim 2, the plaintiffs challenge the removal of T.C.'s sensory diet from his 2009 IEP.  (*See* Pls.' Moving Br. 19.)  This conduct clearly falls beyond the limitations period.  Further, the plaintiffs appear to claim that his OT regimen was insufficient even before its removal from the IEP in 2011; to the extent that they challenge any of the pre-2010 IEPs, the plaintiffs' claims are time barred, as are injuries that accrued before the limitations cut-off date.  (*See* Pls.' Moving Br. 21.)

Thus, any specific claims arising out of pre-March 2010 events are barred by the IDEA statute of limitations.  *See also D.K.*, 696 F.3d at 248 (observing, inter alia, that the continuing violation doctrine does not apply to IDEA claims).  However, the Court will consider the broader context of T.C.'s time at Mount Olive in evaluating those claims that are not barred.

### B) The Plaintiffs' Claims

#### 1) *Claim 2: Failure to Design and Implement an Appropriate IEP*

In their second claim—which is partially barred, as discussed above—the plaintiffs contend that the Township failed to "design and implement an IEP based on T.C.'s unique needs that was reasonably calculated to enable T.C. to receive meaningful educational benefits."  (Pls.' Moving Br. 15.)  This shortcoming allegedly denied T.C. the FAPE to which he was entitled.

The Third Circuit has held that an IEP "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004) (internal quotation marks & citations omitted). "Under 20 U.S.C. § 1412(5), children must also be educated in the least restrictive environment"—the "mainstreaming" provision mentioned above, which establishes a statutory preference for placement of a child in a regular educational setting when possible. *Id.*

The plaintiffs argue first that Mount Olive failed to provide an educational placement based on T.C.'s "unique needs," asserting that the Township "completely ignored [his] intellectual deficits and needs in designing his educational placements." (Pls.' Moving Br. 15–16.) They point to his alleged regression between 2007 and 2010, his placement into general education classes, and the ESY assignment involving preschool children as proof that the Township "designed and implemented IEPs that were not, and could not have been, reasonably calculated to allow T.C. to received educational benefits, making the IEPs deficient, and depriving T.C. of FAPE." (Pls.' Moving Br. 16–17.)

Having examined the record, the Court concludes that the plaintiffs have not shown by a preponderance that the IEPs were inappropriate. In light of the mainstreaming preferences of the IDEA, placing T.C. into general education classes was to be sought when possible. For example, for the 2009–10 academic year, he was, for a time, placed in mainstreamed classes in geometry, biology lab, Spanish, phys ed, and theatre arts. (*See* Academic Achievement Functional Performance in 2010 IEP.) The record does not suggest that this placement was met with any objection; the plaintiffs did not challenge that IEP at the time, and D.C. was involved in its preparation. Far from "totally ignoring" T.C.'s disabilities, the Township provided a support

40

structure for him with the goal of allowing T.C. to function in general education classes with minimal disruption to both him and the other students.

The plaintiffs' objection to his ESY placement in a preschool environment, meanwhile, ignores the record reports that T.C. did well in a similar Kindergarten ESY placement.  (2010 IEP 16.)  In retrospect, the preschool summer did not work well for him, as the record attests. Critically, however, appropriateness under the IDEA is judged "prospectively so that any lack of progress under a particular IEP, assuming arguendo that there was no progress, does not render that IEP inappropriate."  *Carlisle Area Sch. v. Bess P. ex rel. Scott P.*, 62 F.3d 520, 530 (3d Cir. 1995); *accord Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1058 (9th Cir. 2012) ("We are mindful that we must not critique an IEP with the benefit of hindsight—instead, we evaluate whether the goals and methods were reasonably calculated to ensure that the child would receive educational benefits at the time of implementation.").  The plaintiffs have not supported their claim that the "desensitization" regimen adopted by the Township was prospectively inappropriate under the IDEA, especially in light of the occasional benefits reported in the record, such as in the May 13, 2011 Academic Achievement Functional Performance report.

The plaintiffs also charge the Township with failing to provide the "related services" to T.C. that he needed in order to reap the full benefits from his program of instruction and support. (*See* Pls.' Moving Br. 17–22.)  The plaintiffs identify four specific failings: the Township failed "to provide an appropriate sensory diet," to "provide appropriate social and adaptive skill training," to provide "appropriate" OT services, and to provide "an appropriate individual aide."

An IEP must contain "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child."  20 U.S.C. § 1414(d)(1)(A)(i)(IV).  Related services include OT, speech-

language pathology, and other support services.  *See* 34 C.F.R. § 300.34(a); N.J.A.C. § 6A:14-3.9(a).

The key word in each of these areas is "appropriate."  It is a matter of record (*see, e.g.*, OT Goals and Report Card 2010–2011 in 2010 IEP), as the ALJ found, that T.C. was still engaging in sensory-processing activities as part of his OT regimen after 2009.  (*See* ALJ Op. 15.)  The plaintiffs dispute, in retrospect, whether the full panoply of services provided under the sensory diet regimen was truly appropriate for him.  For example, they rely on Dr. Warburg's testimony and report for the proposition that the Township's sensory diet was not sufficiently "comprehensive."  The ALJ acknowledged Dr. Warburg's testimony, but found the opinions to the contrary to be more convincing.  The plaintiffs have not persuasively shown why the Court should re-weigh this dispute among experts.

The plaintiffs also focus on the placement of the exercise equipment donated to the school by T.C.'s family, contending that its relocation near an area frequented by the student with whom he had difficulties rendered it functionally unreachable and unavailable to him.  They argue that the Township "ignored its own occupational therapist's recommendation, and refused to find an alternative space for the equipment."  (Pls.' Moving Br. 19.)  The record does reflect that Petersen actually recommended relocation of the equipment.  (*See* 5/29 Tr. 229:16–24.)  However, other aspects of T.C.'s sensory diet, such as his ability to walk around at will, were unaffected.  The Court does not find that the "tacit" inaccessibility of the exercise equipment violated the IDEA; the record amply reflects that the alternative benefits provided were substantially more than *de minimis*.  *See Mary T.*, 575 F.3d at 249 (noting that IDEA protections are triggered when an IEP fails to confer more than a *de minimis* benefit).

42

Next, the plaintiffs assert that the Township "failed to provide appropriate social and adaptive skill training." This claim was not pursued in great detail below and is not well developed now; it is therefore difficult to meaningfully evaluate. The ALJ did find that T.C.'s IEPs contained "[Applied Behavioral Analysis] therapy to address socialization with peers, to ask for help or assistance when needed, to be a better listener, and to participate in age-appropriate activities." (ALJ Op. 14.) Subsequent IEPs also included information about activities in which he participated that incorporated immersion in social environments. (ALJ Op. 15–16.) The plaintiffs have not met their burden to demonstrate how this amounted to either a procedural or substantive violation of IDEA. (The Court will analyze the separate, transition-plan-related aspects of this claim further *infra*.)

The plaintiffs also attack, in general, the character of OT services provided to T.C., characterizing the OT regimen as deficient from the beginning—even before its discontinuation. For substantially the same reasons discussed above, the Court concludes that the plaintiffs have not met their burden of showing a significant IDEA violation here. The record is replete with references to the kinds of OT strategies used by the Township, focusing on skills valuable to school and everyday tasks: writing, for example, or a demonstration of "body awareness."

The specific, procedural attack on the OT provided based on alleged failure to update T.C.'s assessment (20 U.S.C. § 1414(d)(l)(A)(i)(II))[11] was presented to the ALJ, but the Court agrees with the plaintiffs that it was not satisfactorily resolved below; accordingly, the Court reviews it *de novo*. Having done so, the Court disagrees that the goals were not "measurable" or "comprehensive." T.C.'s manifestation of high-functioning autism systematically affected his

---

[11] Per the ALJ's opinion, this was raised in the context of applicable New Jersey regulations, such as N.J.A.C. § 6A:14-3.7. (ALJ Op. 18.)

performance in school; goals such as his ability to remain on task or engage in handwriting tasks were both reasonable and measurable.  Nor does repetition of goals compel the conclusion that the goals were not annually reconsidered and evaluated.  With the notable exception of T.C.'s disciplinary troubles, his IEPs do not show any great variations in performance, social adjustment, or skill deficiencies from year to year.  This could reflect steady progress, as the testimony of Iannucci and Staszak supports.

Lastly, the plaintiffs assert that the Township "failed to provide T.C. with an effective aide who could help him access his education."  (Pls.' Moving Br. 21.)  The argument here appears to be twofold: first, his aide was not truly "individual," because he shared the aide with "the particular student with whom he had difficulty"; second, he was provided many different aides, and this discontinuity accrued to his detriment.

With regard to the individual aide issue, the Court notes that the parties have not addressed the salient question of whether a "1:1" (one to one) aide need also be *exclusive* to that student—*i.e.*, not at any time shared with another student.  More to the point, however, the record contains very little about this period of aide-sharing, or about its effects (it is not discussed in the plaintiffs' statement of material facts, for example).  The plaintiffs do not explain how a brief period of aide sharing (which the Township denies took place, *see* Def.'s Opp'n Br. 4) amounted to a denial of a FAPE.[12]

With regard to the issue of qualifications, the record does show that T.C. thrived with the aide he was given in May 2011.  The aide, Inara, improved T.C.'s performance in a short period of time, following a period of apparent flux.  In a July 2011 letter to Staszak, D.C. expressed her frustration that placement with Inara was not guaranteed for 2011–2012, ostensibly due to

---

[12] This is mentioned in D.C.'s July 2011 letter (Ex. 31), discussed further above the margin.

bureaucratic concerns and "union issues."  D.C. worried that placement with another aide might cause regression and further frustration, jeopardizing the strides made under Inara.  Nevertheless, T.C. was given a different aide during the 2011–2012 year; this aide was not a certified teacher. (*See* Pls.' Statement of Material Facts ¶ 46.)

First, the plaintiffs arguably did not exhaust this issue below, as the amended due process petition does not contain a discussion of whether the aide was certified or uncertified—although there was brief testimony about the aide's certification (*see* 5/29 Tr. 129:25–130:3) and the ALJ's discussion does mention (under the "positions of the parties" header) that this final aide was not certified.  (*See* ALJ Op. 19.)  Second, the plaintiffs have not met their burden of showing how the certification of the replacement aide is at all relevant to the provision of a FAPE during the 2011–2012 school year.  The plaintiffs do not explain their reliance on *Valentin ex rel. P.V. v. School District of Philadelphia*, No. 2:11-CV-04027, 2013 WL 618540, at *5–6 (E.D. Pa. Feb. 19, 2013), which discusses the definition of "change in placement,"[13] and they do not explain either that how this shift in services violated IDEA.  What matters is not whether the aide was certified or uncertified, but whether the assistance provided to T.C. met the standards envisioned by his IEPs.  The plaintiffs have not shown the Court that the final aide fell short, even if continuation under Inara was something they preferred.

---

[13] If they are suggesting that the change of aide amounted to a change of placement under the IDEA, triggering formal procedures, the Court cannot agree.  T.C.'s IEPs nowhere stated that a specific aide would be used throughout his time at Mount Olive.  The plaintiffs also characterize the ALJ's findings on parental consent to be "erroneous."  They cite to pages 14–16 of the 2009 IEP, but do not explain the relevance of that span (either the pages actually numbered 14–16, which discuss the provision of various services to T.C., or the pages falling sequentially in that range, which also do not relate to parental consent).

In their last subclaim, the plaintiffs contend that Mount Olive has offered "no relevant evidence" to support the services it offered to T.C.  As a preliminary matter, they are correct that mere parental consent to an IEP means neither that it was appropriate nor that it provided a FAPE.  *See D.F.*, 694 F.3d at 500.  Further, an IDEA violation is not contingent on a school district's bad faith.  *See Ridgewood Bd. of Educ. v. M.E. ex rel. N.E.*, 172 F.3d 238, 249 (3d Cir. 1999) ("We specifically reject[] a bad faith or egregious circumstances standard . . . ."), *superseded by statute on other grounds as stated in P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009).  But this argument is, in its totality, little more than a blanket assertion that none of the services provided by the Township was appropriate pedagogically or scientifically; in fact, it is an argument predicated in part on the success of the plaintiffs' other claims.  And as discussed, the record is replete with internal and external justifications for the programs chosen by the Township and the educational professionals it employs.  The Court thus concludes that the Township's educational program was adequately supported by relevant evidence.

### 2) *Claim 3: Failure to Consider Behavioral Interventions*

First, the plaintiffs contend that the Township failed to respond to D.C.'s January 2011 request for an FBA or otherwise conduct an evaluation.  To the extent that this failure violated N.J.A.C. § 6A:14-2.3(k), as recounted above, copious testimony was offered for the proposition that an FBA was not warranted at the time due to the infrequency of T.C.'s behavioral issues.  Accordingly, the plaintiffs have not met their burden of showing a substantive violation of the IDEA.

Second, the plaintiffs argue that the Township should have conducted an FBA when T.C.'s behavior began to impede his learning and that of others.  However, there is little to no

record support that the "behavior" in question—the few times he left the school premises and his interactions with the fellow student—was sufficiently deleterious to trigger the statutory or regulatory *obligation* to formally reevaluate his behavioral plan.

Third, the plaintiffs point to the fact that an FBA was not performed after his risk assessment was made and T.C. was suspended. Per 20 U.S.C. § 1415(k)(1)(E)–(F), the relevant provisions requiring an FBA take effect only if the suspension was of a certain length and the manifestation determination attributes the suspension-incurring behavior to the student's disability. (By contrast, 20 U.S.C. § 1415(k)(1)(D) imposes a less stringent standard for children removed from their current placement when, for instance, the behavior is not a manifestation of a disability.) Because the above question is inextricably intertwined with the propriety of the manifestation determination itself, it will be discussed *infra*.

3) *Claims 4 and 5: The Manifestation Determination*[14]

The plaintiffs challenge several aspects of the manifestation determination process, which determined that T.C.'s encounter with the other student (which eventually led to his suspension) was not attributable to his disability or otherwise caused by a failure to properly implement the IEP.

In claim 4, they argue that the Township improperly conducted the manifestation determination "without the required participants and relevant student records," resulting in "an erroneous determination that T.C.'s conduct was not a manifestation of his disabilities" and thus a suspension without educational services. (Pls.' Moving Br. 26.) The Township failed to: notify D.C. of the hearing, consider relevant documents and history, reach out to critical

---

[14] In the stipulation that effected T.C.'s March return to school, neither party conceded that its "position [regarding the manifestation determination and T.C.'s suspension] was anything other than valid." (*See* Final Order 3, Ex. 33.)

members of the IEP team, and take into account teacher observations.  (Pls.' Moving Br. 28.)
This incomplete team, with "inadequate evidence," erroneously "determined that T.C.'s behavior
was not related to his disability," thereby "illegal[y]" suspending him in violation of 20 U.S.C.
§ 1415(h)(1)(C) and (G).  (Pls.' Moving Br. 28.)

Also in claim 4, the plaintiffs contend that the Township "violated the IDEA mandate
that a district continue to provide educational services to a child whose change in placement
exceeds ten days."  (Pls.' Moving Br. 27 (citing, inter alia, 34 C.F.R. § 300.530(b)(2), (c), &
(d)).)  The plaintiffs point to a portion of the New Jersey Administrative Code that, they claim,
imposes a separate state *five-day* period under which services must be provided.  (Pls.' Moving
Br. 27 (citing N.J.A.C. § 6A:16-7.2(a)).)  The plaintiffs further deem to the risk assessment to
have been "faulty."  (*See* Pls.' Moving Br. 27.)

In claim 5(b), the plaintiffs renew their challenge to D.C.'s alleged exclusion from the
manifestation determination hearing.  They argue that the parent's presence is required under 20
U.S.C. § 1415(k)(1)(E), and that her exclusion "constitutes a deprivation of FAPE standing on its
own."  (Pls.' Moving Br. 32.)  It is the plaintiffs' position that, despite recognizing that D.C.'s
attendance was mandatory, the Township "moved forward without her after noting that she was
not present."  (Pls.' Moving Br. 32.)  The plaintiffs point out that the ALJ "did not make any
findings about" D.C.'s absence.  (Pls.' Moving Br. 32.)

Under the IDEA, the procedures governing the suspension of disabled students are as
follows:

> In most circumstances, school authorities may suspend the student's placement
> for more than ten school days only if "the behavior that gave rise to the violation
> of the school code is determined not to be a manifestation of the child's
> disability."  §  1415(k)(1)(C).  To ascertain whether the behavior was a
> manifestation of the disability, the statute mandates a manifestation conference

"within 10 school days of any decision to change the placement."
§ 1415(k)(1)(E).  At this meeting, "the local educational agency, the parent, and
relevant members of the IEP Team" are instructed to "review all relevant
information in the student's file, including the child's IEP, any teacher
observations, and any relevant information provided by the parents to determine"
whether the improper conduct was caused by the student's disability or the
district's failure to properly implement the child's IEP.  *Id.*  If the hearing
concludes that the behavior constituted a manifestation of the disability, the IEP
Team must conduct a functional behavioral assessment, implement or review the
behavioral intervention plan, and immediately return the student to her previous
placement.  § 1415(k)(1)(F).

*A.P. ex rel. A.P. v. Pemberton Twp. Bd. of Educ.*, No. 05-3780, 2006 WL 1344788, at *3 (D.N.J.

May 15, 2006) (Kugler, J.).

Turning first to the attacks on the sufficiency of the evidence considered at the

manifestation determination hearing: the claim that the hearing suffered from faults based on the

universe of evidence considered is arguably unexhausted.  The amended due process petition

challenged the "who," not the "what," of the hearing's composition.  The plaintiffs cross

examined Township witness Staszak about D.C.'s awareness of the hearing, but not the

documents considered at the hearing.  (*See* 5/29 Tr. 118:11–123:18.)  Similarly, Dr. Herrero-

Taylor questioned the results obtained from the hearing and D.C.'s absence from it, but she did

not discuss the breadth of documents considered in coming to the conclusion that T.C.'s behavior

was not a manifestation of his disability.  (*See* 6/11 Tr. 88:3–92:10.)

Even if the issue were exhausted, the plaintiffs have not identified a violation sufficient to

warrant relief.  They are correct in observing that the manifestation determination report that was

issued, and that is included in the record, is a terse document that fails to list the

assessments/evaluations considered (contrary to the form's instructions) and contains empty

checkboxes next to "teacher observations" and "information provided by the parent" under the

49

category of information considered by those assembled. (*See* Ex. 21.)[15]  It contains no comments or exposition about the rationale behind the ultimate decision that T.C.'s behavior was not a manifestation of his disabilities.  But the burden is on the plaintiffs and they have not affirmatively shown that the document, as presented, reflects a proceeding that actually fell short of the standards contemplated by IDEA; they do not point to any cases holding that failing to consider one of the categories of information "included" in the IDEA's requirements equates to a procedural violation of the statute, and even if it were, they do not explain how the inclusion of "teacher observations" would have changed the outcome of the proceeding. *Cf. Fitzgerald v. Fairfax Cnty. Sch. Bd.*, 556 F. Supp. 2d 543, 559 (E.D. Va. 2008) ("[P]laintiffs have set forth no reason why they believe the outcome of Kevin's MDR may have been different if the 2005 IEP had also been reviewed.").

The plaintiffs correctly note that the manifestation hearing was held without the presence of T.C.'s behaviorist. (*See, e.g.*, 5/29 Tr. 118:19–21.)  Although the statute requires "relevant members of the IEP Team" to be present at the meeting, 20 U.S.C. § 1415(k)(1)(E)(i), it gives "the parent and the local educational agency" broad discretion to determine relevancy.  The definition of "IEP Team" in N.J.A.C. § 6A:14-2.3(k)(2) does not mandate the presence of a behaviorist.  The Court observes that T.C.'s behaviorist was not present at either the 2010 or October 2011 IEP meetings.  Nor is there any evidence in the record that the IEP team did not "reach out" to various other members of the IEP or persons who could have provided additional insight into the manifestation determination.  Because the burden is on the plaintiffs, the Court

---

[15] Nevertheless, the Court observes that both teacher observations and contemporaneous evaluations were included in the most-recent IEP, which the assembled committee *did* review.

cannot find that the Township failed to conduct this outreach, assuming *arguendo* that failure to do so would violate the IDEA.

With regard to the claimed lack of written notice to D.C. before the hearing, N.J.A.C. § 6A:14-2.3(f) can plausibly be read to require written notice in advance of a proceeding that could result in the changing of a student's placement.  *See J.S. v. Pemberton Twp. Bd. of Educ.*, No. EDS 10439-00, 2001 WL 36221932, at *4 (N.J. Office of Admin. Law Jan. 4, 2001) (emphasizing importance of parents' involvement with manifestation determination process). *But see R.D. v. Sterling High Sch. Dist. Bd. of Educ.*, No. 4999-00, 2000 WL 1459571, at *4 (N.J. Office of Admin. Law Sept. 1, 2000) (granting limited remedy for violation of parental notice and involvement).  However, Staszak clarified that while *written* notice may have been lacking, both she and the school's secretary called D.C. to tell her about the hearing; Staszak was unsuccessful, while the secretary reached D.C.  According to Staszak, D.C. was aware of the meeting, which was specifically set up to be convenient for her to attend.  (*See* 5/29 Tr. 175:2–21.)  Counsel for the plaintiffs objected to this testimony on the grounds of hearsay, and the ALJ explained that while hearsay was "permitted" in administrative hearings, she would "give it [appropriate] weight . . . according to the residuum rule."  (5/29 Tr. 175:17–21.)  The ALJ ultimately did not make factual findings on this issue.

Under the New Jersey Rules of Evidence, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  N.J. R. Evid. 801(c).  And under the New Jersey residuum rule, hearsay is admissible in administrative proceedings, but factual findings cannot be based on hearsay alone. *See* N.J.A.C. § 1:1-15.5.  "The residuum rule does not require that each fact be based on a

residuum of legally competent evidence but rather focuses on the ultimate finding or findings of material fact." *Ruroede v. Borough of Hasbrouck Heights*, 214 N.J. 338, 359 (2013).

To the extent that the ALJ did not rule on the issue of notice, the Court reviews the matter *de novo*. An argument can be made that the hearsay rule does not apply to this situation at all, but the larger issue is whether the record offers reliable testimony that D.C. received verbal notice, and the Court finds that she did from Staszak's testimony that the time and day of the meeting were chosen to comport with D.C.'s schedule.

The record properly reflects, then, that D.C. received notice in advance of the meeting. The plaintiffs offered nothing below to rebut this, focusing on the lack of proper written notice. The plaintiffs do not argue, for example, that they requested a rescheduled or supplemental meeting but were denied that courtesy. *Cf. Michael J. ex rel. Patrick J. v. Derry Twp. Sch. Dist.*, No. 103CV1104, 2006 WL 148882, at *17 (M.D. Pa. Jan. 19, 2006) ("On these facts, the Court cannot find that the District violated the IDEA or the regulations applicable thereto by going forward with a meeting that the parents had agreed to nearly one month in advance, and in which they declined to participate in because their counsel was unavailable . . . ."). Accordingly, the Court concludes that the possible departure from the prescribed notice requirements did not amount to a deprivation of a FAPE, and did not serve to "deny" D.C.'s participation in the meeting.[16]

---

[16] The Court does not read the plaintiffs' motion as requesting a wholesale reevaluation of the central question: whether the incident, and the statements T.C. made in its aftermath, was really a reflection of his disability. While copious record evidence supports the existence of T.C.'s sound sensitivity (and the Township's recognition of same), his behavioral response to noxious stimuli was generally observed to be *avoidance*, not aggression. (*See, e.g.*, Occupational Therapy Evaluation 5.) For example, Dr. Warburg discussed how, during his visit to her office, he "exhibited 'distress' from the sounds of small children," and "remov[ed] himself from the environment," which reflected "flight and withdrawal." (ALJ Op. 9.) Despite ample

The ALJ otherwise determined that D.C. "was actively involved in developing his education program, and participated in all IEP and transition planning." (ALJ Op. 27.) To the extent that the plaintiffs claim more broadly that D.C.'s "opportunity to participate in the decisionmaking process" was impeded, 20 U.S.C. § 1415(f)(3)(E)(ii)(II), the ALJ decided to the contrary and the plaintiffs have not shown that her decision was in error.

Finally, with regard to the plaintiffs' argument under 20 U.S.C. § 1415(k)(1)(D)/34 C.F.R. § 300.530(c)–(d)/N.J.A.C. § 6A:14-2.8(e), a child removed from his placement when behavior is not a manifestation of the child's disability is entitled to continue receiving appropriate educational services, so as "to progress toward meeting the goals set out in the child's IEP." *See, e.g.*, *Shelton v. Maya Angelou Pub. Charter Sch.*, 578 F. Supp. 2d 83, 93–94 (D.D.C. 2008). A suspension for longer than ten days triggers these "change of placement" requirements. 34 C.F.R. § 300.536(a)(1); *see Shelton*, 578 F. Supp. 2d at 93–94; *see also Honig v. Doe*, 484 U.S. 305, 325 n.8 (1988) (agreeing that a "suspension in excess of 10 days does constitute a prohibited 'change in placement'"). Pursuant to the relevant regulations, the educational services that must be provided in the interim are defined by 34 C.F.R. § 300.101(a), which simply defines FAPE. *See* 34 C.F.R. § 300.530(d)(1)(i). The IEP team is responsible for "determin[ing] the extent to which services are necessary to enable the student to progress appropriately in the general curriculum and advance appropriately toward achieving the goals set out in the student's IEP" when the removal is based on non-manifestation behavior. N.J.A.C. § 6A:14-2.8(e)(2).

---

documentation of T.C.'s sound sensitivity, the record evidence touching upon his relationship with the problematic other student is undeveloped; the Court knows only that the other student was loud and that he did not like her, with hints of more in the margins and suggestions that this difficulty continued in the wake of his return to school. (*See, e.g.*, 6/4 Tr. 6:18–25.)

The Township presented testimony (through Staszak on direct) that it continued to

provide services to T.C. during the period of his suspension:

Q What efforts were taken to provide T. with services while he was out of school?

A It was our - our typical, after five days out of school, we - we look for home instructors and we - as well as the speech therapist. And [an Applied Behavioral Analysis] therapist.

Q Did you encounter difficulties with delivering those services to T.?

A Yes.

Q What were those difficulties?

A When we didn't receive - we did find a home instructor, there was - there was certain hours that the mother was available to provide an - be available for home instruction.

Q Were these restrictions that you had placed on the home instruction for T.?

A No, the parent placed.

Q And, when the instructor went in, how long did the instructor stay?

A I believe it was between forty-five and fifty minutes each time. Usually it's - depending upon the student's performance, it's usually an hour or two depending upon their ability to work with the home instructor.

Q Why were these sessions shorter?

A I believe they said that the - the - I think - believe it was that the parent requested, the tutor had told us.

Q The parent requested the tutor to leave?

A The parent requested that T. could only handle a certain amount of home instruction at the time.

Q And what has been done since . . . T. has returned to school?  . . .

A The . . . teachers have worked with him diligently. And he has a study hall as well as study skills. They created modifications to the curriculum to catch him up t[o] where he needs to be.

Q And do they report that he has been caught up at this point?

A Yes.

(5/29 Tr. 84:11–86:2.)  The plaintiffs did not object to this testimony.  Now, relying on a home-instruction log (Ex. 24), they maintain that T.C. received only six hours of home instruction while suspended.  (*See, e.g.*, Pls.' Moving Br. 29; Pls.' Statement of Material Facts ¶ 60.)  The ALJ does not appear to have made any explicit findings on this issue.

Once again, the Court faces an undeveloped record connected to an equally undeveloped area of the law, as the appropriateness of suspension services have not been discussed at great length.  In *Shelton*, the court emphasized that the services to be provided are to be decided by the IEP team, which includes the student's parents.  *See Shelton*, 578 F. Supp. 2d at 100 (citing 20 U.S.C. § 1414(d)(1)(C); 34 C.F.R. § 300.530(d)(5)).  In that case, the administrative hearing officer had pointed out that the quality, quantity, and coverage of the tutoring provided was the subject of a "factual dispute"; however, the hearing officer decided the matter on the grounds that "the decision to provide the student tutoring was not a decision made by the student's IEP team" and was thus "not . . . a valid interim alternative educational placement under the IDEA and its implementing regulations."  *Id.* at 101.  Here, the development of the tutoring plan has not been challenged by the plaintiffs.  Rather, the dispute appears to rest solely on the quantity of instruction provided.

The Court must return to the burden of proof, and in so doing, it finds that the plaintiffs have not shown that this quantity—six hours at a minimum over the course of the suspension—was inadequate to provide T.C. with a FAPE, in the form of general-education progress and IEP compliance, during the period of suspension.  The question of his reintegration into the curriculum, and his readiness to graduate, will be discussed further below in connection with the

55

transition plan.  But all the record shows is that instruction was provided.  No testimony was offered on the sufficiency of home instruction, except for the selection above in which the Township placed the blame for these limitations squarely on D.C.  On the present record, the Court concludes that the Township's conduct during the period of suspension did not run afoul of the IDEA.

        4) *Claim 6: Graduation and Transition*

    This claim represents the central issue that was presented in the hearing before the ALJ: was T.C. truly ready for graduation at the end of the 2011–2012 school year?  Under the IDEA, a disabled student is entitled to a free appropriate public education until the student reaches age twenty-one.  *Ferren C.*, 612 F.3d at 717.  The relevant regulations clarify that a state is under no obligation to "make [a] FAPE available" to children with disabilities "who have graduated from high school with a regular high school diploma."  34 C.F.R. § 300.102(a)(3)(i); *accord Moseley ex rel. Moseley v. Bd. of Educ. of Albuquerque Pub. Schs.*, 483 F.3d 689, 692 n.6 (10th Cir. 2007).  Because graduation amounts to an IDEA "change in placement," 34 C.F.R. § 300.102(a)(3)(iii), it triggers the procedural protections of the IDEA, and parents may contest the proposed graduation through the due process hearing.  *Moseley*, 483 F.3d at 692 n.6.

    As the record reflects, D.C. and T.C. received written notice of the impending graduation on March 27, 2012.  (Ex. 26.)  The petition for due process, which was eventually amended, was filed specifically "to challenge T.C.'s scheduled graduation date of June 2012."  (*See* May 9 Let. [D.E. 27-1].)

    In Part B of the final petition, the plaintiffs contended that T.C.'s "transition plan and transition services are wholly inadequate," claiming that the Township "ha[d] not made any attempt to prepare T.C. for post-graduation life, in violation of its requirements under state and

federal law."  It is their position that he was not then "enrolled in any vocational or skills-based classes," and a representative from the Division of Vocational Rehabilitation Services had never been present at any of T.C.'s IEP meetings.  The plaintiffs further alleged that the Township failed to comply with the "Coordinated Activities and Strategies" for transition services included in T.C.'s IEPs, by: failing to obtain information regarding postsecondary education, failing to contact theater unions for training opportunities, failing to visit post-graduation service providers, failing to explore assistive and adaptive technology and help, and failing to provide a career-interest inventory or a functional vocational evaluation.  This was the case despite "numerous requests" made by D.C. for services.  The petition concluded:

> Transition services must be designed to facilitate the student's movement from school to post-school life, and must take into account the student's interests, strengths and preferences.  Such services have not been provided, a program has not been followed, and T.C.'s individual needs and interests have not been considered or even examined.  While the district scheduled T.C.'s graduation date for June 2012, such an action is premature.  T.C's graduation date must be determined based on his individual needs, which have not yet been met.

The ALJ determined that the proposed graduation date was appropriate and the transition plan "properly developed" in accordance with the relevant regulations.  (ALJ Op. 27.)  She specifically found that the 2010 IEP "provide[d] for a continuation of his transition plan," that the May/June 2011 IEP contained a college-focused transition plan, and that D.C. did not want T.C. pulled from academic classes for related services.  (ALJ Op. 15–16.)

The plaintiffs challenge the ALJ's decision on the following four interrelated grounds.

### a) The Township's Alleged Failure to Provide an "Appropriate" Transition Plan

Characterizing the transition plan as "almost non-existent," the plaintiffs accuse the Township of failing to provide "even the minimal, boiler-plate transition services" to ensure T.C.'s readiness for his transition.  (Pls.' Moving Br. 35.)  For example, although the IEP

suggested linkages with various New Jersey agencies, including the Division of Vocational

Rehabilitation Services and the Division of Developmental Disabilities, the Township "never

arranged for T.C. to meet with these agencies."  (Pls.' Moving Br. 35–36.)  The plaintiffs claim

that the ALJ "ignore[d] all evidence to the contrary" in finding that the plan had been updated

annually; the "transition plan in his most recent IEP included information that was four years

outdated, and repeated word-for-word the language from previous year[s'] plans."  (Pls.' Moving

Br. 35.)  The plaintiffs cite *Dracut School Committee v. Bureau of Special Education Appeals of*

*the Massachusetts Department of Elementary & Secondary Education*, 737 F. Supp. 2d 35 (D.

Mass. 2010), in support.

> Under the IDEA, "transition services" are:
>
> a coordinated set of activities for a child with a disability that--
>> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
>>
>> (B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
>>
>> (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(34); *see also* N.J.A.C. § 6A:14-3.7(e)(12)(i) (repeating the federal standard).

In New Jersey, IEPs prepared during and after the school year corresponding to a

student's fourteenth birthday must contain annually updated "course[s] of study and related

strategies and/or activities that . . . [a]re intended to assist the student in developing or attaining

postsecondary goals related to training, education, employment and, if appropriate, independent living." N.J.A.C. § 6A:14-3.7(e)(11)(ii). Those IEPs must also contain, as appropriate, 1) "a description of the need for consultation from other agencies that provide services for individuals with disabilities including, but not limited to, the Division of Vocational Rehabilitation Services in the Department of Labor"; and 2) "a statement of any needed interagency linkages and responsibilities." N.J.A.C. § 6A:14-3.7(e)(11)(iii)–(iv). IEPs prepared during and after the school year corresponding to the student's sixteenth birthday must meet the above requirements *and* contain "appropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training, education, employment and, if appropriate, independent living and the transition services including a course of study needed to assist the child in reaching those goals." N.J.A.C. § 6A:14-3.7(e)(12).

"The Third Circuit has not defined what amount of transition planning is required in an IEP to ensure a FAPE." *Coleman v. Pottstown Sch. Dist.*, No. 10-07421, ___ F. Supp. 2d. ___, 2013 WL 6153244, at *13 (E.D. Pa. Nov. 22, 2013). In a nonprecedential decision, the Circuit has suggested that an inadequate description of transition services would be a procedural IDEA violation, not a substantive one. *See Rodrigues v. Fort Lee Bd. of Educ.*, 458 F. App'x 124, 128 (3d Cir. 2011) (per curiam) (citing *Bd. of Educ. v. Ross*, 486 F.3d 267, 276 (7th Cir. 2007)). "The floor set by the IDEA for adequate transition services appears to be low, focusing on whether opportunities are created for a disabled student to pursue independent living and a career, not just a promise of a particular result." *Coleman*, 2013 WL 6153244, at *13. "[A] School District need not ensure that the student is successful in fulfilling transition goals"; rather, "transition services must provide some, or more than a de minimis, benefit." *Dudley v. Lower*

*Merion Sch. Dist.*, No. 10-2749, 2011 WL 5942120, at *5 (E.D. Pa. Nov. 29, 2011) (citations omitted).

In applying the above requirements, the Court finds that some of the plaintiffs' arguments are simply not supported by the record. For example, the contention that the linkages to the Division of Developmental Disabilities were not properly provided is contradicted by the final IEP itself. (*See* October 2011 IEP 7.) Further, the Township provided evidence that T.C. had been put in contact with the Division of Vocational Rehabilitation Services—and both the final and previous IEPs had stressed that it was the *parent's* responsibility to schedule meetings with vocational authorities and other entities like the Center for Academic Support and Enrichment Horizons. (*See* October 2011 IEP 8; 2010 IEP 7–8.) The plaintiffs allege that the Township "never utilized" the results of the career interest inventory, but the portion of the transcript of Staszak's testimony that they cite (5/29 Tr. 130:4–131:7) does not show that the results were not "utilized." Rather, Staszak testified that the results were placed into the Naviance system which, in turn, could be used to further narrow and develop T.C.'s interests. Meanwhile, page 9 of the final IEP contains a list of transition services, each assigned to a specific person or agency. The Court concludes that the IEP complies with the statutory and regulatory IDEA requirements.

The allegation that the transition plan was not actually updated operates on the assumption that the presence of old information, or the repetition of material from one IEP to the next, demonstrates a *prima facie* violation of IDEA requirements. This is not the case. For one, the junior year and senior year transition sections are *not* identical. (*Compare* May 2011 IEP 6, *with* October 2011 IEP 7.) For another, a student may maintain transition goals and plans from one year to the next.

60

It should be emphasized that demonstrating that the Township actually did fail to regularly reconsider transition plans and requirements would not be beyond the plaintiffs' abilities.  They were both present, after all, at the annual IEP meetings, as were others; D.C. wrote Staszak a letter about "services . . . discussed at the [IEP] meeting."  (Ex. 31.)  They could have supplied the ALJ and this Court with affidavits and testimony regarding the Township's failure to meet its obligations.  They did not do so.  And as a consequence, they have not met their burden of showing a procedural failure under the IDEA.

Moreover, the plaintiffs' reliance on *Dracut* is unavailing.[17]  In that case, the state administrative agency had "issued a decision finding that Dracut [School Committee] had denied C.A. . . . a FAPE by providing inadequate transition services."  *Dracut*, 737 F. Supp. 2d at 48.  Because the school had failed to conduct appropriate transition assessments, it could not "understand the nature and scope of Student's deficits" pertaining to transition, and thus the IEPs "did not include any goals to effectively address Student's vocational needs and independent living skills deficits."  *Id.* at 49 (quoting the agency opinion).  However, the Dracut School Committee had completely failed to conduct assessments prior to certain IEPs falling within the limitations period.  *See id.* at 50.  Further, the court in *Dracut* reviewed the agency's decision in a posture where the student and parents had prevailed below; the outcome of the impartial due process proceeding fell in their favor.  Here, the opposite is true.  Much as the school in *Dracut*

---

[17] The Township urges the Court to discard *Dracut* because "it does not reflect the current status of the law in the Third Circuit" and is older than cases like *Rodrigues v. Fort Lee Board of Education*, No. 2:08-CV-05736, 2011 WL 486151 (D.N.J. Feb. 7, 2011) (Wigenton, J.), *aff'd*, 458 F. App'x 124 (3d Cir. 2011).  (Def.'s Opp'n Br. 17–18.)  Nonprecedential decisions of the Court of Appeals do not set binding precedent for this District.  *See In re Grand Jury Investigation*, 445 F.3d 266, 276 (3d Cir. 2006); *see also Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("[T]here is no such thing as 'the law of the district.'").  Because *Dracut* is otherwise distinguishable, it will be dealt with on the merits.

failed to show by a preponderance evidence sufficient to overturn the agency's decision, so have the plaintiffs here failed to demonstrate via a preponderance the inappropriateness of the similar matters challenged.

### b) T.C.'s Alleged Failure to Meet the Goals of the Transition Plan

The plaintiffs argue that the inadequacy of the Township's transition planning is revealed through T.C.'s failure to actually meet any of his stated goals: to go to college, to work in computer animation, and to live independently. (Pls.' Moving Br. 36.)  However, whether he has actually met the goals laid out for him is not dispositive, especially in light of the requirement that IEPs be judged prospectively and not retrospectively. *See Dudley*, 2011 WL 5942120, at *5. Further, the Court is confined to the record as it existed before the ALJ.  The relevant question is thus not whether T.C. "met" these goals—because going to college, working in computer animation or theater arts, and living independently all reasonably post-date the ALJ's decision— but whether the plaintiffs have shown persuasively that the Township failed to provide the services required under the statute with the aim of meeting these goals.

The plaintiffs refer to certain portions of Staszak's testimony on cross examination regarding transition services.  They argue that Staszak "admitted" that the Township "had not helped T.C. achieve any of" his goals in animation or theater. (Pls.' Moving Br. 36–37.)  The Court does not agree.  Staszak said that nobody helped T.C. obtain college applications, but also said that he did meet with his guidance counselor about college. (5/29 Tr. 128:10–21.)  Staszak also testified that she "discussed" a "college program that included vocational training for the area of . . . sound and lighting, in terms of [T.C.'s] interest in the dramatics," but that she did not believe that he applied to the program. (5/29 Tr. 129:2–10.)

The plaintiffs have not persuasively shown that T.C.'s not having applied to various programs equates to the Township's failure under the IDEA.  The record on his preparation is not particularly well-developed, but the testimony cited above shows that the Township was aware of his goals and conveyed to him relevant information.  The plaintiffs have not shown the Court that more was required under the IDEA.

### c) T.C.'s Graduation

In subclaims c and d, the plaintiffs contend that T.C. was in no way ready to graduate when he did, based on the aforementioned transition failures, his life-skills deficits, and his inability to function independently.  The plaintiffs focus on what they characterize as the ALJ's impermissible reliance on his grades as the sole measure of his readiness to graduate.  (*See* Pls.' Moving Br. 37–39.)

With regard to the plaintiffs' specific objections to the ALJ's factual findings, they argue that the ALJ "erroneously stated that D.C. did not object to T.C.'s graduating."  (Pls.' Moving Br. 38.)  It is unclear whether this actually is a factual finding, as it falls under the section of the opinion summarizing the Township's argument.  (*See* ALJ Op. 22.)  The same applies to the opinion's discussion of D.C.'s "rejection" of life-skills courses, which is in the same section.  In any event, the Court observes that while D.C. expressed transition concerns in the final IEP, the record does not show that she mounted an express objection to his actual graduation date until the present action, especially in light of the proposed graduation dates contained in the IEP.  (*See* ALJ Op. 16–17.)  Otherwise, the ALJ's opinion faithfully tracks Staszak's testimony.

With regard to the ALJ's use of grades, the plaintiffs rely on *R.S. ex rel. E.S. v. Montgomery Township Board of Education*, No. 10-5265, 2012 WL 2119148 (D.N.J. June 11, 2012) (Thompson, J.).  In *R.S.*, the court remanded the matter to the ALJ in part because of an

undue weight given to school district witnesses; as Judge Thompson wrote, "[t]o the extent the ALJ credited the District witnesses because of their involvement in the proposed IEP, the Court notes that if such reasoning was the main basis for according greater weight to the testimony of district personnel, then few students would ever be able to prevail against a school district." *Id.* at *7. Judge Thompson also identified certain findings by the ALJ as being "at odds with" record evidence. *Id.* Here, however, the ALJ articulated specific reasons for finding the Township's witnesses to be more persuasive. (*See, e.g.*, ALJ Op. 26–28.) More to the point, the ALJ specifically found that T.C. "fulfilled the requirements to obtain his high school diploma." (ALJ Op. 27.) That would appear to be the germane substantive issue: whether he had fulfilled the education requirements established in his IEPs, so that he might obtain the "regular high school diploma" contemplated by the relevant regulation.

Under New Jersey law, "[t]he IEP of a student with a disability who enters a high school program shall specifically address the graduation requirements." N.J.A.C. § 6A:14-4.11(a). Specifically, the IEP must show how the student is to meet the high-school graduation requirements of N.J.A.C. § 6A:8-5.1, except as the IEP otherwise provides. *See* N.J.A.C. § 6A:14-4.11(a). The plaintiffs do not contend that the program of study contemplated by the IEPs, which exempted T.C. from one testing requirement, violated this legal framework. Rather, they argue that it was "impossible" that his high grades were warranted, and that the grades flatly contradict the assessments obtained by the plaintiffs' experts, which showed inconsistent progress. (Pls.' Moving Br. 38.) However, the plaintiffs ignore the fact that he had always been graded solely on the work he completed—a framework which the plaintiffs have not shown to be unlawful or even ill-advised. T.C.'s performance in school, where he was graded on the work he completed, logically *would* differ from the results of the battery of tests given by the plaintiffs'

experts to evaluate his level of performance. Elsewhere, the plaintiffs' arguments are dependent on a finding that the transition services were inadequate. But because the Court has already found that the plaintiffs have not met their burden in showing the inadequacy of the transition services, these additional objections to T.C.'s readiness to graduate must fail.

Accordingly, the Court concludes that the ALJ correctly decided that T.C. had attained the requirements necessary for graduation.

## VI. Preliminary Injunction

In December 2013, more than a year after the complaint was first filed, the plaintiffs moved for a "preliminary" injunction, arguing that the Township was violating the "stay put" provisions of the IDEA, 20 U.S.C. § 1415(j). As the Court reads the plaintiffs' memorandum, they appear to contend that, based on the automatic operation of 20 U.S.C. § 1415(j), the Township should have been providing T.C. with educational services during the entirety of the litigation, and the Township should not have graduated T.C. while the litigation was pending.

Under 20 U.S.C. § 1415(j), "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . until all such proceedings have been completed." The plaintiffs are correct that § 1415(j) can amount to an "automatic preliminary injunction," and that they need not satisfy the traditional four-factor test for injunctive relief. *Drinker ex rel. Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 865 (3d Cir. 1996).

However, the Court need not consider the complicated assessment of § 1415(j), including the definitions of both "then-current educational placement" and "pendency"—*see M.R. v. Ridley Sch. Dist.*, No. 12-4137, ___ F.3d ___, 2014 WL 657343, at *3–4 (3d Cir. Feb. 20, 2014)

(discussing placement under the stay-put provision)—because the plaintiffs have plainly failed to take advantage of § 1415(j) through the appropriate and contemplated channels.  As *Drinker* makes clear, while the stay-put provision is indeed "automatic" in a sense, parties are not absolved of their responsibility to affirmatively invoke it.  *See Drinker*, 78 F.3d at 865.  The plaintiffs could, in fact, have come directly to this Court in order to obtain an emergency order maintaining the status quo.  *See, e.g.*, *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199–200 (2d Cir. 2002) (Sotomayor, J.); *R.B. v. Mastery Charter Sch.*, 762 F. Supp. 2d 745, 754–55 (E.D. Pa. 2010), *aff'd*, 532 F. App'x 136 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 1280 (2014).  They did not do so.  In fact, the plaintiffs' first (and, as far as this Court can determine, only) invocation of the stay-put rule before now was in a passing footnote in their moving brief.  (*See* Pls.' Moving Br. 39 n.10.)

By this point, any "emergency" has long passed.  T.C. has graduated; his placement has changed.  Granting the plaintiffs' motion at this late stage would amount to a victory on the merits.  As the Court has determined, to the contrary, that the plaintiffs do not prevail, the motion will be denied.

## VII. Conclusion

This action began when the relationship between D.C./T.C. and the Township frayed to the breaking point during the senior-year suspension.  It was filed, at least initially, to return T.C. to school and to prevent him from graduating.  Since that time, it has substantially evolved into something akin to a referendum on his entire experience in the Township's schools.  The IDEA, though, has a defined, limited retrospective reach, and its exhaustion provisions require this Court to review only those matters that were squarely presented to the state agency.  Having

properly focused its review appropriately, the Court concludes that the actions of the Township were appropriate under the law.  Thus, the Court will deny the plaintiffs' motion for summary judgment and grant judgment in favor of the defendants via an appropriate order.


March 31, 2014                                    /s/ Katharine S. Hayden
                                                 Katharine S. Hayden, U.S.D.J.

67